KEVIN G. CLARKSON
ATTORNEY GENERAL
Cheryl Brooking (AK Bar No. 9211069)
Senior Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: 907-269-5100
Facsimile: 907-276-3697
Email: Cheryl.Brooking@alaska.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF FISH AND GAME, <br><br> Plaintiff, <br><br> v. <br><br> The FEDERAL SUBSISTENCE BOARD, et al. <br><br> Defendants. | CIVIL ACTION NO.: 3:20-cv-00195-HRH <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR TRO AND PRELIMINARY INJUNCTION (GMU 13 CLOSURE)** |

## I. INTRODUCTION

1. Plaintiff, the State of Alaska, Department of Fish and Game ("State"), through the Office of the Attorney General, requests an order prohibiting defendant Federal Subsistence Board and other defendants in their official capacities named above (collectively, "Federal Subsistence Board") from closing moose and caribou hunting in Game Management Units ("GMUs") 13A and 13B to non-federally qualified users[1] until

---

[1] Federally qualified subsistence users are Native and non-Native rural Alaska residents authorized to take fish and wildlife on federal public lands under Federal Subsistence Board regulations adopted under Title VIII of ANILCA. 16 U.S.C. § 1601 *et seq*.

the Court decides the merits of this lawsuit. This order is requested under FRCP 65 for the purpose of preserving access to state-regulated general and subsistence hunting in these GMUs. This order is necessary because the Federal Subsistence Board adopted a proposal to close moose and caribou hunting in GMUs 13A and 13B to non-federally qualified users for two years based on competition between hunters, preventing the State from managing and conserving the wildlife in accordance with federal law, the Alaska Constitution, and Alaska statutes and regulations. This closure prohibits non-federally qualified users from moose and caribou hunting in GMUs 13A and 13B and could deprive Alaskans, including local subsistence-dependent Alaskans, of important food resources. The closure, in popular road-accessible areas, is not necessary and may increase crowding of hunters in other areas. The closure purports to close State lands and waters where the Federal Subsistence Board is not authorized to regulate. A temporary restraining order and preliminary injunction are necessary because State management of hunting is unduly restricted and Alaskans will continue to suffer immediate and irreparable harm until the Federal Subsistence Board reopens GMUs 13A and 13B to moose and caribou hunting to all users. The State season for caribou in Unit 13 will open August 10 and the state season for moose in Unit 13 will open August 20 for Alaska residents, so an immediate injunction is needed

## II. LEGAL STANDARDS

### A. Standard for reviewing a request for injunction

The basic function of a preliminary injunction is to preserve the status quo

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 2 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 2 of 20

pending a determination of the action on the merits.[2] Under the Ninth Circuit standard for reviewing temporary restraining order and preliminary injunction requests, the State must show: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in the State's favor, and (4) an injunction is in the public interest.[3]

Notably, when the government is the opposing party, factors (3) and (4) merge.[4] The Ninth Circuit evaluates these factors on a sliding scale. Plaintiffs only need to demonstrate "serious questions going to the merits" when the balance of hardships "tips sharply toward the plaintiff . . . assuming the other two elements of the *Winter* test are also met."[5]

B. **Applicable provisions of ANILCA**

In the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. No. 96–487 (1980), Congress provided that subsistence uses of fish and wildlife shall be the priority consumptive uses for rural residents only "when it is necessary to restrict taking

---

[2] *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F.2d 701, 704 (9th Cir. 1988.)

[3] *Am. Trucking Assoc., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

[4] *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

[5] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). The Ninth Circuit has consistently recited this standard in recent cases. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019).

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 3 of 20
Case 3:20-cv-00195-TMB Document 3-1 Filed 08/10/20 Page 3 of 20

in order to assure continued viability of a fish or wildlife population or the continuation of subsistence uses of that population for subsistence purposes."[6]

Congress directed that nothing in Title VIII of ANILCA is to be construed as

> authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands…unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 816 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law….[7]

In Section 816 of ANILCA, Congress authorized the Federal Subsistence Board to "designate areas where, and establish periods when" no subsistence taking of fish and wildlife would be authorized "for reasons of public safety, administration, or to assure the continued viability of a particular fish or wildlife population" after consultation with the State.[8] In an emergency, the Federal Subsistence Board may close subsistence harvest in an area or for a period of time without notice, but no emergency closure may exceed 60 days and cannot be extended without notice and comment and a subsequent determination that the closure should be extended.[9]

### III. FACTUAL BACKGROUND

#### A. Alaska's has management authority over its game resources.

Alaska's Constitution protects the sustainable use of natural resources, including wildlife, "for the maximum benefit of its people."[10] It sets the threshold as "a sustained

---

[6] 16 U.S.C. § 3112.
[7] 16 U.S.C. § 3125.
[8] 16 U.S.C. § 3126.
[9] 16 U.S.C. § 3126.
[10] Alaska Const., art. 8, § 2.

*SOA, ADF&G v. Federal Subsistence Board, et al.*            No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.      Page 4 of 20
Case 3:20-cv-00195-TMB    Document 3-1    Filed 08/10/20    Page 4 of 20

yield principle, subject to preferences among beneficial uses."[11] State law defines "sustained yield" as "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis."[12]

Self-management of natural resources, including Alaska's wildlife resources, was a driving force behind Alaska statehood; fish and wildlife are the property of the State held in trust for the benefit of all residents.[13] Ownership of the resources passed to Alaska upon statehood under the Alaska Statehood Act.[14] General management authority over fish and wildlife within Alaska passed from the federal government to Alaska shortly after Alaska's adoption of a comprehensive fish and game code in 1959.[15]

Alaska's Board of Game ("BOG") is the government entity authorized and obligated to "provide for the conservation and development" of Alaska's wildlife resources.[16] The BOG is authorized to regulate "the conservation, development, or utilization of game in a manner that addresses whether, how, when, and where the public asset of game is allocated or appropriated."[17] This includes establishing seasons, means and methods, and bag and harvest limits for hunting; implementing "methods, means, and

---

[11]  *Id.* § 4.
[12]  AS 16.05.255(k)(5).
[13]  *See, e.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 57 n.5 (Alaska 1996); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 47 (1962).
[14]  Pub. L. No. 85-508, 72 Stat. 339 (1958).
[15]  *See* 25 Fed. Reg. 33 (Dec. 29, 1959) (transferring management of fish and wildlife resources to the State); *see also Metlakatla Indian Cmty.*, 369 U.S. at 47 n.2.
[16]  AS 16.05.221(b).
[17]  AS 16.05.255.

*SOA, ADF&G v. Federal Subsistence Board, et al.*     No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.     Page 5 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 5 of 20

harvest levels necessary to control predation and competition among game in the state;" and "regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game."[18]

The Alaska Department of Fish and Game ("ADF&G"), led by its Commissioner, administers regulations adopted by the BOG in accordance with the statutory duty to "promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and trapping in the state."[19] In ANILCA, Congress expressly recognized and maintained the State's management authority except as limited in Title VIII,[20] thus any authority regarding fish and wildlife not specifically granted by Congress in Title VIII remains with the State.

### B. The Federal Subsistence Board improperly closed GMUs 13A and 13B to non-federally qualified hunters.

On July 16, 2020, the Federal Subsistence Board met to address four proposals, including WSA 20-03, a temporary special action request seeking a one-year closure to moose and caribou hunting on federal lands with Unit 13 as an experiment to reduce hunter competition.[21] Immediately prior to the scheduled meeting, the Federal Subsistence Board met in an unannounced executive session, delaying the start of the scheduled meeting.[22] While any discussions and actions during the executive session are

---

[18]  *Id.*
[19]  16.05.050(a)(19).
[20]  16 U.S.C. § 3202.
[21]  Exhibit 1, July 16, 2020 Transcript at 43.
[22]  Exhibit 1, July 16, 2020 Transcript at 2.

*SOA, ADF&G v. Federal Subsistence Board, et al.*                                          No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.                         Page 6 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 6 of 20

unknown, the timing of the unannounced meeting indicates there was a discussion of the actions subsequently taken.[23]

During the July 16 meeting, the Federal Subsistence Board adopted WSA 20-03 with modifications to temporarily close moose and caribou hunting in GMUs 13A and 13B to non-federally qualified users, and to make the closure for two years rather than the requested one year.[24] Although the proposal requested a closure for the regulatory year 2020/2021, and in spite of 50 CFR § 100.19(b)(2) requiring a temporary closure to be for only a minimum period necessary, the Board extended the season to include the full 2020/2022 regulatory cycle "to reduce the administrative burden associated with processing special action requests."[25]

While discussing WSA 20-03, the Board received information on hunter success, but did not discuss or consider hunter efforts leading to a level of success. At least one person testified that he did not hunt in the area because it was crowded.[26]

The Federal Subsistence Board recognized that the number of hunters in the area may not decline as a result of the closure because hunters could access non-federal land by crossing federal lands, but the Board did not discuss the ability of non-federally qualified hunters to participate in state hunts on state lands within federal boundaries.

---

[23] Remedies for violating the federal Open Meetings Act include voiding the action. 5 U.S.C. § 552b.
[24] Exhibit 1, July 16, 2020 Transcript at 48.
[25] Exhibit 1, July 16, 2020 Transcript at 48.
[26] Exhibit 1, July 16, 2020 Transcript at 45.

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 7 of 20
Case 3:20-cv-00195-TMB Document 3-1 Filed 08/10/20 Page 7 of 20

The Federal Subsistence Board issued a News Release on July 31, 2020 addressing potential questions related to the closure.[27] In paragraph 5, the News Release incorrectly advises hunters that hunting under State regulations is allowed only in a narrow strip of dry land between mean high water and the waterline.[28] In an email exchange on July 31, 2020, Lisa Maas at the Office of Subsistence Management ("OSM") explained that the Federal Subsistence Board feels it has reserved water rights in State waters thereby granting federal jurisdiction over State submerged lands within Bureau of Land Management boundaries.[29]

In March 2019, the U.S. Supreme Court unanimously held that submerged lands and waters transferred to the State of Alaska at statehood are not subject to regulation as part of a federal unit even when inside the federal unit boundaries.[30] All submerged lands and waters owned by the State within the federal boundaries of GMUs 13A and 13B are subject to Department management and open to non-federally qualified hunters acting under state hunting regulations. These waters are state lands, thus not subject to federal regulations.[31] To the extent the Federal Subsistence Board is authorized to regulate ANILCA Title VIII subsistence on State submerged lands under the reserved water rights doctrine, such authority could only be within federal lands withdrawn from the public

---

[27] Exhibit 2, July 31 News Release, Changes in Federal Moose and Caribou Hunting Regulations in Unit 13.

[28] *Id.*

[29] Exhibit 3, July 31 email from Lisa Maas.

[30] *Sturgeon v. Frost*, 139 S.Ct. 1066 (2019).

[31] *Sturgeon,* 139 S. Ct at 1081-1082 (holding that non-federally owned lands and waters are outside of federal authority to regulate).

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 8 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 8 of 20

domain for a purpose stated by Congress.[32] Lands managed by the BLM are unreserved public lands, not subject to reserved water rights.[33] The Federal Subsistence Board cannot rely on reserved water rights as authority to regulate state lands and waters within BLM boundaries.

The mix of state and federal ownership in Unit 13, as well as the lack of identifiable landscape markers to identify federal boundaries[34] is expected to make enforcement of the closure extremely difficult.

### C. The closure adversely impacts the State's ability to manage its wildlife resources.

As discussed above, the closure prohibits all non-federally qualified hunters from hunting moose and caribou in GMUs 13A and 13B.[35] This prevents the Department from managing the moose and caribou populations throughout their range.[36] Specifically, the closure will prohibit the Department from managing moose and caribou hunts in a manner that attempts to spread hunters throughout Unit 13, and will likely create overcrowding in other areas.[37] This will consequently reduce the State's effectiveness in managing these herds.

---

[32]    *Cappaert v. United States*, 426 U.S. 128 (1976).

[33]    43 U.S.C. § 1701 *et seq.*

[34]    Declaration of Gino Del Frate at ¶ 8.

[35]    Declaration of Gino Del Frate, generally.

[36]    *Id.*

[37]    *Id.*

*SOA, ADF&G v. Federal Subsistence Board, et al.*                                                          No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.                              Page 9 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 9 of 20

## IV. ARGUMENT

### A. Alaska is likely to prevail on the merits.

#### 1. The Federal Subsistence Board failed to comply with Title VIII of ANILCA and its implementing regulations.

In closing federal lands to the harvest of moose and caribou for two years in GMUs 13A and 13B to non-federally qualified users based on competition between hunters as an experiment, the Federal Subsistence board violated Title VIII of ANILCA, "Subsistence Management and Use." ANILCA authorizes the Federal Subsistence Board to close or restrict hunting opportunities on federal public lands for stated purposes and considering specific information.[38] However, Congress did not authorize restrictions on hunting based on competition or number of hunters in an area. Nor does ANILCA authorize experiments.

In Section 802 of ANILCA, Congress provided that subsistence uses of fish and wildlife shall be the priority consumptive uses for rural residents only when it is necessary to restrict taking in order to assure continued viability of a fish or wildlife population or the continuation of subsistence uses of that population for subsistence purposes.[39]

In Section 815, Congress directed that nothing in Title VIII of ANILCA is to be construed as

> authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands…unless necessary for the conservation of healthy populations of fish and wildlife, for the

---

[38] 16 U.S.C. §§ 3112, 3114, 3125, 3126, 3202.
[39] 16 U.S.C. § 3112.

*SOA, ADF&G v. Federal Subsistence Board, et al.*                   No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.      Page 10 of 20
Case 3:20-cv-00195-TMB    Document 3-1    Filed 08/10/20    Page 10 of 20

reasons set forth in section 816 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law….[40]

In Section 816 of ANILCA, Congress authorized the Federal Subsistence Board to "designate areas where, and establish periods when" no subsistence taking of fish and wildlife would be authorized "for reasons of public safety, administration, or to assure the continued viability of a particular fish or wildlife population" after consultation with the Department. In an emergency, the Federal Subsistence Board may close subsistence harvest in an area or for a period of time without notice, but an emergency closure may not exceed 60 days and cannot be extended without notice and comment and a subsequent determination that the closure should be extended.[41] It appears the Federal Subsistence Board relied upon the "public safety" wording in Section 816 to enact a closure under Section 815.

In Section 804, Congress did not include public safety as a reason for restricting use but directed that:

> Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:
> (1) customary and direct dependence upon the populations as the mainstay of livelihood;
> (2) local residency; and
> (3) the availability of alternative resources.[42]

---

[40] 16 U.S.C. § 3125.
[41] 16 U.S.C. § 3126.
[42] 16 U.S.C. § 3114.

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 11 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 11 of 20

Even if the temporary closure had been justified, by modifying the request in WSA 20-03 to double the closure period for the purpose of avoiding the need to address potential future special action requests, the Federal Subsistence Board violated its own regulation, 50 CFR § 100.19(b), that confines a temporary closure to the minimum period necessary.

### 2. The Federal Subsistence Board acted arbitrarily and capriciously.

Defendants' decision to close moose and caribou hunting to non-federally qualified users on federal public lands in GMUs 13A and 13B for two years violates the Administrative Procedure Act ("APA") because the decision is arbitrary, capricious, and not in accordance with law.[43] The facts and testimony presented to the Federal Subsistence Board simply did not justify closure for safety reasons, conservation, or continuation of subsistence uses as required by ANILCA.[44]

Even if the Federal Subsistence Board was justified in adopting a closure, which it was not, the decision to close nonfederally qualified hunting on state lands[45] is arbitrary and capricious and contrary to ANILCA. The Federal Subsistence Board may only implement a federal subsistence priority on public lands, which are those lands where title is held by the United States.[46]

---

[43]   5 U.S.C. § 706(2).

[44]   See relevant ANILCA provisions above, 16 U.S.C. §§ 3112, 3114, 3125, 3126, 3202.

[45]   Exhibit 2.

[46]   ANILCA §102; *Sturgeon,* 139 S. Ct at 1081-1082.

*SOA, ADF&G v. Federal Subsistence Board, et al.*                               No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.            Page 12 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 12 of 20

The Federal Subsistence Board stated that the closure was necessary to address competition between hunters in the area, suggesting that this is a public safety concern. The record shows that public safety concerns may result from traffic jams on the Richardson Highway when caribou migrate across the highway in the fall.[47]

However, in 2019, the Federal Subsistence Board determined there were other alternatives preferable to a closure in these GMUs, including "limiting permit numbers, restricting shooting within a quarter mile of the road, increased law enforcement and public education."[48] And at the July 16, 2020 meeting, OSM advised that alleged public safety concerns in that area "may be better addressed through increased law enforcement or restrictions along roadsides."[49] Importantly, ANILCA does not guarantee hunters a lack of competition.

Similarly, the closure is not necessary for the conservation of healthy populations of moose and caribou.[50] In fact, the moose and caribou in Unit 13A are above population objectives established by the Alaska Board of Game.[51] The Nelchina caribou in Unit 13B are above population objectives established by the Board of Game, but the moose are below population objectives in Unit 13B.[52] Moose and caribou remain available for

---

[47] Exhibit 4, May 20, 2020 Memorandum at 5.
[48] Exhibit 1, July 16, 2020 Transcript at 46.

[50] 16 U.S.C. §§ 3125(3).
[51] Declaration of Gino Del Frate, ¶ 6.
[52] Declaration of Gino Del Frate, ¶ 6.

*SOA, ADF&G v. Federal Subsistence Board, et al.*     No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.     Page 13 of 20
Case 3:20-cv-00195-TMB    Document 3-1    Filed 08/10/20    Page 13 of 20

harvest. As acknowledged by OSM in its presentation to the Federal Subsistence Board, "Closures for conservation is not warranted."[53]

Ben Mulligan, Deputy Commissioner of the ADF&G, provided the Department's comments to the Federal Subsistence Board in response to WSA 20-03.[54] He provided details for recent state and federal moose and caribou hunts in Unit 13, including many periods when state hunts were closed and only federal hunts remained open.[55] The data does not support a conclusion that reducing the number of non-federal hunters will increase the success of federal hunters. In fact, the data shows that the success of federal hunters increases when the number of non-federal hunters increase, and the success of federal hunters decreases when the number of non-federal hunters decrease.[56] Additionally, Federal subsistence hunters enjoy longer seasons for moose and caribou, and can hunt both federal and state seasons.[57] For all these reasons, a closure is not necessary to continue subsistence uses of the populations of moose and caribou.

Notably, just last year, the Board rejected Temporary Wildlife Special Action WSA19-03, which requested closure of Federal public lands in Unit 13 to caribou and moose hunting by non-federally qualified users for the 2019/20 season. WSA 19-03 was essentially the same proposal as WSA 20-03, and no new material facts were presented in 2020 to justify the Board's change in position. The Federal Subsistence Board's change

---

[53] Exhibit 1, July 16, 2020 Transcript at 47.
[54] Exhibit 4, Memorandum to Federal Subsistence Board, May 20, 2020.
[55] *Id.* at 2-3. *See also*, Exhibit 5, Memorandum to Federal Subsistence Board, May 31, 2019.
[56] *Id.* at 4.
[57] *Id.*

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 14 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 14 of 20

of position is arbitrary and capricious because the Board did not provide a reasoned explanation for its change in policy based on changed facts.[58] The proper remedy for such serious violations is to vacate the action taken.[59]

The Office of Subsistence Management summarized the Board's 2019 action in its presentation for the 2020 meeting:

> The Board determined the requested closure was not warranted for conservation, continuation of subsistence uses, or safety reasons. The Board concluded that the closure was not necessary for the conservation of healthy caribou or moose populations in Unit 13, as these populations are routinely monitored and annual biological data is used to inform management plans and to establish sustainable harvest guidelines. The closure was also not shown to be necessary to continue subsistence uses of those populations. Federally qualified subsistence users annual harvest rates have remained fairly consistent in comparison to the annual harvest rates by non-Federally qualified users. Nevertheless, local harvesters do experience an influx of non-local hunters and many feel displaced by this activity and alter their subsistence activities as a result. In addition, the closure would not alleviate public safety concerns as non-Federally qualified users would still be able to cross Federal public lands to access State and private lands.[60]

The State agrees with the factual summary provided by Board Member Chad Padgett regarding WSA 20-03:

> The proponent's primary rationale for submitting this request was for experimental reasons to evaluate if harvest success rates of Federally-qualified subsistence users would improve, which is outside of the scope of this Board's regulatory authority. The closure was not shown to be necessary for the continuation of subsistence

---

[58]  *See Organized Village of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015), citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 538 (2009).

[59]  *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F.Supp.3d 1127, 1143 (D. Alaska 2019).

[60]  Exhibit 1, July 16, 2020 Transcript at 44.

*SOA, ADF&G v. Federal Subsistence Board, et al.*  No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.  Page 15 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 15 of 20

uses of moose and caribou populations. Annual harvest rates of Federally-qualified subsistence users have remained fairly consistent and the low Federal harvest in 2019 was more a function of lack of availability of caribou during the harvest period, rather than the interference from non-Federally-qualified users, however, many Federally-qualified subsistence users do feel displaced by the influx of non-local hunters into the area.

The closure is also not necessary for reasons of public safety. Such a closure would only serve to shift where non-local hunters would go to harvest animals. The OSM analysis indicates that such a shift may, in fact, serve to further disrupt hunting by Federally-qualified subsistence users and such a closure would not prevent non-Federally-qualified users from accessing BLM lands in order to travel from the road to State-managed lands. It could also concentrate non-local hunters along road accessible, State-managed lands, which may increase safety concerns in those areas. This, coupled with the complex and ill-defined boundaries between State and Federal lands in Unit 13 make navigating such a closure difficult at best.

Additionally, issues related to unsafe shooting practices and other user conflicts are best addressed by law enforcement.

As indicated in the OSM analysis, this closure is also not necessary for the conservation of healthy populations of moose or caribou in Unit 13 as population estimates for both species meet State management objectives. While bull, cow and calf/cow ratios for caribou have fluctuated over time, long-term averages for both indicate that the Nelchina Caribou Herd is healthy and can sustain the current level of harvest. In addition, both caribou and moose populations are routinely monitored and the data gathered is used to inform management plans and establish sustainable harvest guidelines.

Last year this Board opposed a similar special action request, no new data have been brought forth in the OSM analysis to indicate that anything has changed since that time.[61]

These compelling facts and comments illustrate how this "experiment" to address

hunter competition is not necessary, warranted, or authorized under Section 815 of

---

[61] Exhibit 1, July 16, 2020 Transcript at 62.

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 16 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 16 of 20

ANILCA. In the absence of data supporting concerns over public safety, conservation, or continuation of subsistence uses, the closure of GMUs 13A and 13B to non-federally qualified moose and caribou hunters was destined to be an ineffective solution. Unsupported actions such as this are arbitrary and capricious.

Further, Defendants' decision to modify a request for a temporary closure, even if such closure had been authorized under ANILCA, by expanding the requested closure of moose and caribou hunting from one year to two years is likewise arbitrary, capricious, and not in accordance with law. Congress did not authorize a closure to avoid the administrative burden of processing potential future special action requests, and the two-year closure violates Federal Subsistence Board regulations that restrain closures to the minimum period necessary.[62]

### B. Alaska is likely to suffer irreparable harm in the absence of preliminary relief.

This closure impairs the State's ability to manage its fish and wildlife, including the State's ability to manage hunting, throughout Unit 13. As discussed above, the State will be unable to adequately spread hunters out in Unit 13 by setting harvest quotas within subunits that take into consideration the popularity of areas that are more easily accessible. Moreover, it is expected that this closure directly impacts hunters who have traditionally hunted in the area and will be forced to make new arrangements in the very short period of time between the Federal Subsistence Board's closure and the start of hunting season.

---

[62] 50 CFR §100.19(b). (Corresponding regulations for the Department of Agriculture are found at 36 CFR Part 100.)

*SOA, ADF&G v. Federal Subsistence Board, et al.*     No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.     Page 17 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 17 of 20

The State of Alaska is constitutionally obligated to manage its wildlife according to the sustained yield principle, subject to preferences among beneficial uses, and to provide for the maximum use and benefit of its natural resources for the Alaskan people.[63] Congress has recognized the State's interest in managing its wildlife, including resident wildlife on federal lands.[64] By closing GMUs 13A and 13B to non-federally qualified moose and caribou hunters until July 2022, including on state lands, the Federal Subsistence Board has severely impaired and reduced the Department's effectiveness in managing these resources, including the Department's obligation to administer hunts under AS 16.05 and fulfilling its constitutionally mandated duties.

The harm Alaska is likely to incur is irreparable. There is no way to compensate the Department or the residents of Alaska for the harm that will occur if the Court denies injunctive relief. Hunting opportunities and the State's ability to effectively manage hunting of the populations across their range will be lost.

## C. The balance of equities tips in Alaska's favor.

Setting aside the Federal Subsistence Board's July 16, 2020 action will not cause any harm. Both federally qualified and non-federally qualified hunters will be able to hunt moose and caribou on federal lands in all of Unit 13. Federally qualified hunters can

---

[63] Constitution of Alaska, Art. VIII, Secs. 1, 2, and 4.
[64] 16 U.S.C. § 3202(a); *see also* 43 CFR 24.3(b), "Congress has, in fact, affirmed the basic responsibility and authority of the States to manage fish and resident wildlife on Federal lands."

*SOA, ADF&G v. Federal Subsistence Board, et al.* No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I. Page 18 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 18 of 20

continue to hunt under both state and federal regulations.[65]

In comparison, the State and many of its residents will suffer immediate, irreparable harm if the closure is allowed to continue. The closure is estimated to impact thousands of hunters (the estimated number of displaced caribou hunters alone is approximately 5,500),[66] and news of the closure was sprung on them just a few weeks before their planned hunt is scheduled to begin. The disruption caused by this closure to access important natural wild food for Alaska residents will result in untold related losses in the coming months if allowed to continue.

Moreover, any public safety concerns resulting from traffic on the Richardson Highway will be unaffected because use of the highway, and access across federal land, remains unchanged.[67]

As discussed above, the State will be unable to effectively manage hunting to spread harvest over the range of the moose and caribou populations. Overall, considering the facts and circumstances, the balance of harms tips sharply in the State's favor.

**D.  The proposed injunction is in the public interest.**

When Congress passed ANILCA to expand federal lands and create new federal lands in Alaska, it provided for subsistence uses to continue on federal public lands.[68] Likewise, Congress mandated that the State of Alaska have continued responsibility and

---

[65]  Exhibit 4, May 20, 2020 Memorandum at 5; Exhibit 5, May 31, 2019 Memorandum at 3.
[66]  Exhibit 1, July 16, 2020 Transcript at 50.
[67]  Exhibit 4, May 20, 2020 Memorandum at 5.
[68]  16 U.S.C. § 3112.

*SOA, ADF&G v. Federal Subsistence Board, et al.*  No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.  Page 19 of 20
Case 3:20-cv-00195-TMB   Document 3-1   Filed 08/10/20   Page 19 of 20

authority for management of fish and wildlife.[69] These purposes will be served by enjoining the closure of GMUs 13A and 13B to non-federally qualified moose and caribou hunters.

## V. CONCLUSION

The State has met its burden of showing "serious questions going to the merits"[70] and is entitled to a temporary restraining order and preliminary injunction prohibiting the closure in GMUs 13A and 13B. For all the above reasons, the State of Alaska's motion for a temporary restraining order and preliminary injunction should be granted.

DATED: August 10, 2020.

                          KEVIN G. CLARKSON
                          ATTORNEY GENERAL

                          By: /s/ Cheryl R. Brooking
                              Cheryl R. Brooking
                              Senior Assistant Attorney General
                              Alaska Bar No. 9201169
                              Department of Law
                              1031 W. 4th Avenue, Suite 200
                              Anchorage, AK 99501
                              Telephone: 907-269-5100
                              Facsimile: 907-279-3697
                              Email: Cheryl.Brooking@alaska.gov

---

[69] 16 U.S.C § 1314(a).

[70] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020); *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019).

*SOA, ADF&G v. Federal Subsistence Board, et al.*                                   No. 3:20-cv-00195-HRH
MEMORANDUM IN SUPPORT OF MOTION FOR T.R.O. AND P.I.        Page 20 of 20
Case 3:20-cv-00195-TMB    Document 3-1    Filed 08/10/20    Page 20 of 20