CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL

Cheryl R. Brooking (Alaska Bar No. 9211069)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: cheryl.brooking@alaska.gov

Attorney for State of Alaska

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br>Department of Fish and Game,<br><br>Plaintiff(s),<br><br>v.<br><br>The FEDERAL SUBSISTENCE BOARD;<br>et al.<br><br>Defendant(s). | Case No.: 3:20-cv-00195-SLG<br><br>**STATE'S REPLY TO FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (UNIT 13)** |

The State of Alaska, Department of Fish and Game ("State") hereby replies to Federal Defendants' ("FSB") Opposition to Plaintiff's Motion for Preliminary Injunction (Unit 13). ECF No. 18. The State's memorandum in support of its motion explains the need for an immediate injunction to reopen moose and caribou hunting on federal public lands in Game Subunits 13A and 13B. ECF No. 3-1.[1] Hunting season is open now.

---

[1] At ECF No. 18 at 7, n.1, the FSB correctly notes that the State's Exhibit 2, ECF No. 3-3, was incorrect and FSB's Exhibit B, ECF No. 18-2, was intended.

The State and the FSB appear to agree that the individual who submitted the proposal to close Unit 13 to non-federally qualified hunters as an experiment for one year, WSA 20-03, did not like to compete with other hunters and wanted the area restricted to make hunting easier for him. ECF No. 18 at 8. Nothing in ANILCA allows a closure to hunting opportunities to reduce competition between hunters. Competition, or road traffic, do not necessarily equate to a public safety concern. It is reasonable to expect an influx of hunters where a herd of caribou are more accessible to a road. More caribou equates to more hunters which equates to more hunter success. The closure to non-federally qualified hunters violates ANILCA, the federal Open Meetings Act, FSB's regulations, and the standards of the APA.[2]

**The State Opposed WSA 20-03**

The FSB alleges the State's opposition to WSA 20-03 was minimal and that only oral testimony was considered; written comments were ignored. ECF No. 18 at 11, 18. If so, FSB violated the rulemaking requirements of the APA, 5 U.S.C. § 553, because the State's written detailed comments were timely submitted prior to the meeting and were included in materials provided to FSB board members. *See*, Declaration of Ben Mulligan; ECF No. 3-3 at 24-29. (*See also,* ECF No. 3-3 at 30-34, State written comments submitted to FSB in 2019 on a similar wildlife special action proposal that was

---

[2] The State is not bringing a standalone claim under the APA, as asserted by FSB at ECF No. 18 at 14, but is claiming FSB violated the Open Meetings Act (5 U.S.C. § 552b), ANILCA, FSB's own regulations (50 CFR § 100.19), and the standards of the APA. (FSB mentioned the State's objections to the FSB's Kake emergency COVID hunt, ECF No. 18 at 15, which is not related to FSB's action to close federal lands in Subunits 13A and 13B to non-federally qualified hunters.)

ADF&G v. Federal Subsistence Board　　　　　　　　　　　　　Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion　　　Page **2** of **9**
Case 3:20-cv-00195-SLG   Document 24   Filed 09/02/20   Page 2 of 9

denied by the FSB.) There is no legal requirement that the State must read aloud its written comments at the meeting in order for those comments to be considered. The FSB meeting was scheduled for 1:00 pm on July 16, 2020 but was delayed because the FSB was holding a secret meeting in violation of the federal Open Meetings Act, 5 U.S.C. §552b. Eventually the FSB members joined the teleconference and the meeting lasted about four hours without even a bathroom break. It is unreasonable to expect everyone who submits written comments to read them into the record and significantly extend the meeting. FSB's assertion that the State's written comments were ignored also indicates that FSB improperly disregarded written comments from others who opposed WSA 20-3 to close Unit 13.

### The Evidence Shows the Presence of Non-federally Qualified Hunters Correlates to Federally Qualified Hunter Success

The written record presented to the FSB on July 16th, which was apparently ignored by the FSB, showed that the success of federally qualified hunters is directly correlated to the success of non-federally qualified hunters. In other words, when there were more state hunters present then the success of the local rural residents increased. Decl. of Ben Mulligan at 2-3, ¶4 and ECF No. 3-3 at 24-29. When there were less state hunters present then the success of federally qualified hunters decreased. *Id.*

> In Regulatory Year (RY) 10–RY13 the average number of annual state moose hunters in Unit 13 was 4,602. This average increased to 5,190 state moose hunters for RY14–RY17. Federal permit success during those time periods actually increased from a four-year average of 5% to a four-year average of 7%; federal hunt success increased from a four-year average of 10% to 13%; federal catch per unit effort (CPUE 100dy) also increased from a four-year average of 1.53 moose per 100 days of effort

*ADF&G v. Federal Subsistence Board*                          Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion     Page **3** of **9**

Case 3:20-cv-00195-SLG    Document 24    Filed 09/02/20    Page 3 of 9

to a four-year average of 2.15 moose per 100 days of effort. In RY18 the number of state moose hunters in Unit 13 dropped to 4,553, but federal moose permit success also dropped to 4%, federal hunt success dropped to 10%, and federal CPUE dropped to 1.7 moose per 100 days. Similarly, for RY10–RY13 the four-year average for number of state caribou hunters in Unit 13 was 4,849. This four-year average increased to 7,214 state caribou hunters for RY14–RY17. Permit success during those time periods remained stable with four-year averages of 14% for both time periods; hunt success remained stable with four-year averages of 28% for both time periods; catch per unit effort (CPUE 100dy) decreased slightly from a four-year average of 4.80 caribou per 100 days of effort to a four-year average of 4.62 caribou per 100 days of effort. In RY18 the total number of state caribou hunters dropped to roughly 5,474 hunters; while federal reporting is not complete at this time to provide hunt success or CPUE for RY18, the overall permit success actually dropped to 11% with the decrease of state hunters in the field.

*Id.* at 2-3, ¶4.

It is important to note that this information provided by the State is the only actual data presented to the FSB regarding number of hunters and hunter success and addressing both federal and state hunts.

### The FSB Exceeded its Authority Granted by Congress in ANILCA

In an attempt to justify the closure, FSB relies on statements about road traffic increasing and congestion outside federal boundaries. ECF No. 18 at 17. For example, FSB quotes member Striker as saying dangerous conditions may exist outside federal lands. *Id.* at 17. The State agrees that when the Nelchina caribou herd crosses the Richardson Highway, word of mouth spreads and hunters come to harvest caribou. *See*, Declaration of Gino Del Frate at 3, ¶5.

*ADF&G v. Federal Subsistence Board*　　　　　　　　　　　　Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion　　　Page **4** of **9**
Case 3:20-cv-00195-SLG　　Document 24　　Filed 09/02/20　　Page 4 of 9

Even FSB's staff pointed out that FSB had no authority to address alleged public safety concerns on the highway, ECF No. 3-3 at 8, and advised that allegations of safety concerns would be better addressed by law enforcement and public education. *Id.* at 6, 8. And non-federally qualified hunters can still use the highway and cross federal lands, and can hunt on federal lands for game other than moose and caribou. Decl. of Ben Mulligan at 2-3, ¶4. *See also,* ECF No. 3-3 at 28 and Exhibit 1, State hunting regulations for 2020/2021 in Unit 13.

FSB does not oppose the fact that no new evidence was presented to the FSB as compared to when the FSB rejected a similar proposal in 2019. ECF No. 3-1 at 15-16; ECF 3-3 at 6, 11.

In ANILCA Congress did not authorize restrictions to prevent competition from other hunters nor did Congress ensure hunter success. Further, Congress did not authorize closures for experimental purposes.

## The FSB Violated its Own Regulations

Doubling the period of the closure, a step not requested by the person who proposed WSA 20-03 nor anyone else who commented on the proposal, has no support in the record and violates 50 CFR § 100.19(b) requiring any temporary closure to be for the minimum period necessary. The only reason FSB had for extending the closure was staff's recommendation that it did not want to deal with a potential similar request next year - "to reduce the administrative burden associated with processing special action requests." ECF No. 3-3 at 8. This is arbitrary and capricious and not in accordance with law, violating the APA standards for agency action.

*ADF&G v. Federal Subsistence Board*      Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion      Page **5** of **9**
Case 3:20-cv-00195-SLG   Document 24   Filed 09/02/20   Page 5 of 9

## FSB Has No Authority to Regulate Hunting on State Land and Invalidly Closed State Lands to Hunting under State Regulations

FSB does not oppose the State's assertion that its closure was intended for only "public lands" as defined in Section 102 of ANILCA. ECF No. 18 at 3-4, 6, 20-21. FSB does not oppose the facts pointed out by the State that the State lands within the boundaries of lands administered by the Bureau of Land Management are not "public lands" and are not subject to reserved water rights. ECF No. 3-1 at 7-9. FSB does not oppose the State's assertion that FSB overstepped its authority by telling the public that the federal closure also closed State lands. *See, Sturgeon v. Frost,* 139 S. Ct 1066, 1081-1082 (2019) holding that non-federally owned lands and waters within federal boundaries are outside of federal authority to regulate.

It appears we have no dispute that FSB mistakenly advised the public that the closure to non-federally qualified hunters applies on both federal lands as well as State lands within federal boundaries. ECF No. 18-2 is the news release published by FSB advising the public that the closure applies on State navigable waters, and that non-federally qualified hunters can only take an animal if both the animal and the hunter are on dry land between the waterline and the mean high water mark. This is not true, and invalidly restricts non-federally qualified hunters from hunting on lands owned by the State and hunting under State hunting regulations. In Unit 13, under State hunting regulations a hunter can shoot an animal standing (not swimming, per 5 AAC 92.085(7)) or from a boat if the motor is off. 5 AAC 92.080(4).

*ADF&G v. Federal Subsistence Board*　　　　　　　　　　　Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion　　　Page **6** of **9**
Case 3:20-cv-00195-SLG   Document 24   Filed 09/02/20   Page 6 of 9

This morning, as the State was about to file this reply, another news release was issued by the FSB to partially correct the information it previously provided to the public in ECF No. 18-2. *See,* Exhibit 2, September 2, 2020 Unit 13 closure news release. FSB's correction to question 5 limits non-federally qualified hunters to taking moose and caribou *on gravel bars*, but there is no law requiring this limitation within the State's lands. This partial correction is helpful, but does not accurately reflect that a nonfederally qualified hunter within the State lands could also take game that is standing in shallow water. The State suggests FSB should have simply told hunters that the closure does not apply in navigable waters below the high water mark. And the State would like the court to note that this partial clarification occurred only after the State filed a lawsuit and sought injunctive relief, and on the day this reply is to be filed which is 22 days after the State caribou season opened and 12 days after the State moose season opened.

**A Preliminary Injunction is needed to Prevent Further Harm to the State**

The State has demonstrated that it is harmed by FSB's action. As described in the State's request for injunctive relief, ECF No. 3-1, the State has the authority to manage wildlife throughout Alaska, including on public lands. The State has the constitutional obligation to manage its natural resources, including fish and wildlife. AK Const. art. 8. The State is hamstrung in attempting to carry out its management responsibilities as a result of the action taken by the FSB. As previously explained, an important step in hunt management is the State's effort to spread hunters throughout the range of the moose and

*ADF&G v. Federal Subsistence Board*   Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion   Page **7** of **9**
Case 3:20-cv-00195-SLG   Document 24   Filed 09/02/20   Page 7 of 9

caribou populations. ECF No. 3-1 at 9, 17-18; ECF No. 3-2 at 2, ¶3. This helps to reduce congestion throughout Unit 13.

The State's obligations include managing populations for sustained yield and providing for the conservation, utilization and development of game. ECF No. 3-1 at 5-6; AS 16.05.255. The Alaska Supreme Court held that "conserving" and "developing" include utilization. *Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State, Board of Fisheries,* 628 P.2d 897, 903 (Alaska 1981). "'Conserving' implies controlled utilization of a resource to prevent its exploitation, destruction or neglect. 'Developing' connotes management of a resource to make it available for use." *Id.* The State must make decisions regarding utilization of the game resources it is obligated to manage. *Id.* By preventing hunting in a popular and accessible area, FSB directly harms the State's ability to accomplish its obligations to make moose and caribou available for use; or in plain words, to help people put food on their tables. *See* Decl. of Gino Del Frate at 3, ¶6.

When a game population grows to a level that exceeds the population objectives, the State takes steps to allow additional hunting opportunity. Although FSB suggests that the amount of federal lands in Subunits 13A and 13B are a small percentage of the land area, ECF No. 18 at 2 and 9, these areas may be the most accessible to hunters and may result in significant harvest opportunities. *See* Decl. of Gino Del Frate at 3-4, ¶¶ 5-7. For example, from October 20 to November 5, 2017, more than half of the caribou taken under State regulations were harvested on federal lands. *Id.* at 3, ¶6.

For the reasons explained by the State at ECF No. 3-1 and as stated above, the State has shown that a preliminary injunction is warranted. The FSB must comply with

*ADF&G v. Federal Subsistence Board*　　　　　　　　　　　Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion　　　Page **8** of **9**
Case 3:20-cv-00195-SLG　　Document 24　　Filed 09/02/20　　Page 8 of 9

the statutory open meeting requirements of 5 U.S.C. § 552b. FSB's actions were arbitrary and capricious and not in accordance with law, in violation of the APA, 5 U.S.C. § 701-706. Agency action will be struck down as arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[3]

The closure to nonfederally qualified hunters on federal lands in Subunits 13A and 13B (and State lands within federal boundaries) must be enjoined.

DATED: September 2, 2020.

CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL

By: /s/Cheryl R. Brooking
Cheryl R. Brooking
Assistant Attorney General
Alaska Bar No. 9211069
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: cheryl.brooking@alaska.gov
Attorney for
State of Alaska

---

[3] *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732-33 (9th Cir. 2017).

*ADF&G v. Federal Subsistence Board*     Case No.: 3:20-cv-00195-SLG
State's Reply To Federal Defendants' Opposition To Plaintiff's Motion     Page **9** of **9**
Case 3:20-cv-00195-SLG    Document 24    Filed 09/02/20    Page 9 of 9