TREG R. TAYLOR
ATTORNEY GENERAL

Cheryl R. Brooking (Alaska Bar No. 9211069)
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: cheryl.brooking@alaska.gov

*Attorney for State of Alaska*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| STATE OF ALASKA,<br>Department of Fish and Game | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:20-cv-00195-SLG |
| v. | ) | |
| | ) | |
| FEDERAL SUBSISTENCE BOARD,<br>*et al.,* | ) | **STATE OF ALASKA'S<br>OPENING BRIEF** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| And | ) | |
| | ) | |
| ORGANIZED VILLAGE OF KAKE, | ) | |
| | ) | |
| Intervenor-Defendant | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.  INTRODUCTION ..................................................................................... 1

II. BACKGROUND ........................................................................................ 2

    A.  The State Manages Wildlife in Alaska ............................................. 2

    B.  FSB invalidly authorized itself and federal land managers to open hunts, in violation of ANILCA, the APA, and the Sunshine Act ........................... 4

    C.  FSB Guidelines for COVID-19 emergency actions ..................................... 5

    D.  Organized Village of Kake's requested hunt .................................. 6

    E.  FSB received other special action requests in 2020 to open emergency hunts. There were no confirmed food supply disruptions or food shortages ............................................................... 7

    F.  FSB repeatedly and intentionally held meetings wthout notice. ................... 8

    G.  FSB improperly closed moose and caribou hunting except for federally qualified users on federal public lands in Game Management Subunits 13A and 13B ............................................................ 10

III. STANDARD OF REVIEW ...................................................................... 10

IV. ARGUMENT ......................................................................................... 12

    A.  FSB consistently and intentionally violates the open meetings requirements of the Sunshine Law ........................................... 13

    B.  FSB lacks authority to "open" seasons, and no *Chevron* deference is given to FSB's interpretation that it has such authority ............... 19

    C.  FSB's decision to authorize the Kake hunt was arbitrary and capricious and contrary to law ....................................... 24

    D.  FSB lacked the authority to delegate administration of the Kake hunt outside a federal agency .................................................. 26

        1.  With the passage of ANILCA, Congress did not expressly grant FSB the authority to subdelegate the administration of a hunt to an outside party .......................................... 27

i

2. Delegating hunt administration outside a federal agency is not the same as the State's administration of State-authorized community subsistence hunts ............................................................................ 32

E. Closing moose and caribou hunting in Game Management Subunits 13A and 13B was arbitrary and capricious and not in accordance with the law ......................................................................... 33

F. Nothing in ANILCA or caselaw allows a closure to avoid competition from other hunters ......................................................................... 34

G. Closing Subunits 13A and 13B was not necessary to continue subsistence ...................................................................... 36

H. FSB wrongly closed State lands over which it has no authority to regulate hunting ......................................................... 41

I. FSB's closure of federal lands harms the State's ability to manage caribou and moose populations in Unit 13 ................................................. 41

J. There was no new factual information before the FSB in 2020 to support an arbitrary change in position after denying an identical proposal in 2019 ...................................................................... 43

K. FSB violated its own regulation by instituting a closure in Subunits 13A and 13B for a full two-year regulatory cycle ...................... 45

V. CONCLUSION ..................................................................................... 46

# TABLE OF AUTHORITIES

## Alaska Cases

*Alaska Fish and Wildlife Cons. Fund. v. State*
    347 P.3d 97, 104 (Alaska 2015) ............................................................ 32

*Friends of Alaska Wildlife Refuges v. Bernhardt*
    381 F.Supp.3d 1127, 1139 (D. Alaska 2019) ...................................... 43

*McDowell v. State*
    785 P.2d 1, 7 (Alaska 1989) .................................................................. 4

*Pullen v. Ulmer*
    923 P.2d 54, 57 n.5 (Alaska 1996) ...................................................... 2

## Federal Cases

*12 Percent Logistics v. Unified Carrier Registration Plan Board,*
    2020 WL 1429904 ................................................................................ 19

*Alaska v. Native Village of Venetie Tribal Government,*
    522 U.S. 520, 532 (1998) .................................................................... 32

*Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. The Board of Oil
    and Gas Conservation of the State of Montana,*
    792 F.2d 782, 795-796 (9th Cir. 1986) ............................. 28, 29, 30, 31

*Bicycle Trails Council of Marin v. Babbitt,*
    82 F.3d 1445 (9th Cir. 1996) ............................................................... 35

*BNSF Railway Co. v. Loos,*
    139 S.Ct 893, 903 (2019) .................................................................... 21

*Center for Biological Diversity v. Haaland,*
    ___ F.3d ___, WL 2232487 at *6 (9th Cir. 2021) .............................. 44

*Center for Biological Diversity v. Zinke,*
    900 F.3d at 1053, 1067 (9th Cir. 2018) .............................................. 11

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837, 842-43 (1984) ......................................... 19, 23, 24, 44

*City of Arlington v. F.C.C.,*
    569 U.S. 290, 290-91 (2013) .............................................................. 22

*Encino Motorcars, LLC v. Navarro,*
    136 S.Ct 2117 (2016) .......................................................................... 44

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502, 515-16 (2009) .............................................................. 44

*Friends of Animals v. Haaland,*
___ F.3d ___, 2021 WL 1955894 (9th Cir. 2021)........................................... 12, 20

*Gardner v. B.L.M.,*
638 F.3d 1217, 1224 (9th Cir. 2011) ....................................................... 11

*Hells Canyon Alliance v. U.S. Forest Service,*
227 F.3d 1170 (9th Cir. 2000) ............................................................. 34

*Humane Soc'y of the U.S. v. Locke,*
626 F.3d 1040, 1048 (9th Cir. 2010) ....................................................... 11

*INS v. Cardoza-Fonseca,*
480 U.S. 421, 434 n.17 (1987) ............................................................. 22

*Metlakatla Indian Cmty. v. Egan,*
369 U.S. 45, 47 n.2 (1962) ............................................................... 2, 3

*Montana v. U.S.,*
450 U.S. 544, 558-564 (1981) ...........................................................30-31

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d (1983) .......................... 11, 12, 20, 29

*Ninilchik Traditional Council v. U.S.,*
227 F.3d 1186, 1192-93 (9th Cir. 2000).............................................. 12, 20

*Northwest Motorcycle Assn. v. U.S. Dept. of Agriculture,*
18 F.3d 1468 (9th Cir. 1994) .............................................................. 35

*Organized Village of Kake v. U.S.D.A.,*
795 F.3d 956, 966, 968-69 (9th Cir. 2015)...............................................11, 43-44

*Pan Am. World Airways Inc. v. CAB,*
684 F.2d 31 (D.C. Cir. 1982) ............................................................. 19

*Sturgeon v. Frost,*
139 S.Ct. 1066, 1079-80 (2019) .......................................................... 23

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
878 F.3d 732-33 (9th Cir. 2017)....................................................... 10, 12, 20

*U.S. v. Mazurie,*
419 U.S. 544, 557 (1975) ........................................................ 27, 28, 29, 30, 31

*U.S. Telecom Ass'n v. F.C.C.,*
359 F.3d 554, 565 (D.C. Ct. App. 2004)................................................ 27, 29

## Constitutional Provisions

ALASKA CONST. art. VIII.................................................................... 41

ALASKA CONST. art. VIII, § 2 ............................................................... 2

**Alaska Statutes**

AS 16.05.050(a)(19) ......................................................................... 3

AS 16.05.060 ................................................................................... 23

AS 16.05.221(b) .............................................................................. 3

AS 16.05.251 ................................................................................... 23

AS 16.05.255 ........................................................................ 3, 23, 41

AS 16.05.255(k)(5) .......................................................................... 2

AS 16.05.330(c) .............................................................................. 32

**Alaska Regulations**

5 AAC 85.025(a)(8) ......................................................................... 41

5 AAC 85.045(a)(11) ....................................................................... 41

5 AAC 92.072(c)(1)(A) .................................................................... 32

5 AAC 92.072(c)(1)(C) .................................................................... 32

5 AAC 92.072(c)(3) ......................................................................... 32

5 AAC 92.510-550 ........................................................................... 42

**Federal Statutes**

5 U.S.C. § 552b ....................................................................... 1, 4, 9

5 U.S.C. § 552b(b) ........................................................................... 13

5 U.S.C. § 552b(c) ........................................................................... 14

5 U.S.C. § 552b(d)(1) ...................................................................... 14

5 U.S.C. § 552b(e)(1) ...................................................................... 15

5 U.S.C. § 552b(f) ........................................................................... 15

5 U.S.C. § 552b(h) ........................................................................... 17

5 U.S.C. § 552b(h)(1) ...................................................................... 18

5 U.S.C. § 706(2) ....................................................................... 2, 11

7 U.S.C. § 136u(a)(1) ................................................................. 27, 30

16 U.S.C. § 1601 ............................................................................. 10

16 U.S.C. § 3114 ........................................................................... 21

16 U.S.C. § 3202 ............................................................................. 3

18 U.S.C. § 1161 ..................................................................... 27, 28

42 U.S.C. § 300j-11(a) ................................................................. 27

42 U.S.C. § 7601(d)(2) ................................................................. 28

**Federal Regulations**

50 C.F.R. § 100.10(d)(6) ............................................................. 22

50 C.F.R. § 100.19 ................................................................. 20, 22

50 C.F.R. § 100.19(b) ............................................................... 1, 46

50 C.F.R. § 100.19(b)(2) ...................................................... 10, 45

50 C.F.R. § 100.25(a) ................................................................. 26

# I.    INTRODUCTION

The State of Alaska seeks declaratory and injunctive relief to prevent the Federal Subsistence Board ("FSB") from acting in ways contrary to the authority granted by Congress. FSB holds meetings and takes actions without providing notice to the public or allowing the public to be present, in violation of the Sunshine Act, 5 U.S.C. § 552b. FSB delegated authority to federal land managers around Alaska to open hunts, and FSB itself opened a hunt (the "Kake hunt"), in violation of the Alaska National Interest Lands Conservation Act, Pub. Law 96-487 as amended ("ANILCA"). Initially FSB refused to share certain hunt information with the State, in violation of ANILCA, regarding the animals taken in the Kake hunt. FSB improperly delegated administration of the Kake hunt outside of a federal agency, and issued a permit that, on its face, improperly limited participation.

FSB closed moose and caribou hunting on federal lands in Game Management Subunits 13A and 13B to non-federally qualified hunters for two years, in violation of ANILCA and FSB's own regulations. The Unit 13 closure was not necessary to assure the continued viability of the moose or caribou populations or the continuation of subsistence uses of moose and caribou in the area, as ANILCA requires. The Unit 13 closure also violated 50 C.F.R. § 100.19(b)[1] by adopting a closure twice as long as proposed. Additionally, the closure violated ANILCA by closing state lands over which it had no authority.

---

[1]    Federal Subsistence Board regulations are found at 50 C.F.R. Part 100 and 36 C.F.R. Part 242. Because they are the same, the State will refer to 50 C.F.R. Part 100.

1

All of these actions were final agency actions that were arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. 706 ("APA").

## II.    BACKGROUND

### A.    The State Manages Wildlife in Alaska.

The State of Alaska is tasked with managing wildlife resources on all lands in the state regardless of ownership, except as expressly limited by Congress.

Alaska's Constitution protects the sustainable use of natural resources, including wildlife, "for the maximum benefit of its people." Alaska Const., art. 8, § 2. It sets the threshold as "a sustained yield principle, subject to preferences among beneficial uses." *Id.* § 4. State law defines "sustained yield" as "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis." AS 16.05.255(k)(5).

Self-management of natural resources, including Alaska's wildlife resources, was a driving force behind Alaska statehood; fish and wildlife are the property of the State held in trust for the benefit of all residents. *See, e.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 57 n.5 (Alaska 1996); *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 47 (1962). Ownership of the resources passed to Alaska upon statehood under the Alaska Statehood Act. Pub. L. No. 85-508, 72 Stat. 339 (1958). General management authority over fish and wildlife within Alaska passed from the federal government to Alaska shortly after Alaska's adoption of a comprehensive fish and game code in 1959. *See* Alaska Statehood Act, Section 6(e); 25 Fed. Reg. 33 (Dec. 29, 1959) (transferring management of fish and

wildlife resources to the State); and *Metlakatla Indian Cmty.*, 369 U.S. at 47 n.2.

Alaska's Board of Game ("BOG") is the government entity authorized and obligated to "provide for the conservation and development" of Alaska's wildlife resources. AS 16.05.221(b). The BOG is authorized to regulate "the conservation, development, or utilization of game in a manner that addresses whether, how, when, and where the public asset of game is allocated or appropriated." AS 16.05.255. This includes establishing seasons, means and methods, and bag and harvest limits for hunting; implementing "methods, means, and harvest levels necessary to control predation and competition among game in the state;" and "regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game." *Id.*

The Alaska Department of Fish and Game ("ADF&G"), led by its Commissioner, administers regulations adopted by the BOG in accordance with the statutory duty to "promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and trapping in the state." AS 16.05.050(a)(19).

In ANILCA, Congress expressly recognized and maintained the State's management authority except as limited in Title VIII, 16 U.S.C. § 3202; thus any authority regarding fish and wildlife not specifically granted by Congress in Title VIII remains with the State.

In Section 802 of ANILCA, Congress provided that subsistence uses of fish and wildlife shall be the priority consumptive uses for rural residents only "when it is necessary to restrict taking in order to assure continued viability of a fish or wildlife

population or the continuation of subsistence uses of that population for subsistence purposes."

Congress envisioned that the State of Alaska would implement the subsistence preference as directed in Section 805(d) of ANILCA, and the State did so for many years until the federal land management agencies took over after the Alaska Supreme Court ruled that the Alaska Constitution's common use and equal access provisions prohibit a rural residence preference. *McDowell v. State*, 785 P.2d 1, 7 (Alaska 1989).

The Secretaries of Interior and Agriculture established the FSB and delegated their authority to implement ANILCA's subsistence preference to the FSB. 50 CFR §100.10. The State continues to be the primary manager of fish and wildlife, including on federal public lands.

### B.     FSB invalidly authorized itself and federal land managers to open hunts, in violation of ANILCA, the APA, and the Sunshine Act.

On April 9, 2020 the FSB approved a process to delegate broad authority to local federal land managers ("agency field managers") throughout Alaska to adopt emergency, up to 60 days, or temporary regulations to open areas for hunting and fishing. 0482-FSB, Memorandum from Sue Detwiler to David Bernhardt, OSM 20022.SD, at 4.

No announcement of the meeting was made and no members of the public were given an opportunity to be present and observe actions by the FSB, as required by the Sunshine Act, 5 U.S.C. § 552b.

On April 14, 2020 the FSB voted to take action to give agency field managers authority to open COVID-related hunts - in a secret meeting that was never announced to

4

the public. ECF 15-2 at 1-2, ¶3.

On June 2, 2020 the FSB issued letters of delegations to agency field managers, authorizing each agency field manager to "issue emergency special actions *related to food security* and may be exercised only *for reasons of public safety*, and when doing so will not threaten the continued viability of the wildlife resource." ECF 4-3, Exhibit 2, June 2, 2020 delegation of authority letters.[2] (Emphasis in original.) These delegations were in effect until June 1, 2021.

On June 22, 2020, the FSB authorized opening a hunt for a tribe on Forest Service lands near Kake, WSA 19-14 (0136-FSB, the "Kake hunt"). No public notice of the meeting was published, but the State received five days' notice by email, ECF 15-3 at 54.

### C.    FSB Guidelines for COVID-19 emergency actions.

The guidelines to be followed by the agency field managers, and the FSB, to open emergency hunting and fishing seasons are set forth in an undated memorandum from Sue Detwiler to Secretary Bernhardt. 0478-FSB. Hunting and fishing would only be opened "in response to any demonstrated COVID-19-related emergency situation relating to food security that rises to the level of constituting a threat to public safety." 0481-FSB.

The guidelines include the following requirements (emphasis added):

- No COVID-19-related action will be taken *by the FSB or their delegated agent* if the requested hunting or fishing opportunity

---

[2]    FSB did not include the letters of delegation in the administrative record but does not object if they are relied upon by the State. ECF 41 at 11. The letters are relevant to the State's claims that the delegation to open hunts is a final agency action that violates ANILCA and the APA. The letters made available to the State were filed at ECF 4-3 at 5-36.

threatens the viability of the resource or in the absence of a demonstrable and imminent threat to public safety.

- Any actions so taken will be temporary in nature and will not remain in effect beyond the time that the threat to public safety has passed.

- No action will be taken *by the FSB or their delegated agent* to open additional hunting or fishing opportunities prior to consultation with the ADFG and confirmation of need with the State of Alaska Unified Command Mass Care Group. (*Id.*)

The guidelines also provided that: "In the event that the Alaska Unified Command Mass Care Group does not confirm the need for this special action, you will defer this special action to the Board."

### D.    Organized Village of Kake's requested hunt.

In a request dated April 13, 2020, renewed in a request dated June 4, 2020, the Organized Village of Kake ("OVK"), a federally recognized tribal government, submitted a request to the FSB to open an emergency hunt, for tribal members only, allowing harvest of five male deer and two bull moose per month for 60-days.[3] The District Ranger for the U.S. Forest Service near Kake sent a letter to the FSB dated June 12, 2020 stating he contacted Mark Roberts, Alaska SEOC Operations Section Chief for the Unified Command Mass Care Group ("Mass Care") who confirmed there was no food security or supply chain disruption in Kake associated with COVID-19. 0426-FSB; 0432-FSB. There is no evidence in the record of an attempt by anyone at the local Forest Service office to contact anyone at ADF&G.

---

[3]    ECF 4-3 at 37. The April 13 and June 4 letters from OVK are referenced at 0432-FSB.

With no confirmation by Mass Care of an alleged food security or supply chain disruption in Kake, 0426-FSB, the agency field manager deferred the special action request for the Kake hunt, WSA 19-14, back to the FSB. 0432-FSB. On June 22, 2020, the FSB held a meeting to address WSA 19-14 and approved the Kake hunt.

Following FSB's authorization, on June 24, 2020, Ted Sandhofer, Forest Service District Ranger for the Petersburg Ranger District, issued an Emergency Special Action Permit to OVK, authorizing the tribe "to harvest up to 2 antlered bull moose and 5 male Sitka black-tailed deer from Thursday, June 24, 2020 to Sunday, August 22, 2020." 0136-FSB. The permit provides that participation in the Kake hunt is limited to individuals selected by the tribe. *Id.* There is no language in OVK's request for the Kake hunt or FSB's permit for the Kake hunt that recognizes non-native participation.

ADF&G's request for information regarding the animals taken in the Kake hunt was refused. 0132-FSB through 0134-FSB; 0441-FSB through 0443-FSB.

**E.    FSB received other special action requests in 2020 to open emergency hunts. There were no confirmed food supply disruptions or food shortages.**

WSA 19-15 is a special action request dated April 10, 2020 from the Koyukuk Tribal Village requesting an emergency hunt be opened on federal lands in Unit 21D to take up to three moose. ECF 4-3 at 49. The stated justification was a concern that COVID-19 and travel restrictions in the Governor's Health Mandate 12 could lead to food shortages in local stores in remote areas. *Id.* The tribe requested a 60-day hunt, but stated that the hunt should occur during April 2020 "due to deteriorating snow and river ice conditions." *Id.*

On June 25, Lisa Maas, Policy Coordinator for the Office of Subsistence Management, stated that the FSB received eleven special action requests to open hunting or fishing on the basis of alleged COVID-related food security concerns. *See* 0458-FSB, June 25 email stating eleven special action requests were received since March and referencing a table. The table and the special action requests referenced in the email were excluded from the administrative record. *But see* 0478-FSB, memo from Sue Detwiler stating twelve special action requests were received by April 9.

In an email dated June 25, 2020, Rob Rebarchik, the Koyukuk/Nowitna/Innoko National Wildlife Refuge Manager, asked Mass Care "to confirm the need for the emergency request by Koyukuk to open a moose hunt related to food security for reasons of public safety," and Mass Care responded that: "Our Mass Care Group is not aware of any substantial food shortage or food supply chain disruption due to COVID-19. Regular shipments of food and commercial supply is available in the State. ECF 4-3 at 52-53.

Similarly, in an email exchange on June 29, 2020, Michael Walker, Forest Service District Ranger in Ketchikan, asked Mass Care about food security in response to an April request from the Organized Village of Saxman. Mass Care responded that they received more than six similar requests and were "not aware of any substantial food shortage or food supply chain disruption in the State of Alaska due to COVID-19." ECF 4-3 at 57-59.

### F. FSB repeatedly and intentionally held meetings without notice.

The Sunshine Act requires all actions to be taken at public meetings following at

8

least seven days published notice of a meeting. 5 U.S.C. § 552b. FSB did not publish a meeting notice for actions taken on April 9, 2020, April 14, 2020, nor for the July 22-27 email action taken on WSA 94-15. ECF 44-1 at 3-4. The administrative record does not include published notice for the June 22, 2020 or July 16, 2020 meetings.

An email on July 22, 2020 from Lisa Maas, informed Ben Mulligan, ADF&G Deputy Commissioner, and Mark Burch, ADF&G Wildlife Biologist, that the FSB would be taking action on WSA 19-15 by email poll, without holding a meeting, and email votes were due July 27. ECF 4-3 at 54. "Given the short/emergency nature of the request [dated April 10, 2020 and renewed on June 3, 2020], a teleconference was not able to be convened." *Id.*

The FSB regularly holds closed meetings without a vote to go into a closed session. For example, closed meetings excluding the State and members of the public were held on April 20, 2020 and July 16, 2020. 0477-FSB provided published notice of the public portion of the April 20-23 meeting but there was no notice of the closed portion of the meeting. 0002-FSB is a portion of the transcript for the July 16, 2020 meeting in which the Chair explains the FSB just had an executive session. There are no published notices or transcripts for the June 22, 2020 or July 16, 2020 closed meetings.

### G. FSB improperly closed moose and caribou hunting except for federally qualified users[4] on federal public lands in Game Management Subunits 13A and 13B.

On July 16, 2020, the FSB met to address four proposals, including WSA 20-03, a temporary special action request seeking a one-year closure to moose and caribou hunting on federal lands within Unit 13 as an experiment to reduce hunter competition. 0043-FSB. Immediately prior to the scheduled meeting, the FSB met in an unannounced executive session, delaying the start of the scheduled meeting. 0002-FSB.

During the July 16 meeting, the FSB adopted WSA 20-03 with modifications to temporarily close moose and caribou hunting in GMUs 13A and13B to non-federally qualified users, and to make the closure for two years rather than the requested one year. 0048-FSB. Although the proposal requested a closure for the regulatory year 2020/2021, and in spite of 50 C.F.R. § 100.19(b)(2) requiring a temporary closure to be for only a minimum period necessary, the Board extended the season to include the full 2020/2022 regulatory cycle "to reduce the administrative burden associated with processing special action requests." *Id.*

## III. STANDARD OF REVIEW

The Court reviews agency decisions under Section 706 of the APA. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732–33 (9th Cir. 2017). The APA requires courts to "hold unlawful and set aside agency action, findings, and

---

[4]    Federally qualified subsistence users are Native and non-Native rural Alaska residents authorized to take fish and wildlife on federal public lands under Federal Subsistence Board regulations adopted under Title VIII of ANILCA. 16 U.S.C. § 1601 *et seq.*

conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

A decision is arbitrary and capricious when the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Gardner v. BLM,* 638 F.3d 1217, 1224 (9th Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is arbitrary and capricious unless the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010).

Although an agency may change its position on an issue, it cannot "simply discard prior factual findings … without a reasoned explanation," or it violates the APA. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 968-69 (9th Cir. 2015). A "reasoned explanation" is particularly necessary "[w]hen an agency changes a policy based on factual findings that contradict those on which the prior policy was based." *Ctr. for Bio. Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018).

A regulation is arbitrary and capricious, and in violation of the APA, "if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or ... is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"

*Friends of Animals v. Haaland,* ____F.3d ___, 2021 WL 1955894 (9th Cir. 2021)*, citing Turtle Island*, 878 F.3d at 732–33 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). In *Friends of Animals,* the Ninth Circuit invalidated a regulation that was inconsistent with the Endangered Species Act.

Violations of ANILCA are reviewed under the standards of the APA. *Ninilchik Traditional Council v. U.S.,* 227 F.3d 1186, 1193 (9th Cir. 2000).

The court "cannot 'supply a reasoned basis for the agency's decision that the agency itself has not given.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983).

## IV.    ARGUMENT

Congress did not authorize the FSB to act as it did. Congress did not authorize FSB to take important actions affecting the public in secret or closed meetings, did not authorize the FSB to open seasons, did not authorize FSB to violate its own regulations or adopted procedures, did not authorize hunt administration to be delegated outside of a federal agency, did not authorize withholding harvest information from ADF&G, did not authorize a closure based on competition between users, and did not authorize a closure beyond what is necessary.

**A.  FSB consistently and intentionally violates the open meetings requirements of the Sunshine Law.**

The FSB took actions on April 9 (ECF 15 at 4), April 14, June 22, and approximately July 22-27 without notice to the public or the ability of the public to be present to observe. The Sunshine Law mandates that:

> Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency shall be open to public observation. (5 U.S.C. § 552b(b)).

None of the exceptions in subsection (c) apply to the actions taken by FSB, and FSB has not suggested an exception applies. The only reason given for not complying with the important federal law is FSB's mistaken belief that the law does not apply unless FSB adopts regulations agreeing to comply. ECF 15 at 11.

On April 9 or April 14, FSB purportedly adopted procedures for the FSB, and local land managers with delegated authority from the FSB, to open hunting and fishing seasons in the event of confirmed food insecurity caused by COVID-19; it appears from the record that delegation of authority was secretly approved April 9 prior to the secret vote on April 14. 0481-FSB (April 9); 0482-FSB (April 14); ECF 15-2 at 1-2, ¶3-4. Letters of delegation were issued in June to land managers throughout Alaska to authorize opening seasons. ECF 4-3 at 6-32. These actions were taken without notice to the public and without being open to the public. An April 9 email suggests that adopting a streamlined process for handling special action requests alleging pandemic-related food security concerns and delegating approval authority to land managers is "administrative" so it can be done without a public meeting. 0482-FSB. That is

13

incorrect, but the statement shows that FSB knew it needed to comply with the Sunshine Act. To the extent the FSB is now suggesting that an exception in 5 U.S.C. § 552b(c) applies, then FSB members would have needed to vote on closing the meeting. No such vote occurred. This behavior is in direct violation of the Sunshine Act which specifies that:

> Action under subsection (c) shall be taken only when a majority of the entire membership of the agency (as defined in subsection (a)(1)) votes to take such action. A separate vote of the agency members shall be taken with respect to each agency meeting a portion or portions of which are proposed to be closed to the public pursuant to subsection (c), or with respect to any information which is proposed to be withheld under subsection (c). A single vote may be taken with respect to a series of meetings, a portion or portions of which are proposed to be closed to the public, or with respect to any information concerning such series of meetings, so long as each meeting in such series involves the same particular matters and is scheduled to be held no more than thirty days after the initial meeting in such series. The vote of each agency member participating in such vote shall be recorded and no proxies shall be allowed. (5 U.S.C. § 552b(d)(1))

On June 22, FSB met telephonically and approved the Kake hunt. 0001-FSB, 0130-FSB. There was no published notice of this meeting as required by the Sunshine Act which states:

> In the case of each meeting, the agency shall make public announcement, at least one week before the meeting, of the time, place, and subject matter of the meeting, whether it is to be open or closed to the public, and the name and phone number of the official designated by the agency to respond to requests for information about the meeting. Such announcement shall be made unless a majority of the members of the agency determines by a recorded vote that agency business requires that such meeting be called at an earlier date, in which case the agency shall make public announcement of the time, place, and subject matter of such

14

meeting, and whether open or closed to the public, at the earliest practicable time. (5 U.S.C. § 552b(e)(1))

The State was notified by email only five days earlier, and June was also the first time the State was provided with the COVID hunt procedures found at 0478-FSB that were secretly adopted in April.

The FSB issued a news release prior to its April 20-23 meeting. 0477-FSB. However the news release does not provide the time for the meeting, and there is no mention of the closed session that was held in the morning. There was no vote to close this to the public. And there are no legal opinions or transcripts for any of FSB's closed meetings, as required by 5 U.S.C. § 552b(f).

The FSB met on July 16, 2020 to address WSA 20-03, again without publishing notice, and acted to close the most accessible federal lands in Unit 13 to non-federally qualified moose and caribou hunters. 0212-FSB. Crucial input to the FSB from the Southcentral RAC and members of the public, who opposed an identical proposal a year earlier, was impossible. *See* 0215-FSB, letter from Aaron Bloomquist opposing the action but noting that he was unable to provide comments before the FSB action because he was unaware of the meeting. *See also* testimony of Gloria Stickwan, Chair of the Southcentral RAC, noting that the RAC did not have an opportunity to discuss WSA 20-03. 057-FSB. While any discussions and actions during the executive session on July 16 are unknown the timing of the unannounced meeting indicates there was a discussion of the action subsequently taken to close areas in Unit 13.

15

Then, on or about July 22-27, FSB took action in response to a COVID-19 hunt, WSA 19-15, requested in April. ECF 4-3 at 52 and 54. Although FSB correctly declined to open that hunt, its action was taken without notice to the public and without being open to the public. The State was notified that: "Given the short/emergency nature of the request, a teleconference was not able to be convened." *Id.* This is not a reasonable explanation for a proposal submitted to the FSB on April 10. ECF 4-3 at 54. Email notice was given to the State on July 22, apparently the day of FSB's action. *Id.*

The importance of meeting in public and acting with transparency is crucial in government actions. The situation surrounding whatever happened on April 9 and April 14 is a good example. An undated memo to Secretary Bernhardt is shown on the index to the AR as being dated April 9, 2020. 0478-FSB. In his declaration at ECF 44-1 at ¶4a, Theodore Matuskowitz explained that an email with an attached document was sent to FSB members with a request to adopt the streamlined process and approve the memo as shown in the email exchanges from April 9-14, 2020. *See* 0482-FSB through 0499-FSB for the email string, with a referenced (but missing) attachment described as the streamlined process to be approved. The revised index that includes the supplemental additions to the administrative record, ECF 44-2 at 2, indicates 0478-FSB through 0481-FSB is dated April 9 and is the document attached to the April 9 email. However, a close look at 0478-FSB shows that this cannot be the document that was attached to the April 9 email. Footnote 1 of 0478-FSB refers to a public meeting that was held by the FSB April 20-23, 2020. Footnote 2 refers to an email sent to Mass Care on April 21, 2020. These events had not yet happened, so the memo provided as 0478-FSB cannot be the

document included in the April 9 email. The actual document secretly approved by FSB is not in the record, and the emails from FSB members approving the document do not suggest any amendments. 0482-FSB. Without the public present, somehow FSB revised, at some unknown time, the procedures that it alleges to have adopted. Such bait and switch and inexplicable representations can be avoided by following the Sunshine Act (and providing an accurate and complete administrative record).

The only defense suggested by FSB is that it need not comply with the Sunshine Act because it did not adopt regulations agreeing to do so. ECF 15 at 11. The Sunshine Act is mandatory and FSB is a federal agency bound to comply, even if it does not want to. As stated above, FSB knew it was bound by the Sunshine Act when it referenced open meeting requirements while not following them. *See* July 22 email regarding voting on WSA 19-15 by email without a meeting, ECF 4-3 at 54, and April 9, 2020 email polls, 0482-FSB.

FSB suggests the State's remedy for a violation of the open meetings requirements of the Sunshine Act should be limited to having the FSB provide transcripts rather than having a court enjoin the agency's action. ECF 15 at 11. FSB misinterprets the law. The Sunshine Act expressly provides injunctive relief as a remedy, including an injunction against future violations. 5 U.S.C. § 552b(h).[5] Even if

---

[5] **(h)(1)** The district courts of the United States shall have jurisdiction to enforce the requirements of subsections (b) through (f) of this section by declaratory judgment, injunctive relief, or other relief as may be appropriate. Such actions may be brought by any person against an agency prior to, or within sixty days after, the meeting out of which the violation of this section arises, except that if public announcement of such meeting is not initially provided by the agency in accordance with the requirements of

FSB was correct, no transcripts are available for April 9, April 14, July 22-27 and secret portions of meetings held April 20 and July 16. Letters of delegation were issued June 2, which was the earliest the State became aware of what FSB had delegated and to whom. The memo allegedly approving the process to open hunts was provided to the State in June, which was the earliest the State became aware of the memo outlining the process FSB alleges it approved on April 9. Although the State filed its Complaint in August, ECF 1, which is within 60 days after being provided with the outcome of actions taken outside of public meetings, FSB did not serve an answer within 30 days as required by 5 U.S.C. § 552b(h)(1). The statute also clearly places the burden on FSB to sustain its actions. *Id.*

---

this section, such action may be instituted pursuant to this section at any time prior to sixty days after any public announcement of such meeting. Such actions may be brought in the district court of the United States for the district in which the agency meeting is held or in which the agency in question has its headquarters, or in the District Court for the District of Columbia. In such actions a defendant shall serve his answer within thirty days after the service of the complaint. The burden is on the defendant to sustain his action. In deciding such cases the court may examine in camera any portion of the transcript, electronic recording, or minutes of a meeting closed to the public, and may take such additional evidence as it deems necessary. The court, having due regard for orderly administration and the public interest, as well as the interests of the parties, may grant such equitable relief as it deems appropriate, including granting an injunction against future violations of this section or ordering the agency to make available to the public such portion of the transcript, recording, or minutes of a meeting as is not authorized to be withheld under subsection (c) of this section.

**(2)** Any Federal court otherwise authorized by law to review agency action may, at the application of any person properly participating in the proceeding pursuant to other applicable law, inquire into violations by the agency of the requirements of this section and afford such relief as it deems appropriate. Nothing in this section authorizes any Federal court having jurisdiction solely on the basis of paragraph (1) to set aside, enjoin, or invalidate any agency action (other than an action to close a meeting or to withhold information under this section) taken or discussed at any agency meeting out of which the violation of this section arose.

The Sunshine Act does not limit the remedy to providing transcripts, even if all transcripts were available. The leading case for an alternative remedy for violating the open meeting provisions of the Sunshine Act is *Pan Am. World Airways Inc. v. CAB*, 684 F.2d 31 (DC Cir. 1982). In that case, the transcript showed the agency actions were reasonable but the court found that the closed meeting was a violation of the Sunshine Act. A key question is whether the violation was intentional. *Pan Am*, 684 F.2d at 36. The court did not say that a transcript is always a remedy, but in that case the transcript explained to the court whether the action was reasonable. *Id.* If a violation is intentional, no transcript can cure the violation.

Here we have consistent, intentional violations of the Sunshine Act so no transcripts can cure FSG's violations. And we lack transcripts so the remedy would be impossible.

It is too late to enjoin the past violations. The State asks this court to enjoin the FSB from conducting future actions without proper notice and open meetings. Future injunctive relief and an award of attorney fees is appropriate for intentional failure to comply with the Sunshine Act. *12 Percent Logistics v. Unified Carrier Registration Plan Board,* 2020 WL 1429904.

### B.    FSB lacks authority to "open" seasons, and no *Chevron* deference is given to FSB's interpretation that it has such authority.

The Ninth Circuit recently confirmed the longstanding rule that a regulation is arbitrary and capricious, and in violation of the APA, "if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or ... is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Friends of Animals v. Haaland,* ____F.3d ___, 2021 WL 1955894 (9th Cir. 2021)*, citing Turtle Island,* 878 F.3d at 732–33 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)). In *Friends of Animals,* the Ninth Circuit invalidated a regulation that was inconsistent with the Endangered Species Act.

In this case, FSB's regulation at 50 C.F.R. § 100.19 is invalid to the extent the regulation authorizes opening a hunting or fishing season. "Subsistence living, although at the heart of ANILCA, is not a per se preemptive statutory priority." *Ninilchik Traditional Council v. U.S.*, 227 F3d 1186, 1192-93 (9th Cir. 2000), (explaining that when restrictions are necessary they are to be in accordance with Section 804). To clarify the State's position, the State does not object to FSB's authority to reopen a season that has been validly closed under the authority granted in Title VIII of ANILCA. Nothing in ANILCA authorizes opening a season, and Congress did not intend seasons to be opened by FSB (or by delegation to local land managers).

Section 804 of ANILCA provides:

> Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

20

(1) customary and direct dependence upon the populations as the mainstay of livelihood;
(2) local residency; and
(3) the availability of alternative resources. (16 U.S.C. § 3114.)

The first sentence cannot be read in isolation, and cannot be read to alter the language in Section 802(2) that subsistence uses of fish and wildlife shall be the priority consumptive uses for rural residents only "when it is necessary to restrict taking in order to assure continued viability of a fish or wildlife population or the continuation of subsistence uses of that population for subsistence purposes." Congress included the words "except as otherwise provided" in Section 804, recognizing that other provisions of ANILCA provide limitations and override the words in the first sentence. "Except as otherwise provided" is a phrase indicating exclusions or restrictions. *BNSF Railway Co. v. Loos*, 139 S.Ct 893, 903 (2019). Section 802(2), as well as the remainder of Section 804 and other provisions in Title VIII of ANILCA, provide limitations. The remainder of Section 804 explains how the subsistence priority is to be implemented, and that is to be through restrictions and not by opening seasons.

Nothing in Title VIII of ANILCA authorizes hunting and fishing seasons to be *opened* by the Federal Subsistence Board. Language to authorize opening seasons was considered and rejected by Congress.

In May 1978, the House of Representatives passed its version of ANILCA, HR 39, and forwarded the bill to the Senate. The House version included authority to open seasons when extraordinary measures must be taken, but the Senate did not pass

this version and the following language in the House bill was *deleted* from the bill that became law:

> [705(d)(2)]: If after notice to the State under subsection (a) or (b), the Secretary determines that extraordinary measures must be taken to protect public welfare, he may open public lands, or any portion thereof, to subsistence uses by local residents and publish the reasons justifying such action in the Federal Register. Such emergency action shall be effective when made, but shall not extend for a period of time greater than sixty days, or until such time as the threat to the public welfare which necessitated such action has been resolved, whichever time first occurs. [Alaska National Interest Lands Conservation Act, Legislative History, Vol. II at 533.]

The Supreme Court has held that the court must reject administrative constructions which are contrary to congressional intent, and when agencies "act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC,* 569 U.S. 290, 290-91 (2013). The court can discern congressional intent to expressly disallow actions where language adopted in one house of Congress was rejected in the other house. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 434 n.17 (1987). Applying this rule of law, Congress' intent was to narrow federal authority to imposing restrictions when necessary, but not to open seasons. Sections 802, 804, 815, and 816 of ANILCA address *restrictions* on taking fish and wildlife *when necessary*. Congress considered and rejected giving FSB the authority to *open* subsistence seasons.

As stated above, the regulation adopted and relied upon by FSB to open a season (50 C.F.R. § 100.19) is invalid to the extent it authorizes opening public lands for the taking of fish and wildlife. The regulation at 50 C.F.R. § 100.10(d)(6) contains the same improper language asserting authority to open a season. There is no statutory authority

to open a season and FSB cites only to its regulation for granting itself the alleged authority that Congress considered and rejected. Section 816 is the only provision in Title VIII of ANILCA authorizing the Secretary to take action for public safety or administrative reasons; this section authorizes the Secretary to "designate areas where, and establish periods when" no subsistence taking of fish and wildlife would be authorized "for reasons of public safety, administration, or to assure the continued viability of a particular fish or wildlife population" after consultation with the State. FSB acknowledges it did not rely on Sections 815 or 816 of ANILCA to open a hunt for public safety reasons. ECF 15 at 15-16; ECF 37 at 31-32.

In contrast, the State has the express statutory authority to open and close seasons when circumstances require. AS 16.05.060. The State has the authority to manage fish and game throughout Alaska, as confirmed in the Statehood Act and the Alaska Constitution. The State has the statutory authority to adopt regulations setting seasons, methods and means, and more. AS 16.05.251 and 255.

Where Congress is clear, the court does not give *Chevron* deference to the agency's interpretation of a statute. *Sturgeon v. Frost*, 139 S.Ct. 1066, 1079-80 (2019), holding the definition of public lands in ANILCA is unambiguous and no *Chevron* deference to the federal agency is appropriate. "First, the Court must determine whether 'Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, (1984).

FSB's actions to give itself authority to open hunts in violation of ANILCA, to delegate to federal land managers the ability to open emergency hunts, and to open the Kake hunt, are all actions prohibited by ANILCA. No *Chevron* deference applies to FSB's interpretation of ANILCA to expand its authority. Contrary to FSB's assertion, ECF 15 at 15, there is no "federal scheme" authorized by Congress in a situation where Congress considered and rejected opening hunts, even in an "emergency."

The State requests declaratory and injunctive relief to prohibit the FSB from opening hunts, and from delegating the authority to open hunts.

### C.   FSB's decision to authorize the Kake hunt was arbitrary and capricious and contrary to law.

FSB lacked the authority to open the Kake hunt but even if it had legal authority, the record does not provide substantial evidence to support FSB's decision to open an emergency hunt. FSB guidelines preclude opening a hunt unless a food security disruption caused by COVID is confirmed by Mass Care. 0478-FSB. Mass Care tried to get factual information from OVK, but OVK did not respond to questions. 01335-FSB to 01336-FSB.

FSB limited public testimony to only one individual; Joel Jackson, President of OVK. 01344-FSB through 01346-FSB. On June 22, 2020 Joel Jackson testified to the FSB that there are no supply chain disruptions in getting food to Kake, meat continues to be available for purchase but he prefers wild game, limits are only on cleaning supplies and paper towels, people were fishing and sharing halibut, and the Alaska ferry system was operating and a ferry arrived in Kake that day. *Id.* Although there is a preference for

wild moose and deer over store-bought meat, there was no difference in the availability of food in June 2020 as compared to availability of food pre-COVID-19. *Id.* A preference for taking game out of season and in excess of bag limits does not give rise to a food shortage.

Although Jackson testified that he did not know when the next ferry would arrive, *Id.,* the Alaska Marine Highway schedule was available and shows ferries to and from Kake in 2020 with two in June, four in July, and five in August; in fact a ferry arrived in Kake on the day the FSB met.[6] Reduced ferry schedules throughout Alaska were implemented in early autumn 2019 through spring 2020 and were unrelated to COVID-19. *Id.* The FSB was in error if it relied on ferry schedules to find food deliveries to Kake were disrupted. The availability of ferry service is not relevant to food deliveries to Kake because Kake receives its food deliveries by barge. Weekly barge service and food deliveries were not disrupted.[7] Mass Care confirmed there were no food disruptions related to COVID-19. 0426-FSB; 0432-FSB.

Despite a lack of facts to support a finding of food security disruption, more than two months after the April 13 request, on June 22, 2020, the FSB approved an "emergency" 30-day hunt, to be evaluated after 30 days to determine if it would be extended for another 30 days. 01352-FSB. However, the permit issued to OVK was for 60 days, not 30 days. 0136-FSB. The arbitrary and capricious decision to issue the

---

[6]     https://www.dot.alaska.gov/oars/reservations/CalendarFM.amhsf?selectMonth=August+2020&selectPort=Kake&selectVessel=All+Vessels&action=Get+Schedule
[7]     *See* lynden.com/aml/barge-schedule/html, and discussion of uninterrupted food deliveries to Kake at ECF 40, 6-7.

permit was further exacerbated by the unwarranted term of the permitted hunt.

Further, advice from federal staff to the FSB for its June 22, 2020 meeting included an opinion (01328-FSB; 01325-FSB) that the additional harvest would not be counted toward an individual's harvest limit, in spite of 50 C.F.R § 100.25(a) that contains no such exemption:

> *Definitions: Harvest limit* means the number of any one species permitted to be taken by any one person or designated group, per specified time period, in a Unit or portion of a Unit in which the taking occurs even if part or all of the harvest is preserved.

The potential for 60-day harvests of fish and game throughout Alaska for a full year infringes on the State's ability to manage fish and wildlife populations. The State would have no estimate of the potentially unlimited additional harvests that could be authorized by the FSB or the local land managers through delegated authority.

Extending a 30-day hunt to 60 days, and ignoring the harvest limit without amending 50 C.F.R. § 100.25(a), and ignoring the guidelines FSB approved for COVID-related emergency hunts that requires an affirmative finding by Mass Care and consultation with ADF&G, are all actions contrary to FSB's own determinations. The FSB consistently failed to follow its own guidelines and regulations.

### D. FSB lacked the authority to delegate administration of the Kake hunt outside a federal agency.

It is important to note that the State is objecting to delegation of hunt administration to anyone outside of a federal agency. In this case it happened to be delegation to a tribe. This litigation is about errors made by the FSB, and a discussion about lack of tribal authority on federal lands in Alaska is only needed because FSB

improperly delegated its administrative authority to a tribe. It makes no difference if the outside entity is a tribe, business corporation, nonprofit entity, or individual; FSB lacks authority to delegate outside of a federal agency absent Congressional authority.

1. **With the passage of ANILCA, Congress did not expressly grant FSB the authority to subdelegate the administration of a hunt to an outside party.**

"Absent affirmative evidence of . . . contrary congressional intent," a Secretary subdelegating authority to "subordinate federal officer or agencies" is "presumptively permissible." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Ct. App. 2004). In contrast, "subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* Subdelegation by a federal agency authority to an outside party requires evidence of expressed congressional subdelegation. *Id.* For example, the U.S. Supreme Court found in 18 U.S.C. § 1161 Congress expressly subdelegated to tribes the introduction of alcohol into the Wind River Reservation. *U.S. v. Mazurie*, 419 U.S. 544, 557 (1975). In 18 U.S.C. 1161, Congress required the tribe to adopt an ordinance that would also be approved by the Secretary of Interior.

Several environmental regulatory acts provide additional examples of expressed congressional subdelegation to tribes on reservation lands. Under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136u(a)(1) states,

> The administrator may enter into cooperative agreements with States and Indian tribes to delegate to any State or Indian tribe the authority to cooperate in the enforcement of this subchapter.

Under the Safe Drinking Water Act, 42 U.S.C. § 300j-11(a) states,

> . . . the administrator may delegate to such Tribes primary enforcement responsibility for public water systems and for underground injection control.

Lastly, under the Clean Air Act, 42 U.S.C. § 7601(d)(2) authorizes the Administrator to treat tribes as "States" and thus delegate "the management and protection of air resources within the . . . areas within the tribe's jurisdiction."

Though not dispositive, courts often address a tribe's inherent sovereignty over its members and reservation lands subject to the subdelegation in reviewing whether Congress expressly subdelegated certain authority to outside parties.  In *U.S. v. Mazurie*, the U.S. Supreme Court recognized Congress under 18 U.S.C. § 1161 expressly delegated to tribes the introduction of alcohol in their reservations. *Mazurie*, 419 U.S. at 557.  The Court's discussion of the tribe's inherent sovereignty over its lands, that "Indian tribes within Indian country are a good deal more than private, voluntary organizations," reinforced their finding of expressed congressional subdelegation. *Id.* Similarly, the Ninth Circuit in *Assiniboine* first held that no expressed congressional subdelegation existed granting a state agency the authority to issue final oil and gas exploration decisions affecting reservation lands.[8]  The Court bulwarked its reasoning by addressing how the state agency's conduct interfered with the tribe's sovereignty over its reservation lands. *Id.*  Like in *Mazurie*, the tribe's inherent sovereignty over its

---

[8]     *Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. the Board of Oil and Gas Conservation of the State of Montana*, 792 F.2d 782, 795-796 (9th Cir. 1986).

reservation lands supported the court's application of the expressed congressional subdelegation rule.

*Mazurie* and *Assiniboine* do not support a proposition that the general rule requiring expressed congressional subdelegation can be overridden when a federal agency subdelegates authority to a tribe.[9]  The D.C. Circuit Court clarified that the courts in *Mazurie* and *Assinboine* addressed tribal sovereignty, but such discussions were not "necessary to the outcome" because in both the rule of expressed congressional subdelegation proved dispositive.  *U.S. Telecom Ass'n*, 359 F.3d at 565.  Therefore, for the analysis here, the general rule espoused in *U.S. Telecom Ass'n v. F.C.C.* – of expressed congressional subdelegation – controls.

Applying these precedents, the question before this court is whether Congress in ANILCA expressly authorized the Secretary to subdelegate outside of a federal agency, and in the specific instance of the Kake hunt to OVK, the authority to administer any aspects of a subsistence hunt occurring – not on Indian reservation lands subject to treaty rights[10] – but on federal Forest Service lands.

---

[9]    This Court suggested this proposition in its "Order Denying Motion for Preliminary Injunction Regarding Delegation of Authority to Open Emergency Hunts," ECF 37 at 40-41, despite the fact that FSB did not assert this proposition. The court "cannot 'supply a reasoned basis for the agency's decision that the agency itself has not given.'" *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co,* 463 U.S. 29, 43 (1983).

[10]    "All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land under all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished." Section 4, Alaska Native Claims Settlement Act, Pub. Law 92-203.

The resounding answer is "no."

Title VIII of ANILCA is for all rural Alaskans. In Section 801, Congress expressed its intent to protect, preserve and provide subsistence uses for all rural residents of Alaska, both Native and non-Native. Throughout Title VIII, the FSB and the State, not third parties, issue decisions on subsistence uses. Section 805 provides for recommendations to the FSB by regional advisory councils, but does not suggest outside parties may be subdelegated decision making or administrative authority on subsistence harvests. Section 809 allows for cooperative agreements, but unlike 7 U.S.C. § 136u(a)(1), the section does not suggest cooperative agreements may be entered into for the subdelegation of decision making authority. Title VIII of ANILCA does not include any expressed language subdelegating subsistence hunting decisions to outside entities. *The only delegation outside a federal agency authorized by Congress is to the State in Section 805(d).* By improperly delegating its authority outside of a federal agency, FSB relinquished management and oversight and administration of the Kake hunt.

Lastly, the cited subdelegation cases do not suggest, absent expressed congressional approval, a federal agency may subdelegate a decision making process to a tribe beyond its tribal jurisdiction. In both *Mazurie* and *Assiniboine*, the court recognized the tribe's inherent sovereignty and thus jurisdiction over its reservation lands and its members as further support of its determination on expressed congressional subdelegation. *Mazurie*, 419 U.S. at 557; *Assiniboine*, 792 F.2d 795-796. The U.S. Supreme Court has held a tribe lacks jurisdiction to regulate hunting and fishing on fee lands within a reservation, much less lands and waters outside of a reservation. *Montana*

*v. U.S.*, 450 U.S. 544, 558 – 564 (1981) ("Since regulation of hunting and fishing by non-members of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations, the general principles of retained inherent sovereignty did not authorize" the Crow tribe to regulate hunting on those fee lands held within the reservation.) Similarly, a tribe lacks jurisdiction to regulate nonmembers hunting or fishing outside of a reservation. *Id.* And in Alaska, tribes lack authority to regulate hunting and fishing because Congress, in Section 4 of ANCSA, extinguished aboriginal hunting and fishing rights in Alaska. Here, without any expressed congressional subdelegation under ANILCA, the FSB subdelegated to OVK the ability to administer the hunt on Forest Service lands, knowing that OVK's request for the hunt was intended to benefit only tribal members. *See* ECF 4-3 at 37, "to provide for our tribal citizens" and 0136-FSB limiting participation to the tribe. The FSB relinquished its administrative oversight and authorized OVK to select between members and non-members and decide who would participate in the hunt and who would be entitled to receive moose and deer meat. 0136-FSB. FSB's decision affected federal forest lands, where OVK has no inherent sovereignty. Both actions separately – much less taken together – are well beyond the inherent tribal sovereignty and tribal jurisdiction articulated in *Mazurie* and *Assiniboine*.[11]

---

[11]      Regarding inherent sovereignty and tribal jurisdiction, the tribes in *Mazurie* and *Assiniboine* differ from Alaska tribes. 58 FR 54364-01, recognizes OVK as an Indian Tribe. However, footnote 1 of 58 FR 54364-01 states, "notwithstanding the potential that Indian country still exists in Alaska in certain limited cases, Congress has left little or no room for tribes in Alaska to exercise governmental authority over land or nonmembers." *Citing* Thomas Sansonetti, "Governmental Jurisdiction of Alaska Native Villages Over

The State asks the court to enjoin the FSB from delegating authority outside of a federal land management agency.

> **2.  Delegating hunt administration outside a federal agency is not the same as the State's administration of State-authorized community subsistence hunts.**

Alaska has the express statutory authority to adopt community subsistence hunts, unlike FSB. *See* AS 16.05.330(c). The State's community subsistence hunts were upheld in *Alaska Fish and Wildlife Cons. Fund. v. State,* 347 P.3d 97, 104 (Alaska 2015). The State can allocate between uses but cannot improperly discriminate between users. *Id.* Similarly, the FSB cannot discriminate between Native and non-Native users in violation of ANILCA Sections 801(4) and 1314. Here, the request for the Kake hunt was expressly to benefit OVK's tribal members only, ECF 4-3 at 37, and the permit issued at the direction of the FSB relinquished hunt administration to OVK. 0136-FSB. That is not how State community hunts operate. An application for a State community hunt requires names and addresses of all persons in the community or group. 5 AAC 92.072(c)(1)(A). Harvest reports are to be provided by hunters following take, and harvest information for the community or group is to be reported within 15 days of the close of the season. 5 AAC 92.072(c)(1)(C) and (c)(3). The State does not delegate its management or administrative obligations.

---

Land and Nonmembers, M-36975 (January 11, 1993); available at: https://www.doi.gov/sites/doi.gov/files/uploads/m-36975.pdf (accessed on December 24, 2020); *see also Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 532 (1998) (recognizing that ANCSA lands do not qualify as Indian country).

**E.** **Closing moose and caribou hunting in Game Management Subunits 13A and 13B was arbitrary and capricious and not in accordance with the law.**

Congress was quite specific in describing the situations that would allow non-federally qualified hunters to be restricted from taking fish and wildlife on public lands. In Section 815 of ANILCA, Congress directed that nothing in Title VIII of ANILCA is to be construed as:

> authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands…unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 816 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law….

On July 16, 2020, the FSB took action on WSA 20-03, a request to close all of Unit 13 to non-federally qualified users for one year as an experiment. The FSB ignored relevant information. For example, the FSB received information on hunter success, but did not discuss or consider hunter efforts leading to a level of success. At least one person testified that he did not hunt in the area because it was crowded. 0045-FSB. FSB member Peltola stated that people were not hunting in the area because they do not want competition. 0049-FSB.

Member Peltola also specifically asked Lisa Maas about the number of hunting permits issued under State caribou regulations, and she responded that she did not have that information. 0048-FSB and 0049-FSB. But the State provided detailed federal and state moose and caribou hunting and permit information for the years 2010 through 2018. 0204-FSB and 0206-FSB. Member Peltola then went on to explain the number of permits issued compared to the number of permits actually hunted, referencing the

information provided by the State. 0049-FSB and 0050-FSB. This relevant information was inexplicably ignored in the information presented by Lisa Maas to the FSB.

The FSB recognized that the number of hunters in the area may not decline as a result of the closure because hunters could access non-federal land by crossing federal lands. 0055-FSB. The FSB did not discuss the ability of non-federally qualified hunters to participate in State hunts on State lands within federal boundaries, but then improperly notified the public that certain State lands were closed. 0212-FSB at item 5.

The State asks that federal lands in Subunits 13A and 13B be immediately reopened to non-federally qualified users. The remainder of this brief explains why the closure decision was arbitrary and capricious, in violation of the APA and ANILCA.

**F.    Nothing in ANILCA or caselaw allows a closure to avoid competition from other hunters.**

Lacking any support in ANILCA, FSB asserts that "user conflicts" is a valid basis for agency restrictions and cites to three unrelated cases to support that assertion. ECF 18 at 17. In *Hells Canyon Alliance v, U.S. Forest Service*, 227 F.3d 1170 (9th Cir. 2000) the court addressed restrictions imposed to alternate days designated for motorized and non-motorized users, not an action banning certain motorized or non-motorized users. In this case, we are not dealing with conflicting uses; all are hunters. FSB completely banned some hunters while allowing other hunters. In *Hells Canyon*, the court was asked to interpret the Hells Canyon National Recreation Act, the Wild and Scenic Rivers Act, and the National Environmental Policy Act ("NEPA") – not ANILCA or the Sunshine Act. In this case, none of the federal laws at issue in

*Hells Canyon* are relevant. And even if there were some legal similarities, FSB did not simply restrict non-federally qualified hunters on alternate days but instead banned them completely.

In *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445 (9th Cir. 1996), the court addressed restricting bicycles to designated trails in Golden Gate Park. The court interpreted the National Park Service Organic Act and NEPA – not ANILCA or the Sunshine Act. The National Park Service did not ban all bicycles from the federal park but incorporated different uses including hikers, equestrians and bicyclists. There was no attempt to discriminate between different groups of bicyclists, or different groups of equestrians, or different groups of hikers. Here, FSB distinguished between hunters, not conflicting uses. Further, the plan at issue in *Bicycle Trails* was published and public comments were sought and reviewed before a final plan was adopted. Here, public input was severely lacking. S*ee* 0215-FSB (did not know of the meeting) and 0057 (Southcentral RAC unable to meet to discuss WSA 20-03) when FSB adopted WSA 20-03 to close Subunits 13A and 13B to all non-federally qualified users.

In *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture,* 18 F.3d 1468 (9th Cir. 1994), the court addressed conflicts between motorized and non-motorized uses. The court defined "conflict" as follows, "Defendants used 'conflict' in its normal everyday sense, that is, a 'clash or divergence of opinions, interests, etc.; a mental or moral struggle occasioned by incompatible desires, aims, etc.'" *Id.* at 1473. Again, here we do not have conflicting uses; all are moose and caribou hunters. The alleged conflict is competition between hunters, which is not a conflicting use. In *Northwest Motorcycle,*

the court also explained that the court cannot make up for deficiencies in an agency's action. *Id.* at 1478. As with the other cases cited by FSB, ECF 18 at 17, this decision did not interpret ANILCA. It interpreted NEPA and an Executive Order expressly directing the agency to look at conflicting uses. *Id.* at 1472.

FSB lacks authority under ANILCA to close hunting based on competition.

### G. Closing Subunits 13A and 13B was not necessary to continue subsistence.

It is suggested that the closure is necessary to continue subsistence uses, ECF 18 at 17, but the record shows the number of federally qualified subsistence users in the area continues to increase. 0050-FSB. The Board also failed to consider that federally qualified hunters are also eligible to hunt under state regulations, so these individuals have a much greater opportunity to harvest a plentiful resource. Restricting, or banning, access to others is not necessary. ANILCA protects hunting for all hunters, not just local rural residents; no restrictions on the taking of fish and wildlife for non-federally qualified users are authorized unless *necessary*. ANILCA 802, 804, 815.

In a memo dated May 20, the State provided details about caribou and moose hunting in Unit 13, including the facts that the federal seasons are often open when State seasons are closed, and that federal users can hunt under both federal and State regulations. 0201-FSB through 0206-FSB. The record shows that federally qualified users had longer seasons for both moose and caribou, with the areas already to themselves without competition from hunters who may only hunt under State

regulations. The record lacks substantial evidence to support a conclusion that any

closure, much less an extended closure, was necessary to continue subsistence.

The detailed factual information found at 0201-FSB through 0206-FSB include

the following (emphasis added):

> **The Unit 13 federal caribou season FC1302 opened on August 1, 2018 with no competition from state hunters.** CC001 (838 permits) opened on August 10th and remained open until September 20th. Only 376 CC001 hunters have reported hunting in RY18. RC561 opened on August 10th as well, but the quota was achieved, and the hunt was closed by emergency order on August 18th. Less than 1,800 RC561 hunters hunted Unit 13 over this time period. DC485 opened on August 20th the quota was met, and the hunt was closed by emergency order on August 26th; 1,223 DC485 hunters hunted in Unit 13 over this time period. **Only federal hunters and CC001 hunters were in the field from August 27th until September 1st** when RC562 opened. The quota for RC562 was reached at the close of the regularly scheduled season on September 20th; 2,080 RC562 hunters hunted Unit 13 over this time period. **Only federal hunters remained in the field from September 21st until the fall season closed on September 30th.** CC001 was the only state hunt to reopen for the winter season on October 21st when the federal season also reopened. **State hunts, however, were limited to bulls only while the federal hunts remained either sex.** Both hunts remained open until March 31st. Caribou migrated across federal lands in Unit 13 in late October and early November in 2018. Only 63 caribou were harvested by CC001 hunters during the winter season. **A total of 260 caribou were harvested by non-subsistence users in RY18. One- thousand-five-hundred eighty-five caribou were harvested by subsistence users**, and 19% of the total harvest of Nelchina caribou was taken on FC1302 permits. The Amount Necessary for Subsistence (ANS) for caribou in Unit 13 is 600–1,000.

> [See 0203-FSB for Table 1 showing the bag limits, permits, and other harvest information for Unit 13 caribou, RY18.]

> For RY19, Nelchina caribou grouped-up in large photographable aggregations and the herd had very high productivity. The federal caribou season opened August 1st and closed on September 30th.

The new youth caribou hunt (YC495; 200 permits) opened on August 1st – closing on August 5th. **No state hunters were in the field from August 6th through the 9th.** On August 10th CC001 opened (810 permits), as well as RC561 (2,790 permits). RC561 closed on August 31st and RC562 opened on September 1st (2,884 permits). DC485 opened on August 29th (399 permits). This hunt structure resulted in significantly less caribou hunters in Unit 13 at any given time, compared to the previous seven seasons. **Due to slow harvest rates for both state and federal hunters, additional opportunity for state permits was created for September 21st through September 30th. This allowed federal hunters holding state permits to continue to hunt on state lands in addition to federal lands during this period.** Caribou migrated across the Richardson Highway and largely out of Unit 13 during the season closure of October 1st through October 20th. Harvestable surplus for RY19 was not harvested during the fall season, and all regularly scheduled caribou seasons reopened on October 21st and closed on March 31st.

## Moose

Following the standard moose hunt structure for Unit 13, the federal season for RY19 opened on August 1st and closed on September 20th. **No other moose hunters were in the field from August 1st until CM300 opened on August 20th.** There were 2,140 CM300 permits for RY19, but in RY18 only 662 CM300 hunters actually hunted out of 2,331 permits issued. On September 1st, the state general moose season opened, as did DM324 (5 permits) and DM335–DM339 (115 permits combined). All moose hunts closed on September 20th.

## <u>Management Strategies</u>

The Amount Necessary for Subsistence (ANS) for caribou in Unit 13 is 600–1,000 and the ANS for moose in Unit 13 is 300–600. Harvestable surplus and harvest for both caribou and moose in Unit 13 were well above the ANS in RY18 with 1,845 caribou and at least 790 moose harvested. Total moose harvest for RY18 in Unit 13 has not been finalized, as harvest data continues to be coded for GM000. Federal permit holders harvesting caribou in Unit 13 where caribou are available on federal subsistence hunt areas annually harvest 7%–19% of the total Nelchina caribou harvest (most recent five-year average = 11%). Federal permit holders harvesting moose

38

on federal lands in Unit 13 account for 8%–10% of the total moose harvest in Unit 13 (most recent five-year average = 9%).
**Federal hunt data does not support the interpretation that the number of state hunters in the field negatively impacts either moose or caribou hunt success on federal permits in Unit 13**. In RY10– RY13 the average number of annual state moose hunters in Unit 13 was 4,602 (Table 2). This average increased to 5,190 state moose hunters for RY14–RY17. Federal permit success during those time periods actually increased from a four-year average of 5% to a four-year average of 7%; **federal hunt success increased from a four-year average of 10% to 13%**; federal catch per unit effort (CPUE 100dy) also increased from a four-year average of 1.53 moose per 100 days of effort to a four-year average of 2.15 moose per 100 days of effort. In RY18 the number of state moose hunters in Unit 13 dropped to 4,553, but federal moose permit success also dropped to 4%, federal hunt success dropped to 10%, and federal CPUE dropped to 1.7 moose per 100 days.

[See 0204-FSB for Table 2 showing Unit 13 moose permit and harvest information 2010-2018.]

Similarly, for RY10–RY13 the four-year average for number of state caribou hunters in Unit 13 was 4,849 (Table 3). This four-year average increased to 7,214 state caribou hunters for RY14– RY17. Permit success during those time periods remained stable with four-year averages of 14% for both time periods; hunt success remained stable with four-year averages of 28% for both time periods; catch per unit effort (CPUE 100dy) decreased slightly from a four-year average of 4.80 caribou per 100 days of effort to a four-year average of 4.62 caribou per 100 days of effort. In RY18 the total number of state caribou hunters dropped to roughly 5,474 hunters; while federal reporting is not complete at this time to provide hunt success or CPUE for RY18, **the overall permit success actually dropped to 11% with the decrease of state hunters in the field. Federal hunt success for caribou is likely impacted more by the timing of caribou migration across federal lands than by the number of state hunters in the field**.

[See 0205-FSB for Table 3 showing Unit 13 caribou permit and harvest information 2010-2018.]

Federally qualified subsistence hunters wishing to harvest moose and caribou in Unit 13 can and do participate in subsistence and

39

general season hunts for moose or caribou offered by the State of Alaska, which allow these hunters to access wildlife resources on all public lands in Unit 13. Federally qualified subsistence caribou hunters in Unit 13 may choose to hunt state lands in addition to federal lands by participating in Tier I registration hunts (RC561 or RC562) or the Community Subsistence Harvest opportunity (CC001). Federally qualified subsistence moose hunters in Unit 13 may choose to hunt state lands in addition to federal lands by participating in the general season moose hunt (GM000) or the Community Subsistence Harvest opportunity (CM300).

While no hunting-related accidents have been reported in Unit 13 to substantiate a public safety concern related to excessive hunting pressure on Unit 13 federal lands at large, questionable hunting practices do create a public safety concern **when caribou are migrating across the Richardson Highway in late fall or early winter**. This public safety concern is most often a result of traffic jams caused by hunters walking on and/or parking on the pavement of the Richardson Highway in narrow and dangerous sections of the road in an attempt to harvest caribou that have just been witnessed crossing the road. **This situation occurs every year when caribou cross during open hunting seasons, even during times when state hunts are closed and only federal hunters have the opportunity to harvest animals during the migration across the highway**. This public safety concern is a realistic argument presented in WSA19-03, but this concern would not be addressed by eliminating state hunters from hunting on federal lands. **If this public safety concern is to be addressed, the most effective way to do so would be to consider a corridor along the Richardson Highway in which all hunting is prohibited within a given distance from the centerline of the highway.**

As clearly shown, the closure was not necessary to continue subsistence and exclude state hunters, including state subsistence hunters. The federal hunters, without the closure, enjoy longer seasons and more opportunity. The closure violated the APA and ANILCA, and the areas should immediately be reopened.

## H. FSB wrongly closed State lands over which it has no authority to regulate hunting.

When the hunt closure was announced on July 31, 2020, FSB improperly informed the public that the federal closure also closed state lands, including submerged lands, within federal boundaries. *See* 0212-FSB and 0213-FSB, notifying the public that non-federally qualified users hunting under state regulations may only hunt in a narrow strip of land below high water. When the error was pointed out by the State, Lisa Maas incorrectly insisted that FSB had authority over those state lands. ECS 3-3 at 17 – 18. Ben Mulligan then attempted to get information about FSB's assertions from Sue Detwiler in an email exchange on August 6, 2020, 0148-FSB, but there was no response to the State. FSB improperly included state lands as Federal public lands, even after being made aware of the error. The State's subsistence caribou season opened August 10 (5 AAC 85.025(a)(8)) and the State's subsistence moose season opened August 20 (5 AAC 85.045(a)(11)). The action of the FSB improperly closed important areas of both state and federal lands to residents dependent on hunting for subsistence.

The State seeks declaratory and injunctive relief to prevent the FSB from asserting authority over hunting on State lands.

## I. FSB's closure of federal lands harms the State's ability to manage caribou and moose populations in Unit 13.

The State is obligated by the Alaska Constitution and applicable statutes to manage fish and wildlife for sustained yield and for the conservation, utilization, and development of these replenishable resources. Alaska Constitution, art. VIII; AS 16.05.255. The State is harmed by the closure because it is prevented from making

41

utilization decisions regarding the game it is charged with managing. The State is hobbled in its ability to provide opportunity. The maps at ECF 24-1 and 0166-FSB illustrate the dearth of roads throughout Unit 13, as well as the preponderance of federal lands along the Richardson Highway. The few roads provide important access to hunters. The suggestion that the closure of Subunits 13A and 13B may be insignificant when compared with the entirety of all of Unit 13 ignores the tremendous impact of closing the areas that provide the bulk of accessible hunting opportunity. For example, from October 20 to November 5, 2017, more than half of the caribou taken under State regulations were harvested on federal lands. ECF 24-4 at 3, ¶6.

When managing wildlife and hunting opportunities, it is worth noting that the State recognizes there may be instances when restrictions on hunting are appropriate. To that end, the Alaska BOG adopts regulations to restrict methods and means, restrict certain vehicle use during hunting seasons or for specified periods of time, or limit the type of game that may be taken in an area. 5 AAC 92.510-550. The maps at ECF 24-1 and 0166-FSB show the controlled use areas and restrictions adopted by the State in Unit 13. This regulatory authority, particularly outside of federal boundaries (such as along the Richardson Highway) is properly to be exercised by the State, while balancing the need to provide hunting opportunity. With the current populations of moose and

caribou thriving in Unit 13,[12] it is inappropriate to cut off access to areas where more than half of the caribou harvest occurs.

Congress expressly protected the State's authority to manage wildlife, including on federal public lands, in Section 1314(a) of ANILCA. Any closure by the FSB must be "necessary" to be authorized under Section 815 of ANILCA. The Unit 13 closure was not shown to be necessary and should be reversed.

J.      **There was no new factual information before the FSB in 2020 to support an arbitrary change in position after denying an identical proposal in 2019.**

No input was received from the local RAC because it did not have the opportunity to meet and discuss WSA 20-03. 0057-FSB. When the FSB considered and rejected an identical proposal in 2019, WSA 19-03, the Southcentral RAC was given the opportunity to provide its input and opposed a closure. WSA 19-03 was opposed by the State, the Interagency Staff Committee, the Southcentral RAC, and the FSB. 0044-FSB. "I'm not hearing anything being recommended different than what we dealt with in '19, other than maybe we reduce size of the units to just A and B." 0052-FSB.

It is a violation of the APA for an agency to not provide a reasoned explanation for disregarding its previous factual findings. *Friends of Alaska Wildlife Refuges v. Bernhardt*, 381 F.Supp.3d 1127, 1139 (D. Alaska 2019), citing *Organized Village of*

---

[12]     *See* ECF 3-1 at 13-14 explaining there is no biological or conservation concerns for moose and caribou in Unit 13, ECF 18 at 16-17 concurring that closure for conservation was not warranted and not the basis for FSB's closure decision.

*Kake v. U.S. Dept. of Agriculture,* 795 F.3d 956, 966 and *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-16 (2009).

There is no reasonable explanation for the FSB's shift in denying the request in 2019 and then adopting the same request in 2020. No new information was received by the FSB when addressing WSA 20-03. The modifications made by the FSB, i.e., selecting the areas where accessible federal public lands are located and extending the closure to two years, do not constitute "new information" brought before the FSB. Limiting the ability of the RAC and members of the public to provide input does not constitute "new information." *See* 0044-FSB, RAC was unable to meet and provide comments, and 0215-FSB, letter from A. Bloomquist opposing the closure after FSB acted and explaining he was not aware of the FSB in time to provide comments. The facts before the FSB in 2019 and 2020 were the same.

No *Chevron* deference is owed to the FSB because it failed to follow required procedures. *Encino Motorcars, LLC v. Navarro,* 136 S.Ct 2117, 2120 (2016), there is no *Chevron* deference if an agency did not follow proper procedures.

FSB's change in position was not based on new facts, and it disregarded opposition to an identical proposal a year earlier without allowing for renewed input. It is a violation of the APA if an agency countermands or ignores its previous findings without a reasoned explanation. *Center for Biological Diversity v. Haaland*, ___ F.3d. ___, WL 2232487 at *6 (9th Cir. 2021). The decision to close Subunits 13A and 13B to moose and caribou hunting by non-federally qualified users violated the APA and must be reversed.

**K.    FSB violated its own regulation by instituting a closure in Subunits 13A and 13B for a full two-year regulatory cycle.**

FSB's regulation at 50 C.F.R. § 100.19(b)(2) is controlling with regard to the length of a temporary closure. As stated previously, FSB cannot open a season except to reopen a season that was closed.

> The length of any temporary action will be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances. In any event, a temporary opening or closure will not extend longer than the end of the current regulatory cycle.

Although WSA 20-03 sought a one-year closure, FSB closed all moose and caribou hunting for two regulatory years, doubling the period of the closure solely to avoid an administrative burden in case a similar request were to be received the following year. 0048-FSB. But doubling the closure period is inconsistent with confining a temporary closure to the minimum time period necessary.

FSB member Siekanic discussed an alternative of limiting a possible closure to a period in fall, but this was opposed by Lisa Maas on the basis that the State might extend the State's caribou season at the end of September and federally qualified users would not benefit. 0051-FSB. This statement and rationale is not supported by the facts. The record shows that federally qualified users benefit from period when no other hunters are present, and the record shows that federally qualified users can hunt under both federal and State regulations. (See above discussion explaining that the closure is not necessary to continue subsistence) When the population of caribou warrants additional harvest, the State will use its authority to provide additional opportunity –

45

including for federally qualified users. The State's comments on WSA 20-03 are found at 0201-FSB through 0206-FSB. Detailed information about the moose and caribou hunts in 2018 and 2019 were provided, including an explanation that the lower than expected harvest of caribou - under both State and federal regulations - led to an extension of the State's harvest season in RY19 for all hunters. 0203-FSB.

Caribou hunting success along the Richardson Highway is linked to the migration of caribou across the highway. 0206-FSB. More hunters participate, under both federal and state regulations, when the game is more accessible. This is shown by the correlation between an increase of hunters in the field to an increase in success, and an increase in state hunters in the field correlated to an increase in federally qualified hunters in the field. *Id.* When the game is present, opportunity for hunting success is present for everyone. But the FSB decision to close the area did not limit the closure to only those periods when the caribou migrate across the Richardson Highway; instead the closure extends to June 30, 2022 regardless of hunting seasons or caribou migration. This is not the minimum period necessary for a temporary special action as required by 50 C.F.R. § 100.19(b).

## V.    CONCLUSION

For all of the above reasons, the FSB violated the APA, ANILCA, and the open meeting requirements of the Sunshine Act. In addition, the FSB improperly delegated authority outside of a federal agency, and attempted to assert regulatory authority over State lands. The State seeks declaratory relief, finding that the FSB violated the laws as

described above. As the recognized primary manager of fish and wildlife throughout Alaska, the State is harmed by the FSB's improper actions and asks the court to enjoin the FSB from interfering with the State's management. The State also seeks injunctive relief to prevent improper delegations of authority outside of federal agencies, to prevent the FSB from opening seasons, to require the FSB to comply with the Sunshine Act, to prevent the FSB from misrepresenting its authority and State hunting regulations, and to comply with the direction provided by Congress in ANILCA.

DATED: July 2, 2021.

TREG R. TAYLOR
ATTORNEY GENERAL


By:    /s/ Cheryl R. Brooking
        Cheryl R. Brooking
        Senior Assistant Attorney General
        Alaska Bar No. 9211069
        Department of Law
        1031 West Fourth Avenue, Ste. 200
        Anchorage, AK  99501
        Phone: (907) 269-5232
        Facsimile: (907) 276-3697
        Email: cheryl.brooking@alaska.gov

*Attorney for State of Alaska*

## <u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITS</u>

I certify that this document contains **<u>12, 662</u>** words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 2nd day of July, 2021.

By: <u>/s/ Cheryl Rawls Brooking</u>
Cheryl Rawls Brooking, Sr. AAG

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **July 2, 2021**, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

*/s/ Hannah B. Pothast*
Hannah B. Pothast
Law Office Assistant