TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

PAUL A. TURCKE (Idaho Bar No. 4759)
SHANNON BOYLAN (D.C. Bar No. 1724269)
Trial Attorneys
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 (Turcke)
202-598-9584 (Boylan)
202-305-0506 (fax)
paul.turcke@usdoj.gov
shannon.boylan@usdoj.gov

*Attorneys for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br>Department of Fish and Game,<br><br>      Plaintiff,<br><br>  v.<br><br>The FEDERAL SUBSISTENCE BOARD,<br>*et al.*,<br>      Federal Defendants,<br><br>  and<br><br>ORGANIZED VILLAGE OF KAKE,<br><br>      Intervenor-Defendant. | Case No. 3:20-cv-00195-SLG |

## FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR MISCELLANEOUS RELIEF

*State of Alaska v. Federal Subsistence Board*
DEFENDANTS' MERITS BRIEF

Case No. 3:20-cv-00195-SLG

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 1

    I.     ANILCA's Subsistence Use Priority ............................................................ 2

    II.    Temporary COVID-Related Subsistence Opportunities. ............................. 3

    III.   Organized Village of Kake Emergency Special Action. .............................. 4

    IV.   FSB Temporary Special Action to Close Parts of Units 13A and 13B. ...... 7

    V.    District Court Proceedings. ........................................................................ 13

LEGAL STANDARD ............................................................................................ 14

ARGUMENT .......................................................................................................... 15

    I.     Plaintiff Fails to Establish a Claim Under the Open Meetings Act. ........... 15

         A.    The Open Meetings Act does not apply to the FSB. ....................... 16

         B.    Even if the OMA applies to the FSB, the FSB did not violate it. ... 22

         C.    The OMA does not authorize the relief Plaintiff seeks. .................. 24

    II.    The FSB Has Authority to Open Seasons Under ANILCA. ...................... 27

    III.   The FSB Action to Open the Kake Hunt Was Lawful. ............................... 32

         A.    Plaintiff's claim regarding the Kake hunt is moot. ........................ 32

         B.    The FSB's decision to authorize the Kake hunt was based on substantial evidence. .................................................................................... 34

    IV.   The FSB Had Authority to Allow Organization of the Kake Hunt by the OVK. ....... 37

    V.    The FSB's Decision to Approve WSA 20-03 Was Lawful. ...................... 40

         A.    ANILCA Provides for the FSB's Action. ...................................... 40

         B.    The FSB's Action On WSA 20-03 Reflects Reasoned Discretion. ..... 43

CONCLUSION ....................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*12 Percent Logistics v. Unified Carrier Registration Plan Bd.*,
   282 F. Supp. 3d 190 (D.D.C. 2017) ................................................................. 21, 25, 27

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) ................................................................................ 33

*Alaska v. Fed. Subsistence Bd.*,
   544 F.3d 1089 (9th Cir. 2008) .......................................................................... 2, 43

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*,
   792 F.2d 782 (9th Cir. 1986) ................................................................................ 38

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................... 26

*Bicycle Trails Council of Marin v. Babbitt*,
   82 F.3d 1445 (9th Cir. 1996) ................................................................................ 42

*Braniff Master Exec. Council of Air Line Pilots Ass'n Int'l v. Civil Aeronautics Bd.*,
   693 F.2d 220 (D.C. Cir. 1982) .............................................................................. 25

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*,
   885 F.3d 560 (9th Cir. 2018) ................................................................................ 47

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................................... 31

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) .............................................................................. 35

*De la Fuente II v. FDIC*,
   332 F.3d 1208 (9th Cir. 2003) .............................................................................. 15

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
   501 F. Supp. 3d 671 (D. Alaska 2020) 1, 2, 3, 4, 5, 7, 14, 23, 25, 30, 31, 32, 33, 35, 36, 37, 38, 39

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
   No. 3:20-cv-00195-SLG, 2020 WL 5625897 (D. Alaska Sept. 18, 2020) 1, 2, 8, 14, 24, 41, 45, 47

*Dickinson v. Zurko*,
   527 U.S. 150 (1999) ......................................................................................... 15, 35

*Dillmon v. Nat'l Transp. Safety Bd.*,
   588 F.3d 1085 (D.C. Cir. 2009) ........................................................................... 15

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
   463 F. Supp. 3d 1011 (D. Alaska 2020) .............................................................. 14

*Friends of the Earth, Inc. v. Laidlaw Env't Services, (TOC),*
    528 U.S. 167 (2000)................................................................................... 33, 34

*Hells Canyon All. v. U.S. Forest Serv.,*
    227 F.3d 1170 (9th Cir. 2000) ........................................................................ 42

*Hunt v. Nuclear Regul. Comm'n,*
    611 F.2d 332 (10th Cir. 1979) ....................................................................... 17

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987)................................................................................... 29, 30

*John v. United States,*
    247 F.3d 1032 (9th Cir. 2001) .................................................................. 27, 30

*Kappos v. Hyatt,*
    566 U.S. 431 (2012)................................................................................... 15, 35

*Leigh v. Salazar,*
    677 F.3d 892 (9th Cir. 2012) ........................................................................ 33

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990)........................................................................................ 26

*McChesney v. Petersen,*
    275 F. Supp. 3d 1123 (D. Neb. 2016)............................................................ 25

*McFarland v. Kempthorne,*
    545 F.3d 1106 (9th Cir. 2008) ...................................................................... 14

*Monjaraz-Munoz v. INS,*
    327 F.3d 892 (9th Cir. 2003) ............................................................. 15, 35, 37

*Montana v. United States,*
    450 U.S. 544 (1981)........................................................................................ 39

*Nachman Corp. v. Pension Ben. Guaranty Corp.,*
    446 U.S. 359 (1980)........................................................................................ 30

*Ninilchik Traditional Council v. Towarak,*
    No. 3:15-cv-205 JWS, 2016 WL 1559122 (D. Alaska Apr. 17, 2016) ................... 31, 40

*Ninilchik Traditional Council v. United States,*
    227 F.3d 1186 (9th Cir. 2000) ......................................................... 30, 31, 41, 43

*NLRB v. Int'l Bhd. of Elec. Workers, Local 48, AFL CIO,*
    345 F.3d 1049 (9th Cir. 2003) ...................................................................... 15

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ...................................................................... 14

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) ........................................................................... 42

*Pac. Legal Found. v. Council on Env't Quality*,
   636 F.2d 1259 (D.C. Cir. 1980) ...................................................................... 19

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015) ......................................................................... 26

*Pan Am. World Airways Inc. v. CAB*,
   684 F.2d 31 (DC Cir. 1982) ........................................................................... 21

*Parravano v. Babbitt*,
   837 F. Supp. 1034 (N.D. Cal. 1993) ........................................................ 18, 19

*Perry v. Schwarzenegger*,
   628 F.3d 1191 (9th Cir. 2011) ....................................................................... 32

*River Runners for Wilderness v. Martin*,
   593 F.3d 1064 (9th Cir. 2010) ....................................................................... 14

*S. Pac. Transp. Co. v. Watt*,
   700 F.2d 550 (9th Cir. 1983) ......................................................................... 38

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................................................... 43

*Stand Up for Cal.! v. U.S. Dep't of the Interior*,
   204 F. Supp. 3d 212 (D.D.C. 2016) .............................................................. 15

*Symons v. Chrysler Corp. Loan Guarantee Bd.*,
   670 F.2d 238 (D.C. Cir. 1981) ...................................................................... 19

*U.S. Telecom Ass'n v. FCC*,
   359 F.3d 554 (D.C. Cir. 2012) ...................................................................... 37

*United States v. Alexander*,
   938 F.2d 942 (9th Cir. 1991) ......................................................................... 31

*United States v. Mazurie*,
   419 U.S. 544 (1975) ....................................................................................... 38

**Statutes**

16 U.S.C. § 3101(b)-(c) ........................................................................................ 27

16 U.S.C. § 3111 ................................................................................................... 2

16 U.S.C. § 3111(4) ............................................................................................ 27

16 U.S.C. § 3112(1) ....................................................................................... 28, 30

16 U.S.C. § 3112(2) ................................................................................................ 2

16 U.S.C. § 3114 ........................................................................................... 28, 42

16 U.S.C. § 3124 .............................................................................................. 28

16 U.S.C. § 3125 ......................................................................................... 28, 29

16 U.S.C. § 3125(3) .......................................................................................... 41

16 U.S.C. § 3126 .............................................................................................. 20

16 U.S.C. § 3126(b) ...................................................................................... 41, 47

16 U.S.C. §§ 3101-3233 .................................................................................... 1

42 U.S.C. § 300j-11(a) ...................................................................................... 39

42 U.S.C. § 7601(d)(2) ...................................................................................... 39

5 U.S.C § 552b(a)(1) ................................................................................ 16, 17, 18

5 U.S.C. § 552(e) .............................................................................................. 16

5 U.S.C. § 552b ...................................................................................... 1, 22, 24

5 U.S.C. § 552b(a)(2) ................................................................................... 18, 24

5 U.S.C. § 552b(a)(3) ........................................................................................ 18

5 U.S.C. § 552b(b) ............................................................................................ 16

5 U.S.C. § 552b(h)(1) ........................................................................................ 23

5 U.S.C. § 552b(h)(2) ........................................................................................ 25

5 U.S.C. § 706(2)(A) .......................................................................................... 14

5 U.S.C. §§ 701-06 .................................................................................... 1, 14

7 U.S.C. § 136u(a)(1) ........................................................................................ 39

**Regulations**

36 C.F.R. § 200.1(a) .......................................................................................... 17

36 C.F.R. § 200.1(b) .......................................................................................... 17

36 C.F.R. § 200.2(a) .......................................................................................... 17

50 C.F.R § 100.10(d)(6) ....................................................................................... 3

50 C.F.R. § 100.10(b)(1) ..................................................................................... 16

50 C.F.R. § 100.10(d)(4) ..................................................................................... 21

50 C.F.R. § 100.10(d)(4)(xiii) ................................................................................. 21

50 C.F.R. § 100.10(d)(7) ......................................................................................... 11

50 C.F.R. § 100.19 ................................................................................................... 27

50 C.F.R. § 100.19(b) .............................................................................................. 42

50 C.F.R. § 100.19(b)(2) ..................................................................................... 46, 47

50 C.F.R. Part 100 ...................................................................................................... 2

**Other Authorities**

123 Cong. Rec. 197, 261 (1977) ............................................................................. 28

S. Rep. No. 94-354, 94th Cong. (1975) .......................................................... 20, 21, 22

# INTRODUCTION

Plaintiff State of Alaska, through its Department of Fish and Game, filed this action on August 10, 2020. It also filed two motions for preliminary injunction, which this Court denied. Plaintiff alleges that the Federal Subsistence Board ("FSB") has violated various laws including the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101-3233 ("ANILCA"), the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), and the Open Meetings Act, 5 U.S.C. § 552b ("OMA").

Plaintiff contests the approval of an emergency pandemic-related subsistence hunt in the Village of Kake that resulted in the harvest of 2 moose and 5 deer, and the closure of a portion of Federal land to non-subsistence hunting for reasons of continuing subsistence use and public safety. While Plaintiff makes many of the same claims that this Court already considered and rejected, Defendants attempt to address each as thoroughly as possible. In substance, however, the FSB was well within its authority under ANILCA to take these actions, and its exercise of discretion in these matters was both reasonable and based on substantial evidence.

# BACKGROUND

The Court is well familiar with the relevant background here. *See Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-cv-00195-SLG, 2020 WL 5625897 (D. Alaska Sept. 18, 2020); *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 501 F. Supp. 3d 671 (D. Alaska 2020). Defendants will synthesize important elements, address Plaintiff's characterizations, and update with citations to the since-filed administrative record.

## I.    ANILCA's Subsistence Use Priority.

Congress enacted ANILCA in 1980, seeking "to preserve Alaska's natural resources, historic sites, and ecosystems, while also providing the continued opportunity for rural residents to engage in a subsistence way of life." *Dep't of Fish & Game*, 2020 WL 5625897, at *5 (citing *Alaska v. Fed. Subsistence Bd*., 544 F.3d 1089, 1091 (9th Cir. 2008). The Federal Subsistence Program is authorized by Title VIII of ANILCA, through which Congress sought to preserve a way of life "essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." 16 U.S.C. § 3111. Congress directed that "nonwasteful subsistence uses of fish and wildlife . . . shall be the priority consumptive uses of all such resources on the public lands of Alaska" and that, when it is necessary to restrict taking of fish and wildlife for enumerated reasons, "the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses." *Id*. § 3112(2).

"Congress authorized the Secretary of the Interior and the Secretary of Agriculture to promulgate regulations in furtherance of its directives; they created the FSB and charged it with 'administering the subsistence taking and uses of fish and wildlife on public lands.'" *Dep't of Fish & Game*, 501 F. Supp. 3d at 683 (quoting *Fed. Subsistence Bd*., 544 F.3d at 1092 n.1); *see* 50 C.F.R. Part 100. These regulations provide mechanisms designed to facilitate efficient and timely operations, such as by re-delegating certain authorities, where appropriate, to agency field officials on individual

units or relating to specific hunts or fisheries. 50 C.F.R § 100.10(d)(6).

## II.     Temporary COVID-Related Subsistence Opportunities.

The COVID-19 pandemic prompted multiple rural Alaskan communities to contact the FSB, seeking "emergency hunting authorizations to address existing or potential food shortages." *Dep't of Fish & Game*, 501 F. Supp. 3d at 679. Between April 9 and 14, 2020, the FSB voted to authorize a process for sending letters of delegation to certain agency field managers. 0478-81_FSB (memorandum describing delegation authority); 0482-99_FSB (approval via e-mail).[1] This followed "discussions with FEMA, the Alaska Emergency Operations Center ("EOC"), Alaska Department of Fish and Game ("ADFG"), subsistence users, and other stakeholders." 0479_FSB. The FSB also received public testimony and written comments indicating that certain food supply lines had been interrupted to such a degree that a number of remote communities were facing the prospect of severe shortages of protein staples such as meat and eggs. 0478-79_FSB. These interruptions developed due to discontinued cargo flights, the shutdown of the Alaska Ferry System, and the need of many communities without health care facilities to quarantine themselves to prevent the introduction of the virus into their populations. *Id*.

Letters were sent outlining a process by which local land managers might open, through reliance on local knowledge and on an expedited basis, subsistence hunting and fishing opportunities on public lands in response to any confirmed COVID-related emergency situation relating to food security that rises to such a level that it constitutes a

---

[1] Citations refer to the Bates numbering in the revised administrative record filed on May 11, 2021. *See* ECF No. 44.

threat to public safety. *See e.g.* 0433-36_FSB (letter to Petersburg District Ranger, Tongass National Forest). The letters of delegation included specific guidelines and limitations, as noted by the Court. *Dep't of Fish & Game*, 501 F. Supp. 3d at 680. Any action was to include coordination, prior to implementation, with the State of Alaska Department of Fish and Game ("ADFG"). 0433_FSB. No action was to be taken if the requested hunting or fishing opportunity threatened the viability of the fish or wildlife population. 0434_FSB. Any emergency openings for hunting and fishing could not remain in effect beyond the time that the threat to public safety has passed and, in any event, could not exceed 60 days in duration. *Id*. If the need for the special action could not be confirmed with the State of Alaska Unified Command Mass Care Group ("Mass Care Group"), the land manager was required to defer the request to the FSB. 0436_FSB.

By their express terms, the delegation letters lapsed on June 1, 2021. *Dep't of Fish & Game*, 501 F. Supp. 3d at 680; *see also* 0435_FSB.

## III. Organized Village of Kake Emergency Special Action.

The Petersburg District Ranger received a letter dated June 4, 2020, from the President of the Organized Village of Kake. 0432_FSB. The letter requested an "emergency moose and deer hunt" to "aid needy members and protect the general Welfare and security of the Village." *Id*. District Ranger Ted Sandhofer proceeded in accordance with his delegation letter, seeking concurrence from ADFG on June 4, 2020, to which he had not received a response before June 12, 2020. *Id*. On June 4, 2020, he also communicated with the Mass Care Group, which "could not confirm any food

shortage or supply chain disruption in Kake" prompting Ranger Sandhofer, by letter dated June 12, 2020, to "defer the special action request to the Board." *Id*.

The Kake request was presented as Wildlife Special Action 19-14 ("WSA 19-14"), which the FSB considered and approved during its telephonic meeting on June 22, 2020. *See* 1333-53_FSB.[2] The State seemingly questions Ranger Sandhofer's account that the Forest Service attempted to contact ADFG. Pl.'s Br. (ECF No. 49) 13. Regardless, the State received advance notice of the FSB meeting and documents addressing WSA 19-14 (461-63_FSB), and ADFG representatives were present and participated in the FSB's telephonic meeting. 1268_FSB; 1299_FSB; 1332-33_FSB. The FSB approved WSA 19-14, which authorized "a Kake community harvest permit" for harvest of "up to 2 bull moose and 5 male Sitka black-tailed deer per month from Thursday, June 24, 2020 to Sunday, August 22, 2020." 0470_FSB. The FSB found the action appropriate "for reasons of public safety related to food security concerns in Kake due to intermittent and unreliable food deliveries caused by the COVID-19 pandemic and limited ferry service." 0471_FSB. The FSB "additionally noted that no conservation concerns exist for resources as a result from this request." *Id*.; *see also* 0431_FSB.

In reaching its decision, the FSB took into consideration available evidence and numerous factors. *See Dep't of Fish & Game*, 501 F. Supp. 3d at 680-81. This included

---

[2] The cited pages are from the "informal telephonic transcript of the June 22, 202[0], hearing on the Kake hunt" that Defendants agreed to add in a supplement to the administrative record subject to "caveats regarding numerous inaccuracies and omissions in the transcript, which was transcribed with voice-recognition software." Defs.' Opp'n to Pl.'s Mot. to Supp. and Complete the Admin. Record 6, ECF No. 41.

further explanation from Ranger Sandhofer supporting the determination that no conservation concern existed for the growing moose and deer populations in the area and that the action would not affect the regular State or Federal hunts. 1334-36_FSB. The FSB heard testimony from the Kake Tribal president that the village had only one ferry delivery in the previous six months, that the food available in the local store was extremely expensive and of questionable quality, and that there was an immediate need for a supply of healthy food to help elders and others fight the virus if it should make its way into the remote village, which has no medical facilities. 1343-46_FSB. The FSB deliberated, and some members noted that while the Mass Care Group apparently did not confirm some of the reported supply chain or food shortage reports, "that we, in fact, have found evidence of food shortage in the communities impacted." 1349_FSB; *see also* 1350_FSB. The FSB Chair echoed these statements, while expressing the desire to continue to improve communications with the Mass Care Group and to refine the process for addressing any future requests. 1351_FSB.

The FSB approved a season of up to 60 days in duration to be administered by the USDA Forest Service's Petersburg District Ranger. 0470-72_FSB. In response, Ranger Sandhofer issued a permit authorizing a 30-day-long community harvest of up to 2 antlered bull moose and 5 male Sitka black-tailed deer, and confirmed that the harvest would be shared with all village residents in need, regardless of tribal status or race. 0444-45_FSB. The 30-day hunt ended successfully and meat from the harvested animals "was distributed to 135 households" in the village. 425_FSB. No further hunt was

authorized for Kake under WSA 19-14. *Id*.

The State misleadingly asserts that its "request for information regarding the animals taken in the Kake hunt was refused." Pl.'s Br. 14. There was initially confusion about some of the requests, but customary harvest information concerning the 2 moose and 5 deer harvested was provided to ADFG. *See* 0132-34_FSB; 0441-43_FSB; 0447-52_FSB; *see also Dep't of Fish & Game*, 501 F. Supp. 3d at 698 ("[T]he State acknowledges that Defendants ultimately provided all the requested information but disputes that its requests were unusual.")

## IV.    FSB Temporary Special Action to Close Parts of Units 13A and 13B.

The State additionally challenges the FSB's decision on Temporary Wildlife Special Action 20-03 ("WSA 20-03"), which was a proposal to close the entirety of Game Management Unit 13 to moose and caribou hunting by non-Federally qualified sport hunters for the 2020-2021 season. Proper framing of the FSB's action is essential to its analysis. The FSB adopted restrictions greatly reduced in scope from the request, resulting in a closure that "only applies to the Federal public lands in Units 13A and 13B that are open to Federal subsistence hunting." 0212_FSB. The physical area affected by the closure, depicted on the associated map, consists of the orange shaded areas in subunits 13A and 13B, in the upper center portion of the map. 0214_FSB; *see also* 0150_FSB (explaining that the FSB "has approved this request, with modification, to only close Federal public lands in Units 13A and 13B to moose and caribou hunting by non-Federally qualified users for the 2020-2022 regulatory cycle").

The FSB formally considered the proposal during its telephonic public meeting held on July 16, 2020, which was transcribed by a court reporting firm. *See* 0001-3_FSB. Again, the Court is well familiar with the backdrop for WSA 20-03:

> Alaska is divided into 26 Game Management Units ("Units"). Unit 13 is a popular area for moose and caribou hunting due to its road accessibility. Federal public lands make up 12.4% of Unit 13, of which approximately half is part of Denali National Park. The Unit is divided into five subunits, A through E, of which Units 13A and 13B are the most readily accessible by road. The Richardson Highway cuts through Unit 13B, and caribou migration across the highway leads to traffic jams caused by hunters crossing the highway or parking in narrow and dangerous sections of the highway in pursuit of caribou.

*Dep't of Fish & Game*, 2020 WL 5625897, at *2 (citations omitted).

The proponent, a resident of Glennallen, stated that closure of all Federal lands in Unit 13 was necessary to address extreme hunting competition from high numbers of non-Federally qualified users, which resulted in low harvest success by Federally-qualified subsistence users and precluded fulfillment of the rural subsistence priority. 0043_FSB. Consequently, the proponent argued that action was necessary to ensure the continuation of Federal subsistence uses of moose and caribou in Unit 13. *Id*. The proponent also contended that a closure was needed for reasons of public safety because there are "too many non-Federally-qualified users to safely hunt and pass on customary and traditional harvest and use practices." *Id*. Finally, the proponent opined that the request "could serve as an experiment" in using "a Federal lands closure as a long-term solution to increasing harvest success rates and providing for the subsistence uses of Federally-qualified subsistence users." *Id*.

Lisa Maas, the Acting Policy Coordinator and a Wildlife Biologist for the Office of Subsistence Management (OSM), presented the proposal to the FSB. *Id*. Ms. Maas noted the history of similar proposals or measures within Unit 13, including the FSB's decision to deny a similar proposal in 2019. 0043-44_FSB. She summarized the written comments and public testimony on the pending proposal. 0044-45_FSB. The proponent emphasized the interaction between caribou and moose hunting in the unit, explaining that "the influx of caribou hunters during moose season takes away moose hunting opportunity from Federally-qualified subsistence users." 0045_FSB. Ms. Maas then reviewed biological and harvest data for both species. 0045-47_FSB.

Ms. Maas summarized the matter before the FSB, stating that "[i]f this request is approved, Federal public lands in Unit 13 will be closed to moose and caribou hunting by non-Federally-qualified users for the 2020/21 regulatory year." 0047_FSB. She noted that while Federal public lands comprise 12.4 percent of the entirety of Unit 13, such lands "in Units 13A and 13B, which only comprise 2.7 percent of the unit are the focus of the immense hunting competition, overcrowding, user conflict and safety concerns." *Id*. Ms. Maas presented recommendations to the FSB, stating that "[c]losures for conservation is not warranted as moose and caribou populations are within or above management objectives." 0047_FSB. But "[c]losure for continuation of subsistence uses of moose may be warranted." *Id*. She then addressed public safety:

> Closure for reasons of public safety may be warranted. Safety concerns resulting from intense hunting pressure, overcrowding, disruption of hunts, and unsafe shooting practices have been repeatedly stated by all user groups. While these concerns may be better addressed through increased law

enforcement or restrictions along road sides, these options have not been implemented and are outside of the Board's authority. These safety concerns have been an issue for decades and have resulted in displacement of Federally-qualified subsistence users who do not feel safe hunting in the area.

0047-48_FSB. Ms. Maas concluded by recommending the FSB approve the proposed temporary special action "with modification to close Federal public lands to moose and caribou hunting by non-Federally-qualified users in Units 13A and 13B only for the 2020/22 regulatory cycle." 0048_FSB. She explained the extension to include an additional year would coincide with the regulatory cycle, which would justifiably reduce administrative burdens since "this situation has been an issue for decades, [and] no change in the situation [is] expected between this year and next year." *Id*.

The FSB meaningfully discussed the matter. Several members noted denial of the 2019 proposal. 0049_FSB; 0051_FSB. However, Ms. Maas explained "in 2019 the OSM recommendation was to close the entire unit, whereas this year we really honed into the problem area" and that this change was responsive to FSB member questions during the 2019 proposal "about the possibility of a targeted closure[.]" 0052_FSB. The discussion also questioned how the effectiveness of any action might be measured, and Ms. Maas referred to the possibility of analyzing feedback from local users, as occurred following similar closures instituted for Unit 23. 0053_FSB. A further point addressed the timing of caribou migration and the fact that caribou have previously migrated through and were often unavailable in the small areas of Federal public lands affected. 0054_FSB. The FSB further discussed the percentages of Federal public lands affected, and clarified that the OSM recommendation would not institute any restrictions in subunits 13C, 13D, or 13E.

0055_FSB.

Ms. Maas presented the Interagency Staff Committee position, which was to concur "with the OSM staff analysis that the request is not valid for experimental purposes but is justifiable to improve safety and reduce use conflicts while continuing and potentially increasing the opportunity for subsistence uses of moose and caribou in Units 13A and 13B." 0056_FSB.[3] The FSB then considered testimony from members of the public connected via the teleconference bridge. 0058-60_FSB. ADFG also participated, with Ben Mulligan offering a comment on ADFG's behalf, the entirety of which stated:

> In reviewing WSA20-03 . . . the actions that you take may not . . . solve the issue that the proposer has brought out. In looking at the data, historically we do see trends when there is an increase even in the number of State hunters, we see an increase in the success rate of Federally-qualified hunters also.
>
> And then the safety issue . . . it may clear out the non-Federally-qualified users from those lands but as was previously stated, people will still be able to transition through there, camp there, they just can't hunt there. They may still see a good level of traffic through those Federal lands also.

0060-61_FSB.

Following a vote, the FSB proceeded "to approve WSA20-03 as modified[.]" 0063-64_FSB. Member Siekaniec voted in favor. 0064_FSB. So did Member Schmid, explaining "we're talking about a postage stamp of land area and I think it's time that we try to take some action here[.]"*Id*. Member Peltola also voted to approve, in order to

---

3 The Interagency Staff Committee (ISC) is a body established by regulation that is comprised of experts from the five land managing agencies involved in the subsistence program. The ISC provides analytical and administrative assistance to the FSB. 50 C.F.R. § 100.10(d)(7).

provide for continued subsistence use and observing "the reduction in density of hunters which would be majority on Federal lands could lead towards addressing the safety concerns as well." 0065_FSB. Member Striker similarly approved, finding the proposal "targeted to problem areas" and noting "it's pretty clear that there's a compelling basis with respect to safety." *Id*. Eventually, "the motion passe[d] six yes, one no, and so Special Action Request WSA20-03 as modified by OSM" was approved. 0066_FSB. Thus, the FSB approved a closure through June 30, 2022, but only in Subunits 13A and 13B. The FSB found that such closure was necessary for reasons of public safety and the continuation of subsistence uses, but limited the closure to Subunits 13A and 13B, finding those are the areas disproportionately affected by overcrowding, disruption of hunts, and serious safety concerns.

The State disputes these facts in several ways. For example, it states that the closure "was not necessary to continue subsistence." *See* Pl.'s Br. 36-40. For this it relies on a memorandum written by Mr. Mulligan. *See* Pl.'s Br. 37-40 (quoting 0201-06_FSB). That memorandum was integrated into the OSM Staff Analysis and ISC Recommendation, and was thus considered by the FSB. *See* 0162_FSB; 0174_FSB (noting inclusion of ADFG comments at Appendix 1). The State also asserts that federally qualified hunters are eligible to hunt under state regulations, and thus have access to additional harvest opportunities. Pl.'s Br. 43. These opportunities are addressed in the OSM Staff Analysis, and were thereby considered by the FSB. *See* 0168-69_FSB.

Any discussion about additional opportunities for federal subsistence users in the

form of a longer hunting season fails to recognize that, in recent years, ADFG has issued emergency orders extending its season beyond the approved end date of the September 21, which has negated the rural priority on public lands and undermined the FSB efforts to meet its mandate under Title VIII. *See* 0044-46_FSB; 0051_FSB; 0059_FSB. While the season for moose opens one month earlier for Federally-qualified subsistence users, "most moose are harvested in mid-September due to cooler weather and increased bull susceptibility to harvest" limiting any Federal subsistence priority afforded by the longer season. 0191_FSB; *see also* 0188_FSB.

In reality, Federal subsistence harvest success rates have been lower than for State hunters, a fact noted by the FSB in reaching its decision. *Id*.; 0047_FSB; 0065_FSB. "Many communities surveyed for the 2009-2013 calendar years identified better equipped urban hunters, traffic pressure on the roads, and the significant increase in use of off-highway motorized vehicles as both interfering with access and driving game further from road corridors." 0183_FSB; 0046_FSB (describing area as "a combat hunting zone" interfering with caribou migration); *see also* 0054_FSB.

## V. District Court Proceedings.

On August 10, 2020, the State filed this action (ECF No. 1) and two motions seeking expedited injunctive relief (ECF Nos. 3, 4) addressing the FSB's approval of the Kake hunt and Unit 13 closures. On August 17, 2020, the FSB was directed by the office of the Secretary of the Interior to "temporarily pause its operations in light of the State's complaint." Declaration of Stephen Wackowski ¶ 2, ECF No. 15-4. The Court heard

argument on the motions on September 8, 2020, denied one motion on September 18, 2020, *Dep't of Fish & Game*, 2020 WL 5625897, and denied the other motion on November 18, 2020. *Dep't of Fish & Game*, 501 F. Supp. 3d at 671. The administrative record is before the Court, and Plaintiff's motion presents the merits under Local Rule 16.3 to allow the Court to enter final judgment.

## **LEGAL STANDARD**

Agency decisions are reviewed under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. *See Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1017 (D. Alaska 2020). Under the APA, agency decisions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In accordance with that standard, an agency's decision will be overturned,

> only if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and quotations omitted). The standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted). The APA "does not allow the court to overturn an agency decision because it disagrees with the decision." *River Runners for Wilderness v. Martin*, 593 F.3d

1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted).

Under APA section 706 "when review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'" *Stand Up for Cal.! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 246 (D.D.C. 2016) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)), aff'd, 879 F.3d 1177, 1181 (D.C. Cir. 2018); *see also Kappos v. Hyatt*, 566 U.S. 431, 435 (2012). Substantial evidence means more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See NLRB v. Int'l Bhd. of Elec. Workers, Local 48, AFL CIO*, 345 F.3d 1049, 1053-4 (9th Cir. 2003); *De la Fuente II v. FDIC*, 332 F.3d 1208, 1220 (9th Cir. 2003). The standard, however, is "extremely deferential" and a reviewing court must uphold the agency's findings "unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result." *See Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003), *Op. amended* 339 F.3d 1012 (9th Cir. 2003); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (an agency's factual findings are adopted "as conclusive if supported by substantial evidence . . . even though a plausible alternative interpretation of the evidence would support a contrary view") (internal quotation marks and citation omitted).

## **ARGUMENT**

### I. **Plaintiff Fails to Establish a Claim Under the Open Meetings Act.**

Plaintiff claims the FSB violated the Open Meetings Act ("OMA"), also known as the Government in the Sunshine Act, in various actions taken on or about April 9,

April 14, April 20-23, June 22, July 16, and July 22-27, 2020. Plaintiff also asserts that the Court, upon finding violations of the Act, can impose remedies to include "[f]uture injunctive relief and an award of attorney['s] fees." Pl.'s Br. 19. Even if the OMA applies to the FSB, which it does not, the FSB did not violate it; and even if it did, the only remedy available for a violation is the release of transcripts, which have already been provided to Plaintiff.

A.    The Open Meetings Act does not apply to the FSB.

The OMA, 5 U.S.C. § 552b(b), is not applicable to the FSB. It provides that "every portion of every meeting of an agency shall be open to public inspection." The statute defines an "agency" as that "headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency." 5 U.S.C § 552b(a)(1) (meaning "agency" as defined in 5 U.S.C. § 552(e)). The voting members of the FSB are:

> A Chair to be appointed by the Secretary of the Interior with concurrence of the Secretary of Agriculture; two public members who possess personal knowledge of and direct experience with subsistence uses in rural Alaska to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; Alaska Regional Director, National Park Service; Alaska Regional Forester, U.S. Forest Service; the Alaska State Director, Bureau of Land Management; and the Alaska Regional Director, Bureau of Indian Affairs.

50 C.F.R. § 100.10(b)(1); *see also* https://www.doi.gov/subsistence/members (last visited July 30, 2021). None of these members, much less a majority, were appointed by the

President with the advice and consent of the Senate.[4]

Nor is the FSB a "subdivision" of an agency within the meaning of the OMA. The definition of "agency" includes the clause "and any subdivision thereof authorized to act on behalf of the agency." 5 U.S.C. § 552b(a)(1). But the FSB is not a subdivision of any agency as defined in the OMA i.e., it is not the subdivision of a group "headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate." *Id*. "This is not an instance where an agency, i.e., a collegial body, a majority of whose members are appointed by the President, has divided itself into sub-groups to conduct the

---

[4] The Chair and two public members are not appointed by the President – the regulation makes clear that those three members are appointed by the Secretary of the Interior with concurrence of the Secretary of Agriculture. None of the agency official positions on the Board are appointed by the President and confirmed by the Senate either. The Alaska Regional Forester is a field officer within the U.S. Forest Service "who is responsible to the Chief for the activities assigned to that region." 36 C.F.R. § 200.2(a). The Chief of the Forest Service acts under the Secretary of Agriculture. *Id*. § 200.1(a) & (b). Thus, both the Chief and Regional Forester operate below the organizational level of officers appointed by the President. Presidential appointees in the Department of Agriculture consist primarily of various Under Secretaries, the Deputy Secretary, and the Secretary. *See* Congressional Research Service, C.M. Davis, M. Greene, Presidential Appointee Positions Requiring Senate Confirmation and Committees Handling Nominations, p. 5 (May 3, 2017). Other Board positions fall within the Department of the Interior, in which the President appoints the Secretary, Deputy Secretary, Assistant Secretaries, and Directors of Bureaus including the Bureau of Land Management, National Park Service, and U.S. Fish and Wildlife Services. *Id*. at 18-19. The State and Regional Directors within these Bureaus serve in field organizations, not the national organizations where the closest Presidential appointee might serve. *See e.g.*, Department Manual 135 DM 2, BLM Organization and Functions (at https://www.doi.gov/sites/doi.gov/files/elips/documents/ 135-dm-2.pdf (last visited July 30, 2021); https://www.doi.gov/sites/doi.gov/files/elips/ documents/135-dm-2-org-chart.pdf (BLM Organization Chart) (last visited July 30, 2021).

business of the agency." *Hunt v. Nuclear Regul. Comm'n*, 611 F.2d 332, 335-36 (10th

Cir. 1979) (finding that the "Atomic Safety and Licensing Board is clearly Not [sic] an

agency within the meaning of the [OMA]. Members of such a Board are not appointed by

the President, but by the Nuclear Regulatory Commission").

> The Court in *Hunt* best elucidated the proper statutory interpretation:
>
> Any possible doubt on this particular matter is cleared up by ensuing sections in the statute. 5 U.S.C. § 552b(a)(2) defines the term 'meeting' as the deliberations of at least the number of individual agency members required to take action on behalf of the agency. This language is entirely consistent with the premise that the 'subdivision' mentioned in 5 U.S.C. § 552b(a)(1) is a subdivision of the 'collegial body' and that such subdivision must be composed of a sufficient number of the members of the collegial body as to permit action on behalf of the collegial body.
>
> If there still be any doubt on this particular matter, such should be resolved by the provision of 5 U.S.C. § 552b(a)(3). That particular section defines the term 'member' as that term is used in the definition of both the term 'agency' and the term 'meeting.' The statute defines the term 'member' as an individual 'who belongs to a collegial body heading an agency.' No member of the present Board belongs to the 'collegial body heading the agency.'

*Id*. at 336.

And while members of the FSB are appointed by either the Secretary of the

Interior or the Secretary of Agriculture or both, neither the Department of Interior nor the

Department of Agriculture are themselves agencies within the meaning of the OMA. *See*

*Parravano v. Babbitt*, 837 F. Supp. 1034, 1048 (N.D. Cal. 1993) (finding that "[b]ecause

the Department of Commerce is headed by a single person, not a collegial body," the

OMA does not apply), *aff'd*, 70 F.3d 539 (9th Cir. 1995). Also, neither Secretary can be

said to "head" the FSB. To "head" a group means to "direct", "lead", or be "in charge" of

it. *See* "head." Merriam-Webster Online Dictionary. 2021. http://www.merriam-webster.com (20 July 2021). Here, the FSB does not report to either Secretary, nor is either Secretary a voting member of the FSB or in any way meaningfully involved in the FSB's decisions. Even if they could be said to "head" the FSB, the Secretaries do not make up a majority of the members of the FSB, as required to qualify as an agency under the statute.

Applicable case law punctuates the force of the statute's plain language. *See Symons v. Chrysler Corp. Loan Guarantee Bd.*, 670 F.2d 238, 240 (D.C. Cir. 1981) (holding that even where Board members are appointed to some government position by the President with the advice and consent of the Senate, they are not covered by the OMA when they were not so appointed to the Board position itself); *see also Pac. Legal Found. v. Council on Env't Quality*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980) (Council recognizing it qualifies "in view of the statutory definition" by consisting of three members appointed by the President with Senate approval). Nor is there any legal pathway under the Act that would connect the FSB to high-level leadership meeting the statutory definition. *Parravano*, 837 F. Supp. at 1048.

Furthermore, the legislative history of the OMA fully supports this interpretation. Regarding the subdivision clause, the Senate Committee on Government Operations Report explained:

> Section 201(a) provides that all meetings of the individual Commissioners, board members, or the like, except those discussions exempted by subsection (b), must be open to the public. Included within this requirement are meetings of agency subdivisions authorized to take action on behalf of

the agency. The open meeting requirement *applies to panels of a Commission, or regional boards*, *consisting of two or more agency heads and authorized to take action on behalf of the agency*. To be a subdivision of an agency covered by this subsection, the panel need not have authority to take agency action which is final in nature. Panels or boards composed of two or more agency members and authorized to submit recommendations, preliminary decisions, or the like to the full commission, or to conduct hearings on behalf of the agency, are required by the subsection to open their meetings to the public.

S. Rep. No. 94-354, 94th Cong., 1st Sess. 17 (1975) (emphasis added). Thus, a "subdivision" would "consist[] of two or more agency heads authorized to take action on behalf of the agency." *Id*. Here, none of the FSB members are "agency heads," either in the ordinary meaning of the phrase, or within the meaning of the statute because they do not head any collegial body comprised of a majority of members that are appointed by the President.

More practically, the FSB's duties under ANILCA are also at odds with the OMA's requirements. For example, Section 816 of ANILCA allows the FSB to take "immediate" action in the event of an emergency. 16 U.S.C. § 3126. Because this provision for emergency action is irreconcilable with the OMA's advance notice requirements, Congress could not have intended for the OMA to apply with respect to those aspects of FSB's duties.

In sum, the statute's plain language, relevant case law, and legislative history all demonstrate that Congress did not intend for the OMA to apply under the circumstances present here. Nothing in the administrative record or in the cases Plaintiff references supports a different conclusion. The cases Plaintiff cites are distinguishable, and have no

bearing here, because the agencies at issue in those cases were explicitly subject to the OMA, either because they were listed in the OMA's Senate Committee Report as one of the agencies subject to the OMA, or because a separate statute explicitly required the entity to comply with the OMA. *See 12 Percent Logistics v. Unified Carrier Registration Plan Bd.*, 282 F. Supp. 3d 190, 196 (D.D.C. 2017) (the Unified Carrier Registration Act explicitly required the defendant board to comply with the OMA); *Pan Am. World Airways Inc. v. CAB*, 684 F.2d 31, 36 (DC Cir. 1982) (the Civil Aeronautics Board was specifically included in the Senate Committee Report on the OMA as one of the 47 Federal agencies covered by the statute, *see* S. Rep. No. 94-354, 94th Cong., 1st Sess. 15 (1975) ). None of those circumstances are present here.

The FSB is also not subject to the OMA merely because it has separately acknowledged the importance of public meetings or pursued a policy of fostering public involvement. Plaintiff submits that the FSB "knew it was bound by the Sunshine Act when it referenced open meeting requirements" in its April 9, 2020 email. Pl.'s Br. 17 (referencing 0482_FSB which includes the sentence: "Because it is an administrative action, this decision does not need to [sic] made at a public meeting."). But the duties of the FSB are set forth in 50 C.F.R. § 100.10(d)(4), and none of these duties require that all meetings of the FSB be held in public. The FSB, rather, has the authority to establish rules and procedures for its own operations, *id.* § 100.10(d)(4)(xiii), and is thus free to adopt practices that create more transparency than that required by law. And, relevant here, the FSB has exercised that authority by opening its decisionmaking process to the

public when possible, including by posting upcoming meeting information and past meeting transcripts and materials on its website, encouraging the public and State representatives to submit written comments and provide verbal testimony during FSB regulatory meetings, holding those regulatory meetings in large venues and accessible locations whenever possible, and ensuring, long before the pandemic, that those unable to attend public meetings personally are able to listen in and participate telephonically. *See* https://www.doi.gov/subsistence/board.

This exercise of discretion is consistent with Congress's intent in passing the OMA. As explained in the Senate Committee on Government Operations Report for the OMA, it was "the committee's hope that each agency not covered by section 201 will closely examine its internal procedures and take on its own every step it can to open up its decisionmaking process, including meetings, to the public." *See* S. Rep. No. 94-354, 94th Cong., 1st Sess. 17 (1975) . Contrary to Plaintiff's contention, however, this exercise of discretion in no way concedes that the FSB is subject to the OMA.

In short, 5 U.S.C. § 552b is not applicable to the FSB, and Plaintiff's claims under the OMA fail.

B. Even if the OMA applies to the FSB, the FSB did not violate it.

Plaintiff alleges that the FSB violated the OMA by taking action in "secret" on April 9 or April 14, 2020 to approve a delegation of authority to local land managers to approve emergency hunts for reasons of pandemic-related food insecurity. Pl.'s Br. 13. As this Court noted in its November 18, 2020, denial of Plaintiff's Motion for

Preliminary Injunction, any challenge to an alleged violation of the OMA on April 9 or April 14, 2020 is untimely. *Dep't of Fish & Game*, 501 F. Supp. 3d at 688. The Act provides that actions "may be brought by any person against an agency prior to, or within sixty days after, the meeting out of which the violation of this section arises . . . [or] at any time prior to sixty days after any public announcement of such meeting." 5 U.S.C. § 552b(h)(1). At the latest, Plaintiff had notice of the delegation process when it received the June 2, 2020 delegation letters,[5] but it did not commence this action until August 10, 2020, more than sixty days later. *Dep't of Fish & Game*, 501 F. Supp. 3d at 687-88. Thus, any claims against supposed violations of the OMA from April 9-14, 2020 are time-barred.[6]

Also, Plaintiff's claim regarding a July 22-27, 2020, email vote on WSA 19-15 must also fail because such a vote, while planned (*see* ECF No. 4-3 at 54), never took place, and thus there was no meeting to trigger the OMA.

Plaintiff also alleges that the FSB violated the OMA by holding closed executive sessions prior to public meetings held on April 20 and July 16, 2020. As explained above, any claim arising from the April 20 meeting is time barred.[7] And as this Court indicated in its September 18, 2020, denial of Plaintiff's Motion for Preliminary

---

[5] Plaintiff also indicated to the Court that it had notice of the delegation of authority on April 16, 2020. *See Dep't of Fish & Game*, 501 F. Supp. 3d at 687-88 (citing ECF No. 29 at 8:11–9:3).

[6] Curiously, Plaintiff seems to imply that because the FSB did not serve an answer to its Complaint within 30 days as required by 5 U.S.C. § 552b(h)(1), this somehow absolves Plaintiff of its tardiness in bringing its action. Pl.'s Br. 18. It does not.

[7] Also, Plaintiff did not complain about the April 20, 2020 meeting in its Complaint.

Injunction, a closed executive session is not a "meeting" within the meaning of the OMA. *Dep't of Fish & Game*, 2020 WL 5625897, at *13. The OMA defines a meeting as "the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business." 5 U.S.C. § 552b(a)(2). Plaintiff theorizes that the timing of the July 16 executive session "indicates there was a discussion of the action subsequently taken to close areas in Unit 13." Pl.'s Br. 15. But nothing in the record supports Plaintiff's contention that the FSB undertook the disposition of any "official agency business" during this executive session. *Dep't of Fish & No. 3:20-CV-00195-SLG* at *13. In fact, the evidence in the record supports the opposite contention. As this Court already found, the FSB received sufficient evidence at the public meeting on July 16 to make the decision to adopt WSA 20-03. *Id*. at *11 ("the Court finds that the record contained ample evidence that supports the FSB's decision to adopt WSA 20-03"). Because the actual disposition of agency action took place at the public meeting, not in any executive session, there is no basis for concluding that the executive sessions are subject to the OMA.

Therefore, the FSB did not violate 5 U.S.C. § 552b, and Plaintiff's claims under the OMA fail.

C.     The OMA does not authorize the relief Plaintiff seeks.

Finally, contrary to Plaintiff's contention, the OMA does not independently authorize an injunction voiding actions taken at an allegedly unlawful meeting.

Jurisdiction under the Act is limited:

> Nothing in this section authorizes any Federal court having jurisdiction solely on the basis of paragraph (1) to set aside, enjoin, or invalidate any agency action (other than an action to close a meeting or to withhold information under this section) taken or discussed at any agency meeting out of which the violation of this section arose.

5 U.S.C. § 552b(h)(2). As such, Plaintiff cannot obtain injunctive relief solely for a violation of the Sunshine Act. Rather, as this Court already found, "'the remedy for . . . violations [of the Act] is increased transparency, not invalidation of agency action.'" *Dep't of Fish & Game*, 501 F. Supp. at 689 (quoting *McChesney v. Petersen*, 275 F. Supp. 3d 1123, 1138–39 (D. Neb. 2016)); *Braniff Master Exec. Council of Air Line Pilots Ass'n Int'l v. Civil Aeronautics Bd.*, 693 F.2d 220, 226 (D.C. Cir. 1982) ("'release of transcripts, not invalidation of the agency's substantive action,' is the remedy generally appropriate for disregard of the Sunshine Act."). Defendants have already provided Plaintiff with all existing transcripts. No transcripts exist for alleged meetings on April 9 or April 14 (claims that are time-barred), July 22-27 (because no meeting took place), or executive sessions prior to public meetings on April 20 and July 16 (no transcripts were created, nor did they need to be, because there was no disposition of official agency business).

Plaintiff nevertheless asks this Court to "enjoin the FSB from conducting future actions without proper notice and open meetings" and contends that "[f]uture injunctive relief and an award of attorney fees is appropriate for intentional failure to comply with the Sunshine Act." Pl.'s Br. 19 (citing *12 Percent Logistics*, 282 F. Supp. 3d at 190). But

such injunctive relief would be inappropriate because it would be directed at future meetings beyond the scope of the claims before the Court. As the Ninth Circuit has explained, "[a] court's equitable power lies only over the merits of the case or controversy before it. When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). In this case, the only OMA claims before the court pertain to meetings that occurred prior to the date of the Complaint, because the APA provides for judicial review only with respect to "final" agency actions. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Even assuming Plaintiff could somehow establish a broad pattern of OMA violations in this case, there still would be no basis for broad, prospective, injunctive relief constraining meetings beyond the scope of the Court's current jurisdiction and equitable authority. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) ("[T]he flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, *and presumably actions yet to be taken as well*—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.") (emphasis added).

This Court should disregard *12 Percent Logistics* to the extent it is inconsistent with the above precedents. But even to the extent the various cases can be reconciled, *12 Percent Logistics* is distinguishable for two reasons. First, as explained above, the Unified Carrier Registration Act mandates compliance with the OMA and ANILCA and

the FSB's regulations do not. Second, the court in *12 Percent Logistics* only granted a limited injunction pending appeal because there was evidence that the Board had *never* complied with notice requirements with respect to subcommittee meetings. *12 Percent Logistics*, 289 F. Supp. 3d at 75–76 (reasoning that the Board "is likely to continue holding subcommittee meetings without providing the legally required notice to the public. The harm that follows from that practice is both obvious and certain"). By contrast, the FSB regularly posts meeting notices on its website along with meeting transcripts and materials. Plaintiff has not shown that the FSB violated the OMA on any of the alleged occasions, much less proven that such alleged violations were "consistent," "intentional," or likely to recur in the future. Pl.'s Br. 19.

For the foregoing reasons, Plaintiff's claims under the OMA must fail.

## II.     The FSB Has Authority to Open Seasons Under ANILCA.

The FSB's regulation at 50 C.F.R. § 100.19 authorizing it to open seasons in emergency situations is a valid exercise of delegated authority under ANILCA. Through ANILCA, Congress exercised "constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands[.]" 16 U.S.C. § 3111(4). "ANILCA, read as a whole, clearly expresses Congress's intent to create *a federal regulatory scheme* 'to protect the resources related to subsistence needs' and 'to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.'" *John v. United States*, 247 F.3d 1032, 1036 (9th Cir. 2001) (en banc) (Tallman, J., concurring) (quoting 16 U.S.C. § 3101(b)-(c))

(emphasis added). More than a factor to be merely considered in a complex balancing of multiple uses, Title VIII of ANILCA mandates that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes." 16 U.S.C. § 3114. The prioritization of the opportunity for subsistence use of resources has been a part of ANILCA since its inception. In an introduction of the Bill in 1977, Representative Udall stated that the legislation he was seeking would "protect the existing way of life of many Alaskan natives" and would allow those "who depend upon subsistence for survival" to continue to do so. 123 Cong. Rec. 197, 261 (1977) (Remarks of Rep. Morris Udall). This intent was later memorialized in Title VIII, the stated purpose of which is "to provide the opportunity for rural residents engaged in a subsistence way of life to do so." 16 U.S.C. § 3112(1). The duty to administer these directives resides with the Secretary of the Interior, who is authorized to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this title." 16 U.S.C. § 3124.

The principles underlying Title VIII of ANILCA cannot be reconciled with Plaintiff's contention that ANILCA only authorizes the FSB to close or restrict hunting opportunities on federal public lands but does not authorize opening a hunt. It is hard to ascribe meaning to the statutory purpose to provide opportunities for subsistence use or the statutory command to prioritize subsistence use without recognizing the ability to provide for such use. Plaintiff's attempt to restrict the FSB's authority ignores this affirmative command, relying instead on Section 815 (16 U.S.C. § 3125) entitled

"Limitations and savings clauses" and Section 816 (16 U.S.C. § 3125) entitled "Closure to subsistence uses[.]" This approach contorts statutory intent – it is little wonder that power to authorize hunting is not explicated in the part of Title VIII addressing the circumstances in which hunting can be restricted. In fact, it makes perfect sense that Title VIII as a whole primarily addresses situations where hunting and fishing is restricted, because those are the exact circumstances that would undermine the purpose of the Act— to provide for subsistence uses of fish and wildlife.

Plaintiff's arguments also find no support in the legislative history. Plaintiff contends that Congress did not intend for the FSB to authorize subsistence hunts because one house of Congress rejected language accepted by the other that would have explicitly granted the FSB authority to open hunting and fishing in extraordinary circumstances. But the case it cites for this proposition, *see* Pl.'s Br. 22, does not support its contention. In *INS v. Cardoza-Fonseca*, 480 U.S. 421, 434 n.17 (1987), the Supreme Court held that Congress's rejection of the Senate version of a bill indicated there was no Congressional intent to accept a new standard set forth in the rejected Senate version. In enacting the Immigration and Nationality Act, Congress was contemplating which of two different standards should be used to prove that an individual would be persecuted in their country of origin if deported. *Cardoza-Fonseca*, 480 U.S. at 441-42. In the end, by rejecting the Senate version of the bill, Congress essentially chose one standard over the other. *Id*. at 442-43. There was no definitive rule of law established in *INS* to support the proposition that Congressional intent can be discerned to "expressly disallow action" from the

rejection of language by one house of Congress that was accepted by the other. Pl.'s Br. 22. Rather, what the Court noted in that case regarding Congressional intent was that "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded *in favor of other language*." *Cardoza-Fonseca*, 480 U.S. at 442–43 (emphasis added) (quoting *Nachman Corp. v. Pension Ben. Guaranty Corp.*, 446 U.S. 359, 392–93) (Stewart, J., dissenting).

Here, Congress did not discard language about FSB's authority to open hunting and fishing seasons in favor of other language regarding the same matter. It simply did not include this provision in its final version of ANILCA. Congressional intent is more readily discernable from the language that Congress did accept in the final Act, specifically its purpose to "provide the opportunity for rural residents engaged in a subsistence way of life to do so." 16 U.S.C. § 3112(1); *John*, 247 F.3d at 1036 ("ANILCA, read as a whole, clearly expresses Congress's intent . . . 'to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.'") (en banc) (Tallman, J., concurring). This intent is further endorsed by the fact that there are no provisions in ANILCA prohibiting the FSB from opening a season for hunting or fishing. *Dep't of Fish & Game*, 501 F. Supp. 3d at 691. If Congress wanted to prohibit the FSB from opening seasons, it could have done so.

The case law also reflects the practical reality that the FSB regularly creates, modifies, or imposes conditions on subsistence hunting opportunity. *See e.g., Ninilchik*

*Traditional Council v. United States*, 227 F.3d 1186, 1194-95 (9th Cir. 2000) (imposing antler restriction on subsistence hunts for moose to protect continued viability of bull moose population); *Ninilchik Traditional Council v. Towarak*, No. 3:15-cv-205 JWS, 2016 WL 1559122, at *2 (D. Alaska Apr. 17, 2016) (approving NTC's proposed regulations to authorize residents of Ninilchik to operate two community subsistence gillnets in the Kenai and Kasilof Rivers). While Title VIII of ANILCA largely dictates how to prioritize and protect subsistence uses when restricting hunting opportunities, other situations, such as a global pandemic that threatens food supplies to rural communities, likewise threaten "the physical well-being of rural residents of Alaska." *Dep't of Fish & Game*, 501 F. Supp. at 692 (finding that "ANILCA's priority for subsistence uses aims, among other things, to ensure the physical well-being of rural residents of Alaska").

Finally, the FSB's interpretation of ANILCA is entitled to deference. *Dep't of Fish & Game*, 501 F. Supp. 3d at 691 (citing *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191-92 (9th Cir. 2000) (giving judicial deference to the FSB's interpretation of 16 U.S.C. § 3114); *United States v. Alexander*, 938 F.2d 942, 946 n.6 (9th Cir. 1991) (within realm of ANILCA, a reviewing court "owe[s] the state regulatory agency's interpretation no deference"). The Court is "thus prohibited from substituting [its] 'own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.'" *Ninilchik*, 227 F.3d at 1191 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

In short, statutory interpretation, legislative history, legal precedent, and practical considerations all support the FSB's common-sense reading of Title VIII. The FSB's interpretation of its authority under ANILCA is a permissible construction of the statute and thus must be accorded deference. *Dep't of Fish & Game*, 501 F. Supp. 3d at 692 (concluding that "the FSB's interpretation of Section 804 as authorizing a regulation to open emergency hunts due to public safety concerns is reasonable").

## III.     The FSB Action to Open the Kake Hunt Was Lawful.

The FSB's decision to approve the Organized Village of Kake's ("OVK") request to open a hunt due to pandemic conditions was entirely reasonable and based on substantial evidence. First, it cannot go without mentioning that the Kake hunt occurred over a year ago and it was the only such hunt approved under the FSB's COVID-19 delegation process that expired on June 1, 2020. Thus, Plaintiff's claim regarding the Kake hunt is moot. Second, this Court has already found that the FSB's decision was lawful under the APA. *Dep't of Fish & Game*, 501 F. Supp. 3d at 696-97.

### A.     Plaintiff's claim regarding the Kake hunt is moot.

Any action in federal court must at all times satisfy Article III jurisdictional requirements. *Perry v. Schwarzenegger*, 628 F.3d 1191, 1195 (9th Cir. 2011). To maintain standing, a litigant must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Friends of the Earth, Inc. v. Laidlaw Env't Services, (TOC)*, 528 U.S. 167, 180-81 (2000). Mootness addresses whether a sufficient live case or controversy still exists and is sometimes described as "the doctrine of standing set in a time frame[.]"*Id*. at 189-90; *see also Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012) (The mootness doctrine requires that an actual, ongoing controversy exist at all stages of federal court proceedings). These related concerns further intersect here in the question of redressability. A litigant must show that it is "likely, as opposed to merely speculative" that she has suffered an injury that can be "redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181.

While there is an exception to the mootness doctrine when the challenged conduct is capable of repetition but evades review, that exception is not applicable here. *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 856 (9th Cir. 1999). This Court found that the emergency Kake hunt fell within this exception during the preliminary injunction phase of this case because "the FSB's delegation of authority to local land managers does not expire until June 2021, and the COVID-19 pandemic is ongoing." *Dep't of Fish & Game*, 501 F. Supp. 3d at 685-86. But today's changed circumstances require a different result. The delegation process has expired and the COVID-19 pandemic has abated considerably. The Kake hunt was a discrete response on a particularized record to address one remote community's needs during a global pandemic. Defendants have not authorized similar hunts, have not issued renewed delegations, and there is no basis in the present record for finding that the Kake hunt

creates a template or is in any way predictive of the FSB's response to a different request.

Furthermore, Plaintiff has not shown that it is "likely, as opposed to merely speculative," that it has suffered an injury that can be "redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181. The Kake hunt resulted in the harvest of only two bull moose and five antlered Sitka black-tailed deer, so whatever "injury" Plaintiff suffered, if any, is marginal at best. It stretches the imagination to think that such a discrete, past action by the FSB, in light of evidence showing a lack of wildlife conservation concerns in the area, "infringe[d] on the State's ability to manage fish and wildlife populations." Pl.'s Br. 26; *see also* 0137_FSB (noting that "no conservation concerns exist for resources as a result from this request"). And Plaintiff has provided no evidence that such emergency hunts will recur in some future extraordinary condition such that "the State would have no estimate of the potentially unlimited additional harvests that could be authorized by the FSB or the local land managers through delegated authority." *Id*. Thus, the Kake hunt does not present a justiciable case or controversy and is moot.

> B.    The FSB's decision to authorize the Kake hunt was based on substantial evidence.

Even if this Court determines Plaintiff's challenge is not moot, the FSB's decision to authorize the emergency Kake hunt was not arbitrary, capricious, or contrary to law. An agency decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018). Agency's factual findings are reviewed under the substantial evidence standard. *See Kappos*, 566 U.S. at 434-35; *Dickinson*, 527 U.S. at 153-61. The standard is "extremely deferential" and a reviewing court must uphold the agency's findings "unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result." *See Monjaraz-Munoz*, 327 F.3d at 895. As this Court already found, the "record contained ample evidence that supported and was rationally connected to the FSB's decision to approve the emergency special action in Kake for reasons of public safety related to food security concerns; the FSB considered relevant factors— conservation and public safety concerns—and articulated a satisfactory explanation for its decision." *Dep't of Fish & Game*, 501 F. Supp. 3d at 696.

Plaintiff opines that there was not substantial evidence showing a food shortage in Kake and then proceeds to mischaracterize the testimony received by the FSB, 1334-1353_FSB, but that testimony speaks for itself. Joel Jackson, the President of OVK, testified to the FSB regarding supply chain issues in Kake and rising prices in the stores, especially for meat. *See* 1344_FSB. He testified to the low quality of meat in the stores and that the "stores here are not able to secure everything that they ordered." 1344-45_FSB. Mr. Jackson explained that the OVK was "trying to supply everybody in town with fresh fish" but that he was concerned about obtaining healthy meat for "our people,

our elders and our tribal citizens." 1345_FSB. Mr. Jackson expressed concern that the lack of quality meat could impact the health of the community members which may exacerbate the danger of contracting COVID-19 which was spreading in the surrounding area. 1345_FSB. He added that they had just received a ferry shipment, but that it was the first one in half a year, and he "[did not] know when the next one would arrive." 1345_FSB. Balanced against that, the Mass Care Group commented that they were "unaware of any food shortages in Kake." 1336_FSB. But while Plaintiff seizes on this comment, it has little probative value because being "unaware" of a food shortage is quite different from concluding that there is none. In any event, FSB members weighed all available evidence and stated: "we believe that the Mass Care Group was in error."[8]

After hearing the evidence, and considering the fact that there were no wildlife conservation concerns in the area, the FSB voted 7-to-1 to approve the OVK's request for an emergency hunt.[9] 0137_FSB; 1353_FSB. This decision was based on substantial

---

[8] Regarding Plaintiff's contention that the FSB violated its own guidelines when it did not rely on the Mass Care Group's opinion that there were no food safety concerns: "The FSB did not act prior to receiving and considering the Mass Care Group's position; it simply did not agree with its conclusion. The Letters of Delegation, which also reflect internal guidelines, clearly contemplate overriding the Mass Care Group's findings because the letters instruct the delegates to defer the case for the FSB's consideration in the absence of confirmation of need. Moreover, the Court finds that it would not be rational for the FSB to ignore evidence of food security issues where they exist and decline to act based solely on the Mass Care Group's position." *Dep't of Fish & Game*, 501 F. Supp. 3d at 696, n. 165.

[9] And unlike what Plaintiff alleges, the hunt was only authorized for 30 days to be reevaluated for another possible 30 days by the local in-season manager. 0136_FSB ("A 30 day review by the in-season manager will determine the need for an additional 30 day harvest limit"). In fact, the in-season manager did not end up issuing an additional harvest permit after the initial 30-day period expired. 0425_FSB.

evidence, i.e., the evidence presented would not "*compel* a reasonable finder of fact to reach a contrary result." *Monjaraz-Munoz*, 327 F.3d at 895. In short, "the "record contained ample evidence that supported and was rationally connected to the FSB's decision to approve the emergency special action in Kake for reasons of public safety related to food security concerns." *Dep't of Fish & Game*, 501 F. Supp. 3d at 696.

## IV.     The FSB Had Authority to Allow Organization of the Kake Hunt by the OVK.

Plaintiff's argument regarding "subdelegation" is based on a misleading contortion of the facts and the law. First, contrary to Plaintiff's contentions, the FSB did not delegate authority to administer the hunt to the OVK. 0137_FSB ("The hunt will be administered by the U.S. Forest Service, Petersburg District Ranger"). Second, Plaintiff's reliance on *United States Telecom Association v. FCC*, for the proposition that any subdelegation by an agency to outside parties must be affirmatively authorized by Congress, is misguided. 359 F.3d 554, 565 (D.C. Cir. 2012). As this Court has explained, the D.C. Circuit's reasoning in that case was based on the fear that "when an agency delegates power to outside parties, lines of accountability may blur" and there is an increased "risk that these parties will not share the agency's 'national vision and perspective' and thus may pursue goals inconsistent with those of the agency and the underlying statutory scheme." *Dep't of Fish & Game*, 501 F. Supp. 3d at 697 (quoting *U.S. Telecom Ass'n*, 359 F.3d at 566). Here, "there is no reason to expect that the OVK will select participants in a manner that is inconsistent with the goals of the FSB or ANILCA's mandate." *Id*. The OVK was authorized to select both tribal and non-tribal Federally qualified subsistence users as

participants in the hunt and its bounty. 0136_FSB. This is in line with Title VIII's goal to "preserve and provide subsistence uses for all rural residents of Alaska, both Native and non-Native." Pl.'s Br. 30. Thus, the FSB's authorization of hunt participant selection to OVK "does not implicate the concerns at issue in *United States Telecom Association*." *Dep't of Fish & Game*, 501 F. Supp. 3d at 697. Moreover, any concern regarding who would receive the meat from the hunt "would be a concern even if the local land manager had selected the hunt participants and is not inherent to this particular delegation of authority." *Id*.

Even if the FSB's action constitutes a subdelegation, the Ninth Circuit recognizes the unique position of tribal governments in relation to agency delegations. *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983) ("tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory" and "possessing 'the power of regulating their internal and social relations . . . .'") (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). As this Court clarified, "[s]ubdelegation of administrative authority to a sovereign entity is not *per se* improper," and subdelegation need not "rest on express statutory authority." *Dep't of Fish & Game*, 501 F. Supp. 3d at 697 (quoting *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983); *see also Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 795 (9th Cir. 1986) (collecting cases indicating federal government could subdelegate to tribe). The OVK in this circumstance is entitled to such consideration:

The OVK is a federally recognized Indian Tribe with powers of self-governance and jurisdiction over its tribal citizens and subsistence resources are a 'foundational piece of the cultural fabric of Kake.' It brought this emergency request to the FSB '[t]o aid needy members and protect the general Welfare and security of the Village.'

*Dep't of Fish & Game*, 501 F. Supp. 3d at 696 (internal citations omitted). "Moreover, the delegation of authority at issue here is minor, implicating only who participates in the hunt." *Id.*

Plaintiff references various statutes that include express Congressional authorizations of delegation in an attempt to highlight the lack of such express authorization in Title VIII. Specifically, Plaintiff cites cases interpreting: the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136u(a)(1) (authorizing the delegation of enforcement powers to tribes); the Safe Drinking Water Act, 42 U.S.C. § 300j-11(a) (same); and the Clean Air Act, 42 U.S.C. § 7601(d)(2) (authorizing the delegation of management and protection of air resources). *See* Pl.'s Br. 27-28. But these examples only serve to underline why an express Congressional authorization of delegation was not required for the Kake hunt. The FSB did not authorize the OVK to "enforce" or "manage" provisions of ANILCA, nor did the FSB authorize the OVK to "regulate" hunting and fishing on its land or elsewhere. *See* Pl.'s Br. 30-31 (citing *Montana v. U.S.*, 450 U.S. 544, 558 – 564 (1981) (holding that a tribe lacks jurisdiction to "regulate" hunting and fishing on lands no longer owned by the tribe)). The FSB merely allowed the OVK to choose who participated in the emergency community hunt,

which it was quite obviously in the best position to do.[10]

Finally, this type of community authorization is frequently employed by both the FSB and the State. While the action at issue authorized the OVK to organize the community harvest, the FSB has previously engaged in the practice of accepting proposals for management of harvest opportunities, including by tribal organizations. *See Towarak*, 2016 WL 1559122, at *2 (involving proposal whereby the Traditional Council would operate "two community subsistence gillnets"). Plaintiff itself recognizes the practice it now challenges, allowing designated hunters "who may possess particular expertise in hunting to harvest wildlife resources on behalf of the members of the community or group." *See* http://www.adfg.alaska.gov/static/license/huntlicense/pdfs/csh_caribou_2020_2021.pdf at 4 (last visited July 30, 2021).[11] In short, the FSB had the authority to authorize the OVK to select hunt participants.

## V.    The FSB's Decision to Approve WSA 20-03 Was Lawful.

### A.    ANILCA Provides for the FSB's Action.

The FSB has legal authority to impose the modest restrictions of WSA 20-03. Plaintiff argues that the FSB "lacks authority under ANILCA to close hunting based on

---

[10] And despite Plaintiffs continued attempts to belie this fact, the Kake hunt authorization *did not* expressly limit hunt participation to the tribe. *See* 0136_FSB ("Participation in the season is limited to Federally qualified subsistence users selected by the Organized Village of Kake.") The OVK was thus free to select non-tribal Federally qualified subsistence users to participate in the hunt.

[11] Plaintiff's attempts to distinguish its own community hunt delegations are unavailing. That an application for a State community hunt requires names and addresses of all persons in the community or group and that harvest reports are to be provided by hunters following take does not change the fact that the community is authorized to pick the hunters and who partakes of the harvest, just as the OVK was in the Kake hunt.

competition." Pl.'s Br. 36. First, Plaintiff ignores the FSB's stated reasons for approving WSA 20-03: to ensure continued subsistence use opportunities and to address public safety concerns resulting from overcrowding and user conflict along the Richardson Highway. 0192_FSB. Second, Plaintiff's narrow reading of ANILCA defies common sense and basic concepts of causality. *See Dep't of Fish & Game*, 2020 WL 5625897, at *9 (While "'competition' is not one of the enumerated reasons for restriction of nonsubsistence uses under Section 815, if the levels of competition interfere with the continuation of subsistence uses, or give rise to public safety concerns, restrictions may become necessary for those enumerated reasons").

Again, ANILCA creates a federal regulatory scheme in which the FSB's interpretation of ANILCA is entitled to deference. *Ninilchik Traditional Council*, 227 F.3d at 1191-92. Section 815 of ANILCA authorized the FSB to restrict nonsubsistence uses so long as it is "necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 3126 of this title [section 816], to continue subsistence uses of such populations, or pursuant to other applicable law." 16 U.S.C. § 3125(3). Section 816 provides that "nothing in [Title VIII] is intended to enlarge or diminish the authority ... [to] establish periods when, no taking of fish and wildlife shall be permitted on the public lands for reasons of public safety[.]" 16 U.S.C. § 3126(b). Applicable law includes the FSB's authority to act upon a proposal like WSA 20-03, as set out in its regulations governing temporary special actions:

(b) Temporary special actions. After adequate notice and public hearing, the Board may temporarily close or open public lands for the taking of fish and

wildlife for subsistence uses, or modify the requirements for subsistence take, or close public lands for the taking of fish and wildlife for nonsubsistence uses, or restrict take for nonsubsistence uses.

50 C.F.R. § 100.19(b). Thus, the FSB has authority to close public lands to continue subsistence uses and for reasons of public safety, even if those issues arise incidentally from overcrowding and excessive competition.

Plaintiff argues that "nothing in ANILCA or caselaw allows a closure to avoid competition from other hunters." Pl.'s Br. 34. "User conflict," however, as evidenced through individual comment, is a well-established basis for agency restrictions. *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1185 (9th Cir. 2000); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1464 (9th Cir. 1996); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1475 (9th Cir. 1994). And while Plaintiff is correct that those cases do not involve ANILCA—but rather statutes such as the Hells Canyon National Recreation Act, the National Park Service Organic Act, and the National Environmental Policy Act. Pl.'s Br. 34-36—the case for managing user conflict is even stronger under Title VIII of ANILCA, which explicitly directs the FSB to prioritize subsistence uses over non-subsistence uses. 16 U.S.C. § 3114. Discriminating between different types of hunters, i.e., subsistence vs. non-subsistence hunters, is exactly what Congress directed the FSB to do. And that was precisely the goal underlying the FSB's approval of WSA 20-03.

The closure of Unit 13A and 13B also does not harm Plaintiff by preventing it "from making utilization decisions regarding the game it is charged with managing." Pl.'s

Br. 41-42. As demonstrated above, the FSB acted well within its authority under Title VIII and its implementing regulations in approving WSA 20-03. Nor does Plaintiff articulate a sufficient nexus between the limited closure of subunits 13A and 13B and alleged harms to its broad wildlife management interests to constitute an injury within the meaning of the APA. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (2016) (To establish an injury-in-fact for Article III standing purposes, a plaintiff must establish that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."); *see also Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1100 (9th Cir. 2008) (ANILCA is not concerned with the "collateral effect" that a regulation "might cause a separate regulatory body").

Plaintiff's argument suggests that the Unit 13A and 13B limited closures reflect an unusual or unprecedented expansion of the FSB's authority. But the FSB routinely takes such action, and doing so is squarely within the authority conferred by Title VIII. *See Ninilchik*, 227 F.3d at 1195 (involving similar management tools such as preferred seasons and antler restrictions for Unit 15 moose hunting); ECF No. 3-3 at 12 (Unit 23 caribou hunting restrictions); 0054_FSB (Maas comparison of same to WSA 20-03). The FSB acted within the letter of applicable law and in accordance with established practice.

B.    The FSB's Action on WSA 20-03 Reflects Reasoned Discretion.

Plaintiff's other "arbitrary and capricious" arguments similarly fall far short of establishing a sufficient basis for vacating the decision. They fail to address the

information in the record supporting the FSB's choice, and fail to credit the FSB's decision as a measured response that would only close a very small portion of Federal lands to non-Federally-qualified users. Plaintiff's arguments amount to little more than second-guessing the FSB's exercise of discretion, which is not a sufficient basis for overturning an agency decision under the APA.

Plaintiff starts by listing a number of facts and issues that the FSB allegedly "ignored," but confusingly references pages in the transcript of the July 16, 2020, meeting where the FSB literally discussed those same facts and issues. *See* Pl.'s Br. 33-34. At bottom, Plaintiff's actual problem is not that the FSB failed to consider Plaintiff's preferred facts, but that the FSB assigned them a different weight and drew different conclusions. *See* Pl.'s Br. 37-40 (using four pages of its brief to reproduce of a portion of a memorandum by Ben Mulligan, Deputy Commissioner of ADF&G, that was provided to the FSB, and which the FSB fully considered when making its decision—hence its inclusion in the administrative record).

For example, Plaintiff contends that the FSB "failed to consider that federally qualified hunters are also eligible to hunt under state regulations, so these individuals have a much greater opportunity to harvest a plentiful resource." Pl.'s Br. 36. The FSB did consider this. *See* 0044_FSB; 0046_FSB; 0051_FSB; 0059_FSB. A fact that Plaintiff actively ignores in its brief, however, is that in recent years, the State has issued emergency orders extending the caribou season to end on the same day as the Federal season, "precluding the Federal subsistence priority from that longer season." 0051_FSB;

*see also* 0046_FSB (noting that even though the Federal moose hunting season starts on August 1st, one month earlier than the State's season, most moose are harvested in mid-September when bulls are more susceptible to harvest); 0046_FSB, 0054_FSB (discussing deflection of herd migration caused by the presence of hunters, thereby reducing opportunities for subsistence hunters even after the non-subsistence hunters are gone). Thus, not only did the FSB consider this factor, but its resulting decision was based on substantial evidence that the closure is warranted for continuation of subsistence uses. And for moose harvesting in particular, there is a significant difference in success rates between non-subsistence hunters (17%) and subsistence hunters (only 11%). *See* 0047_FSB; 0065_FSB. Considering that those most dependent on the resource are suffering such dismal success rates in itself argues for action to be taken to continue subsistence uses.

Plaintiff also argues that the FSB wrongly closed State lands under navigable waters. Pl.'s Br. 41. This argument seems to intentionally ignore the fact that the FSB issued a revised press release on September 2, 2020, clarifying that non-Federally qualified users can take moose and caribou on gravel bars along navigable waters below the ordinary high water mark even when the adjacent uplands are Federal public lands because those gravel bars are state-owned submerged lands. ECF No. 24-2 at 2; *Dep't of Fish & Game*, 2020 WL 5625897, at *12 ("The Court finds that by its plain terms, the press release does not prohibit a non-federally qualified hunter from taking a moose or caribou that is standing in water"). Plaintiff's argument thus fails.

Moreover, FSB's decision to approve WSA 20-03 is not arbitrary and capricious merely because the FSB rejected a similar proposal in 2019. Pl.'s Br. 43. The 2019 proposal would have closed the entirety of Unit 13, whereas the 2020 decision was much more limited, and that limitation factored heavily into the FSB's analysis and reasoning. 0047_FSB (noting that the closed lands in the 2020 modified decision would represent a fraction of the lands requested for closure in the 2019 proposal). And the record demonstrated that the FSB considered new information. 0065_FSB ("I think there's a little bit of new information in the success rates that we have most recently and it's troubling to us that the Federally-qualified subsistence user success rate is significantly lower than non-Federally-qualified users. That doesn't seem to be in the direction we're supposed to be headed in"). In sum, the FSB articulated a reasoned basis for approving WSA 20-03 despite having rejected a similar, but not identical, proposal from the previous year.

Plaintiff's final argument is similarly unpersuasive. The FSB's regulation for special temporary actions provides that "[t]he length of any temporary action will be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances. In any event, a temporary opening or closure will not extend longer than the end of the current regulatory cycle." 50 C.F.R. § 100.19(b)(2). Plaintiff complains that the FSB's choice of timeframe was not the minimum necessary under the circumstances. Pl.'s Br. 45. But here again, the record reveals the basis for the FSB's decision. 0048_FSB (explaining that the extension to include an additional year

would coincide with the regulatory cycle, which would justifiably reduce administrative burdens since "this situation has been an issue for decades, [and] no change in the situation [is] expected between this year and next year"); *see also* 16 U.S.C. § 3126(b) (authorizing the FSB to close public lands to hunting for reasons of "administration"). As the Court already found, "the closure term is consistent with the outer limits of 50 C.F.R. § 100.19(b)(2)—the end of the current regulatory cycle." *See Dep't of Fish & Game*, No. 2020 WL 5625897, at *9.

Plaintiff, in sum, disagrees with the FSB's exercise of discretion and would have weighed the record evidence differently, but this falls short of Plaintiff's burden. The FSB's findings need only be supported by "more than a mere scintilla" to constitute substantial evidence. *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018). Plaintiff fails to identify that any of its concerns rise to the level of demonstrating that the FSB entirely overlooked an important aspect of the problem or failed to articulate a rational connection between the facts found and the choice made through the FSB's measured action in WSA 20-03.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reject Plaintiff's arguments on the merits, deny Plaintiff's motion for miscellaneous relief, enter final judgment in favor of Defendants, and dismiss this action with prejudice.

DATED:  July 30, 2021.

TODD KIM
Assistant Attorney General

United States Department of Justice
Environment and Natural Resources Div.

*/s/ Shannon Boylan*
SHANNON BOYLAN (D.C. Bar No. 1724269)
PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorneys
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-598-9584 (Boylan)
202-353-1389 (Turcke)
202-305-0506 (fax)
shannon.boylan@usdoj.gov
paul.turcke@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(2) as modified by the Court (ECF No. 46) because this memorandum contains 13,449 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 2016 (16.0.5161.1000) MSO (16.0.5173.1000) 32-bit.

  */s/ Shannon Boylan*
SHANNON BOYLAN

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2021, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

  */s/ Shannon Boylan*
SHANNON BOYLAN