Jonathan K. Tillinghast (Alaska Bar No. 7410109)
One Sealaska Plaza, Suite 300
Juneau, AK 99801
Telephone: (907) 321-3405
Email: jon@stsl.com

*Attorneys for Amicus Curiae Sealaska Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br>Department of Fish and Game<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL SUBSISTENCE BOARD,<br>et al.,<br><br>    Defendants,<br><br>    and<br><br>ORGANIZED VILLAGE OF KAKE,<br><br>Intervenor-Defendant. | Case No.: 3:20-cv-00195-SLG<br><br>***AMICUS CURIAE* BRIEF OF<br>SEALASKA CORPORATION** |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .........................................................................................ii

**I.     Summary** ................................................................................................ 1

**II.    The FSB's Action Involved No Unlawful Delegation** ..................................... 3

**III.   The Sharing of Subsistence Resources, and the Division of Subsistence Labor,
are Foundations of Alaska Native Culture** ................................................... 6

    A. *Sharing the subsistence harvest is at the core of Alaska Native culture* ............ 6

    B. *Sharing relies on a complex and well-coordinated division of labor* ................. 9

**IV.   Congress Did Not Intend to Preclude Tribal Participation in Community
Hunts in Enacting ANILCA** ................................................................... 11

    A. *The impetus for Title VIII actually begins with enactment of ANCSA nine years
earlier* ...................................................................................................... 13

    B. *Title VIII of ANILCA was motivated by Congress' desire to honor the promises of
subsistence protection made, but not kept, in the ANCSA debates* ................... 14

    C. *Congress broadened Title VIII to include non-Native rural residents solely in an
ultimately unsuccessful attempt to enable State management of the title* .......... 16

**V.    Conclusion** ............................................................................................ 21

# Table of Cases and Authorities

**Cases**

*Alaska Chapter, Associated Gen. Contractors, Inc. v. Pierce*,
 694 F.2d 1162, 1167 (9th Cir. 1982) ..................................................................... 11

*Barnhart v. Walton*,
 535 U.S. 212, 220, 122 S. Ct. 1265, 1270 (2002) ................................................. 5

*City of Oakland v. Wells Fargo & Co.,*
 972 F.3d 1112, 1126-27 (9th Cir. 2020) ................................................................ 18

*Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.,*
 99 F. Supp. 2d 1123, 1139 (E.D. Cal.  2000) ...................................................... 19

*Fed. Energy Admin. V. Algonquin SNG, Inc.*,
 426 U.S. 548, 564 (1976) ......................................................................................... 18

*Fournier v. Sebelius,*
 718 F.3d 1110, 1121-22 (9th Cir. 2013) ................................................................. 5

*Hoonah Indian Ass'n v. Morrison*,
 170 F.3d 1223 (9th Cir. 1999) ....................................................................... 18, 19

*John v. United States,*
 720 F.3d 1214, 1228 (9th Cir. 2013) ..................................................................... 21

*Kalvinskas v. Cal. Inst. of Technology,*
 96 F. 3d 1305, 1309 (9th Cir. 1996) ....................................................................... 18

*Kenaitze Indian Tribe v. Alaska*,
 860 F.2d at 313 n.1 ............................................................................................ 15, 19

*McDowell v. State*,
 785 P.2d 1 (Alaska 1989) ......................................................................................... 17

*Morton v. Mancari,*
 417 U.S. 535, 545 (1974) ......................................................................................... 11

*N. Haven Bd. Of Education v. Bell,*
 456 U.S. 512, 526-27 (1982) ................................................................................... 18

*Scholl v. Mnuchin*,
 489 F. Supp. 3d 1008, 1021 n.3 (N.D. Cal. 2020) ............................................... 6

*State v. Erickson*,
 574 P.2d 1, 5-6 (Alaska 1978) ................................................................................. 6

*United States v. Akers,*
    785 F.2d 814, 819 (9th Cir. 1986)……………………………………….………… 19

*United States v. Decker*,
    600 F.2d 733, 740 (9th Cir. 1979) ....................................................................... 11

*United States v. McElhiney*,
    No. CR 02-938-GHK, 2007 U.S. Dist. LEXIS 104708, at *5-7 (C.D. Cal. Mar. 12,
2007) .......................................................................................................................... 6

*Washington v. Wash. State Commercial Passenger Fishing Vessel Assn.,*
    443 U.S. 658, 673, n. 20 (1979) ........................................................................... 11

**Statutes**

16 U.S.C. §1371(b) ........................................................................................................ 11

16 U.S.C. §3101 *et seq* (ANILCA) .........................................................................*passim*

16 U.S.C. §3111 *et seq*. (Title VIII, ANILCA) .......................................................*passim*

16 U.S.C. §§3112(1) ...................................................................................................... 18

16 U.S.C. § 3120 ........................................................................................................... 18

43 U.S.C. §1601(b) ................................................................................................... 1, 11

**Regulations**

50 C.F.R. §92.6(b) ........................................................................................................ 12

50 C.F.R. §100.26 ........................................................................................................... 3

Fed. R. Evid. 201, advisory comm. note (1972) ............................................................. 6

**Congressional Hearings**

*H. Rep. 92-746* (1971), *reprinted at* 126 *Cong. Rec.* 46592 (Dec. 13, 1971) ................... 14

*H. Rep. No. 95-1045, Part 1* (1978) ...................................................................... 14, 19, 20

*H. Rep. 96-97, Part 1* (1979) ..................................................................................... 16, 21

*H. Rep.* 96-97, *Part 2* (1979) ............................................................................................ 21

*S. Rep. 92-405* (1971) ...................................................................................................... 13

*S. Rep. 96-413* (1979) ........................................................................................................21

**Congressional Floor Debates**

125 *Cong. Rec.* 9904 (May 4, 1979)……………………………………………14, 15, 17, 18

125 *Cong. Rec.* 11457-58 (May 16, 1979) ........................................................................15

126 *Cong. Rec.* 29260 (Nov. 12, 1980) ............................................................................15

126 *Cong. Rec.* 29278 (Nov. 12, 1980………………………………...………..17, 18

126 *Cong. Rec.* 29279 (Nov. 12, 1980) ..............................................................................2

**Articles**

National Park Service*, Alaska Subsistence: A National Park Service Management History*
(2002)....................................................................................................................................15

S. Langdon, *The Significance of Sharing Resources in Sustaining Indigenous Alaskan Communities and Cultures,* Sealaska Heritage Institute (2021)....................... 6, 7, 8, 9, 10

## I. Summary

This brief concerns the State of Alaska's dissatisfaction with the Federal Subsistence Board's (the "FSB's") decision to allow a federally-recognized Indian tribe, the Organized Village of Kake, to participate in a COVID-19 relief emergency hunt. Our points are threefold:

*First,* while styled a complaint over alleged3101ly improper "delegation," in truth the State's claim is nothing more than criticism that Kake, in undertaking the community hunt, was allowed to choose both the hunters and the people who would share the meat--two unremarkable characteristics that do not constitute unlawful delegation of the FSB's authority.

*Second*, village designation of hunters, and organizing the sharing of the hunt's harvest, are not only common in Alaska Native communities; they are foundational components of Alaska Native culture. As a recent comprehensive study of Alaska Native subsistence resource sharing demonstrates, hamstringing those traditions (as the State would have us do) would strike at the jugular of that culture. Indeed, because the necessary implication of the State's position is that the federal government itself must designated the hunters, and decide who can share in the meat, the State is advocating precisely the kind of "wardship or trusteeship" that the Alaska Native Claims Settlement Act ("ANCSA") was intended to preclude. 43 U.S.C. §1601(b); and

*Third*, stripped of its insubstantiality, the State is left with nothing but a bald racial discrimination claim—a claim that is factually untrue and legally unsupportable. The

FSB's action was taken under Title VIII of ANILCA.  The principal motivating factor for Title VIII was protection of not only the "Alaska Native subsistence way of life, [but as well]… the Alaska Native culture of which it is a primary and essential element." 126 *Cong. Rec*. 29279 (Nov. 12, 1980).  By seeking to use Title VIII as a means to terminate traditional tribal participation in a facially-neutral community hunt program, the State would turn Title VIII on its head.

Finally, a cautionary note is warranted here.  This court's denial of the State's preliminary injunction motion was based on the conclusion that the record did not indicate that the Kake hunt was limited to tribal members.  *ECF 37* at 33-34.  That was the correct decision; indeed, the State conceded the matter by acknowledging that "there is no evidence [in the record] as to whether the hunters or recipients were native or non-native…" *ECF 22* at 9-10. [1/]  The court's conclusion was correct, and it represented the narrowest ground for affirming the FSB's action.

The point of *amicus* is that while the absence of any evidence of Alaska Native exclusivity in the Kake hunt is dispositive, it is also, in Sealaska's mind, not indispensable to the FSB's case, since nothing in Title VIII precludes the FSB from allowing an Indian

---

[1/] Indeed, the only evidence in the record is the Tribe's assurance that it has "no problem providing for anyone in our community [with meat from the hunt] if they are in need . We will be mindful of this…" 0445-FSB.  The State's only response is the erroneous allegation that the hunt was "expressly to benefit OVK's tribal members only," citing *ECF* 4-3 at 37. *ECF* 49 at 39.  In fact, at *ECF* 4-3, p. 37, the Tribe actually informed the FSB that it desired the hunt "[t]o aid need members ***and protect the general Welfare and security of the Village***." *ECF* 4-3 at 37; *emphasis added*.

tribe to select the hunters in a community hunt or determine how the meat should be shared. And while it is sound jurisprudence to resolve a case on the narrowest ground, Sealaska hopes that the court's final decision does not imply that anything in Title VIII of ANILCA limits a Native community's ability to select the hunters and distribute the meat in the course of an authorized community hunt.

## II.     The FSB's Action Involved No Unlawful Delegation

The FSB did not "delegate[] its administrative authority to a tribe." *ECF 49* at 34.  All the decisions establishing the community hunt's terms were made by the FSB, not Kake, including:

- the number, sex and specie of the animals that could be taken (2 antlered bull moose and 5 buck deer).  0470-71-FSB;

- the hunt's duration (60 days). *Id.*;

- the hunt's specific location (specified portions of Game Unit 3). *Id.*;

- the hunters' qualifications ("federally qualified subsistence users"). *Id.*; and

- the allowable means and methods of the hunt. All subsistence hunts are subject to the detailed restrictions set out in 50 C.F.R. §100.26.

Absent any example of substantive delegation, the State is left to argue that Kake was wrongfully allowed "to select between members and non-members and decide who would participate in the hunt and who would be entitled to receive moose and deer meat." *ECF 49* at 38.

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                                    Page | 3

There is nothing wrong with either of those actions.  In community hunts, it is common, and in fact beneficial, for the community to choose the most efficient hunters.  It is a practice encouraged in the State of Alaska's own community hunts.  For example, the Copper Basin moose and caribou community hunts both advise communities (including tribes) that they may "select, from their group members, individual hunters who may possess hunting expertise to harvest wildlife resources on behalf of the community or group." [2]

Moreover, the FSB has a long-established record of allowing Indian tribes to conduct communal harvests.  In its earlier *amicus* memorandum, Sealaska listed a range of such federally-authorized tribal community hunts--from potlatch hunts to a major memorandum of understanding between the U.S. Fish and Wildlife Service and the Kuskokwim River Inter-Tribal Fish Commission. [3]

---

[2] /
https://www.adfg.alaska.gov/static/license/huntlicense/pdfs/csh_moose_2020_2021.pdf (moose);
http://www.adfg.alaska.gov/static/license/huntlicense/pdfs/csh_caribou_2021_2022.pdf (caribou).
The caribou permit language was cited by the court at n. 136 of its November 18, 2020 denial of the State's preliminary injunction motion. *ECF 37* at 32.
[3] / *ECF 21-2* at 3-7.  The State's answer to this that "that a person can[not] violate the law next week because he or she violated the law last week and got away with it." *ECF* 22 at 9.  The quip is catchy but beside the point.  The Department's longstanding interpretation of Title VIII as allowing tribal hunts to be coordinated by the tribe--as reflected in its numerous regulations authorizing just that--is entitled to considerable deference. *Barnhart v. Walton*, 535 U.S. 212, 220, 122 S. Ct. 1265, 1270 (2002) (the Supreme Court "will

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                        Page | 4

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 9 of 28

And, as we shall see in *Section III*, *post*, distribution of subsistence skills within a Native community is fundamental to Alaska Native culture.

The second example (that Kake was allowed to decide who shared the meat) is, in one sense, silly. Every hunt (even that of the individual urban deer hunter) affords the hunter the ability to decide who shares the harvest. When that hunter shares the meat with friends, he/she is not exercising unlawfully-delegated authority.

In another sense, however, the State's argument is malignant. As discussed in *Section III, post,* disrupting long-established Native sharing traditions is an effective way of undermining Native culture.

All of which brings us to the nub of it all. The State's only remaining grievance, as it turns out, is that "the FSB cannot discriminate between Native and non-Native users in violation of ANILCA Sections 801(4) and 1314," but allegedly did so in this case. *ECF 49* at 39. And so, this case ultimately descends into a raw racial discrimination claim, stripped of the veneer that the State worked so hard to create with its "delegation" scholarship. As *Section IV* will demonstrate, there is neither factual nor legal merit to the State's claim.

---

normally accord particular deference to an agency interpretation of 'longstanding' duration."); *Fournier v. Sebelius,* 718 F.3d 1110, 1121-22 (9th Cir. 2013).

## III. The Sharing of Subsistence Resources, and the Division of Subsistence Labor, are Foundations of Alaska Native Culture

This year, University of Alaska anthropologist Dr. Steve Langdon published a comprehensive report on the sharing of subsistence resources by Alaska Natives. *Exhibit 2.* [4]  The report demonstrates that the very two actions at issue here—the sharing of subsistence resources and the division of labor in gathering those resources—lie at the heart of Alaska Native culture. Specifically:

### A. *Sharing the subsistence harvest is at the core of Alaska Native culture*

"As a central value and practice characteristic of all Indigenous Alaskan societies, sharing of subsistence resources was and is a foundation of Indigenous life and livelihood.

---

[4] / S. Langdon, *The Significance of Sharing Resources in Sustaining Indigenous Alaskan Communities and Cultures,* Sealaska Heritage Institute (2021). Dr. Langdon's report is not part of the administrative record in this case, nor need it be. The report does not relate to the adequacy or consequence of the record in this case; rather, it presents "legislative facts"—facts that bear upon the scope and interpretation of Title VIII of ANILCA. As such, they may be freely considered by the court, without the limitations otherwise applicable to the introduction of "adjudicative facts*." Fed. R. Evid. 201, advisory comm. note (1972)* ("Legislative facts… are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body); *Scholl v. Mnuchin*, 489 F. Supp. 3d 1008, 1021 n.3 (N.D. Cal. 2020); *United States v. McElhiney*, No. CR 02-938-GHK, 2007 U.S. Dist. LEXIS 104708, at *5-7 (C.D. Cal. Mar. 12, 2007) ("Legislative facts need not be made a part of the record for them to be considered on appeal.");); *State v. Erickson*, 574 P.2d 1, 5-6 (Alaska 1978) (and the federal case law cited therein) ("Legislative facts come into play when the court is faced with the task of deciding the constitutionality of a statute, statutory interpretation or the extension or restriction of a common law rule upon grounds of policy. These policy decisions…often hinge on social, political, economic, or scientific facts, most of which no longer fall within the classification of irrefutable. Cases involving such decisions cannot be decided adequately without some view by the court of the policy considerations and background upon which the validity of a particular statute or rule is grounded.").

Sharing is both glue in binding extended families together and lubricant promoting expansion of social ties." *Id.* At 7. The roots of sharing are at once religious and ethical. "According to the Inupiat's world view," for example, "the whale gives itself to Inupiat whalers and thus they should treat it respectively and share it with other Inupiat people. If it is satisfied with the whalers' attitudes and treatments toward it, the whales will come back to them and be harvested again." *Id.* at 44. [5]

Sharing is neither random nor occasional. It is not simply inviting a friend to dinner. Rather, it is an unwritten constitutional code laid down by the village tribe, its elders and tradition:

> *Subsistence is more than a means of production, it is a system for distribution and exchange of subsistence products. The system is not random: it operates according to complex codes of participation, partnership, and obligation. Traditional rules of distribution ensure that subsistence products are available to every village household, even those without hunters.*

*Id.* at 8. [6] Langdon's report is rich in examples of tribally-structured sharing throughout rural Alaska, including two from the opposite ends of our state:

---

[5] / For its part, the ethical obligation is rooted in a "deeply embedded cultural value" that "translates into moral and ethical obligations for producers and those with resources to give to others particularly if they are in need and without expecting a return." *Id.* at 14, 16.

[6] / Dr. Langdon quotes here from British Columbia Supreme Court Justice Thomas Berger (1985). who held hearings in villages around Alaska in the early 1980s--the testimony from which became in part the basis for his book *Village Journey: The Report of the Alaska Native Review Commission.*

**Bowhead and Beluga Whales.**   In Wainright, all village households receive a "community share" of harvested belugas. [7/]   According to one Utquiagvik whaling captain, shares of a harvested bowhead whale are "spread…far and wide," including Fairbanks, Palmer, Wasilla and Seward.  *Id.*  Point Hope captains estimate that the equivalent of 4-5 whales out of 10 captured are shared outside the community. *Id.* at 41.  Captains from Gambell and Wainwright estimated that about 25% of the whale they harvest leave the community, while Savoonga captains estimated that between 30%-50% of their harvested whale are shared outside the community. *Id.*

**Sitka Herring.**   Sitka Sound's subsistence herring roe fishery represents an archtypical example of structured sharing:

> *Between 2002 and 2018, herring eggs were shared with 41 other communities in Southeast Alaska and beyond. Recently, herring eggs have also been shared with institutions in Sitka and Juneau that provide food to Indigenous residents and others who might desire them. In Sitka, individual harvesters and designated harvesters deliver fish eggs to the Sitka Senior Center, Sitka Salvation Army, SEARHC hospital, and the Sitka Pioneer Home…Herring eggs are distributed to institutions in Juneau as well through Sealaska Corporation. The Hoonah Indian Association provides financial assistance to a Hoonah harvester who travels to Sitka Sound every year to obtain herring eggs that are brought back to the community and shared without cost to up to 200 individuals.*
> *The distribution of subsistence herring eggs harvested from Sitka Sound is prodigious, with 87% of the overall harvest volume given away, on average, rather than personally consumed by harvesters and their households. This level of sharing demonstrates the powerful incentives of the harvesters to fulfill expectations of literally thousands*

---

[7] / *Id.* at 11.

> indicating the critical position of sharing in the maintenance of social
> ties and cultural values.

*Id.* at 36 (*internal cites omitted*).

In objecting to Kake's involvement in the sharing of COVID emergency hunt meat, the State of Alaska may simply be viewing the matter through the wrong cultural lens. In a report on the village of Venetie quoted by Langdon:

> ...*sharing and cooperation were described as cultural markers that distinguish the indigenous user from other harvesters such as urban hunters seeking trophy animals... Sharing sustains ongoing bonds and creates new relationships thereby enhancing the emotional and physical well-being of those who give and receive....*

*Id.* at 20-21 (*internal cites omitted*). To save a culture woven from the sinew of sharing traditions, it is critical, Langdon concludes, that regulators understand that very different paradigm and encourage a "regulatory environment that…does not constrain sharing." *Id.* at 54.

### B. Sharing relies on a complex and well-coordinated division of labor

The State's remaining complaint is that the Organized Village of Kake determined who would undertake the hunt. That, however, is precisely how the system works. As one Inupiat hunter put it:

> *It has always been our custom to allow the good hunters to catch more than the current limits and share with people who are berry pickers or green pickers or fishermen, who in turn would share their crop and catch with the hunters.*

*Id.* at 17. With upwards of 20% of Native village households not producing any subsistence foods at all, "[s]haring meat [harvested by skilled hunters] enables people who do not have

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                      Page | 9

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 14 of 28

the necessary hunting resources or skills to obtain the meat which they consider essential to survival." *Id.* at 18.

As we have already seen, the ethical underpinning of sharing is the need to assure food security for the entire village (*see n. 5, ante*). "Sharing is one of the primary institutions through which the harvests of the high producing 'superhouseholds' reach others, especially those in need." *Id.* The "superproducers'" obligation becomes paramount when caring for village elders:

> The sharing of traditional foods with Elders is especially important as they are a necessity for feeling healthy and staying active and are believed to contribute to longevity. It is believed by many Indigenous Alaskans that Elders ... have developed physiological and possibly psychological dependence on such foods.

*Id.* at 18-19. And herein lies the rub: it seems that the most effective way to sabotage a village's traditional sharing system, and hence the village's underlying culture, is to undermine the village's ability to rely on "superproviders" to meet the village's needs. *Id.* at 47. In an analysis performed on three villages (Kaktovik, Wainwright and Venetie), the scientists' hypothetical removal of "key social relations, meaning critical 'superprovider' nodes" caused a projected 70%-80% decline in sharing between households--more severe than either a reduction in resource abundance or reduction in community households. *Id.*

In a nutshell, then, and regardless of how unintentional it might be, in assaulting a village's right to select its own hunters in a community hunt, the State could not have chosen a better target for undermining traditional Alaska Native village culture. And

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*      Page | 10

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 15 of 28

worse: the necessary corollary of the State's "delegation" argument is that the federal government _itself_ must both: (i) chose the hunters; and (ii) decide who will share in the meat. And, in doing so, the federal government can select hunters and award recipients who have no ties to the tribe or the village whatsoever. Such a construct would represent precisely the kind of "wardship or trusteeship" that the Alaska Native Claims Settlement Act was intended to preclude. 43 U.S.C. §1601(b).

## IV.  Congress Did Not Intend to Preclude Tribal Participation in Community Hunts in Enacting ANILCA

Any claim that the federal government is impermissibly favoring Indians necessarily begins with recognition that the federal government has broad power to deal separately and favorably with Indians, and in doing so does it not raise equal protection issues.  _Morton v. Mancari,_ 417 U.S. 535, 545 (1974); _Washington v. Wash. State Commercial Passenger Fishing Vessel Assn.,_ 443 U.S. 658, 673, n. 20 (1979); _Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate_, 470 F.3d 827, 851-52 (9th Cir. 2006) (Fletcher _et al_ concurring); _Alaska Chapter, Associated Gen. Contractors, Inc. v. Pierce_, 694 F.2d 1162, 1167 (9th Cir. 1982); _United States v. Decker_, 600 F.2d 733, 740 (9th Cir. 1979).

Indeed, Congress has created a number of hunting and fishing preferences for Alaska Natives, including:

o  the Alaska Native subsistence exemption under the Marine Mammal Protection Act. 16 U.S.C. §1371(b);

o the Alaska Native village exemption under the Endangered Species Act. 16 U.S.C. §1539(e);

o subsistence whaling through the Alaska Eskimo Whaling Commission; [8] / and

o the Alaska Native handicraft exemption under the Migratory Bird Treaty Act. 50 C.F.R. 92.6(b).

The issue, then, becomes one of statutory interpretation: did Congress, in enacting Title VIII of ANILCA (and particularly Section 804), intend to preclude federally-recognized Indian tribes from participating in a traditional manner in a community hunt program that was otherwise available to all "rural" Alaska residents—Native and non-Native. [9]/

Given that the primary motivation for Title VIII of ANILCA was to protect Alaska's Native subsistence culture, it would be absurd to impute such an intent to Congress. A brief revisit to the history of Title VIII makes that apparent:

---

[8] / *See Cooperative Agreement between the National Oceanic and Atmospheric Administration and the Alaska Whaling Commission* (2019), https://media.fisheries.noaa.gov/dam-migration/aewc-cooperative-agreement-0819.pdf .

[9] / The facial neutrality of the COVID-19 relief program is apparent in FSB's delegation of program administration to federal land managers. In its delegation to the USFS Petersburg Ranger District, the Board notes that COVID-19 "may lead to challenges *for rural residents*" and the intent is to respond to food security issues "that may arise *in rural Alaska*." 0433-FSB (*emphasis added*). There is no mention of any Native or tribal preference.

A. *The impetus for Title VIII actually begins with enactment of ANCSA nine years earlier*
.

Original proposals in legislation that would ultimately create ANCSA called for federal protection of the subsistence hunting and fishing rights of Alaska Natives. Section 21 of the Senate's ANCSA version contained provisions for identifying and protecting "Subsistence Use Units" surrounding only Alaska Native villages in which hunting and fishing could be limited to "residents of the unit." *S. Rep. 92-405* at 43 (1971). The accompanying committee report made it clear that the provision's goal was to protect Alaska Native subsistence rights:

> *Section 21 recognizes the long standing and historic use of the Alaska Native people of large areas of land around their historic villages for hunting, fishing, trapping, berry gathering and other subsistence use purposes…This Act recognizes, but makes no value judgments, concerning the processes and the forces of social change which are transforming the historic culture of the Native people of Alaska. Congress can, however, give Native people the opportunity to decide for themselves the rate at which acculturation will take place. Furnishing protection of subsistence patterns of existence will allow Native people, especially the older generation, to make that choice.*

*Id.* at 156

The ANCSA Conference Committee did not include the Senate provision. Instead, that committee urged that the Department of Interior protect Alaska Native subsistence rights through executive action:

> *The conference committee, after careful consideration, believes that all* ___*Native*___ *interests in subsistence resource lands can and will be protected by the Secretary through the exercise of his existing withdrawal authority.  .... **___The conference committee expects both the Secretary___***

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                    Page | 13

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 18 of 28

> **_and the State to take any action necessary to protect the subsistence needs of the Natives._**

*H. Rep. 92-746* (1971), *reprinted at* 117 *Cong. Rec.* 46592 (Dec. 13, 1971) (emphasis added).

> B.  *Title VIII of ANILCA was motivated by Congress' desire to honor the promises of subsistence protection made, but not kept, in the ANCSA debates*

To Congress' displeasure, neither the Department of Interior nor the State of Alaska did much to protect Native subsistence rights after ANCSA was passed. [10]/  And so, Congress decided to act itself through ANILCA by proposing legislation that would create an Alaska Native subsistence preference.  As the ultimate legislation's principal sponsor (Rep,. Udall) told the House floor during 1979 floor debate on H.R. 39: [11]/

> *I made a promise to Alaska's rural Native people…that we would try to see to it that the trail of broken promises will end with the passage of the Alaska national interest lands legislation.  We promised that we would do our best to see to it that any legislation passed by Congress will guarantee the protection and continuation of subsistence uses by rural Native people in new conservation system units…*
> *[Accordingly,] we prepared a committee print…[that] provided that whenever necessary to restrict the taking of a fish or wildlife resource the highest priority would be given to subsistence use by Alaska natives*

---

[10] / *See, e.g.*: *H. Rep. No. 95-1045, Part 1* at 185 (1978) (in considering ANILCA legislation in 1978, the House Committee on Interior and Insular Affairs stated that  it "expects the Secretary to respond more vigorously to the 1971 admonition of the Alaska Native Claims Settlement Act Conference Committee [regarding Native subsistence protection] than has been the case to date…"); *see also* 125 *Cong. Reg.* 9904 (May 4, 1979) ("Unfortunately, Mr. Chairman, [Rep.. Udall told the House floor,] since 1971 neither the Secretary nor the State has taken completely adequate or timely steps to meet the responsibilities which they assumed at that time.").

[11] /  In both the 95th and 96th Congresses, the principal bill was H.R. 39.  Bills die at the end of each congress.  In the 96th Congress, H.R. 39 was a new bill, given the same number as the bill that died at the end of the 95th Congress.  *See H.Rep. 96-97*, *Part 1* at 141 (1979).

> *[who were] primarily and directly dependent upon the particular resource as a mainstay of livelihood with lower priorities for other persons dependent upon subsistence uses.*

125 *Cong. Rec.* 9904. [12]/ As the Ninth Circuit observed, "[e]arly drafts of Title VIII protected only subsistence uses by Native Alaskans." *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 313, n. 1 (1980). [13]/ For example, an October 28,1977 committee print of H.R. 39 provided that, in times of limited resources, highest priority would be given to uses by "Alaskan Natives primarily and directly dependent upon the particular resource as a mainstay of their livelihood…" §709(b), *H.R. 39, Committee Print No. 2* (*Exhibit 1*).

---

[12] / Rep. Udall was the prime and pre-eminent sponsor of H.R. 39, in addition to being the chair of the House Committee principally responsible for the bill. *See generally H.Rep. 96-97.* Indeed, for years H.R. 39 was colloquially referred to as the "Udall bill," and Udall's imprimatur spans:

- o introduction of the original H.R. 39, naming Udall as the prime sponsor. *H. Rep. 96-97, Part 1* at 539 ("The original H.R. 39 [was] introduced by Representative Udall on January 4, 1977");
- o House passage of the "Udall substitute." 125 *Cong. Rec.* 11457-58 (May 16, 1979); and
- o Udall's closing comment, upon near-final House action on the legislation, that "I have been personally involved in this [the Alaska lands debate] for more than 8 years now, going back to the old Alaska Native claims bill." 126 *Cong. Rec.* 29260 (Nov. 12, 1980).

A concise history of ANILCA Title VIII's legislative journey, and Rep. Udall's role in it, can be found at the National Park Service's *Alaska Subsistence: A National Park Service Management History,* ch. 4(G) (Sept. 2002) ("*NPS*").

[13] / *See also, NPS* at ch. 4(G) ("As noted in the legislative history [of Title VIII of ANILCA], 'early drafts of the subsistence title by the House Interior Committee allocated access to subsistence resources on an ethnic basis…'")

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                                    Page | 15

*B. Congress broadened Title VIII to include non-Native rural residents solely in an
ultimately unsuccessful attempt to enable State management of the title*

While early versions of H.R. 39 included direct enforcement of the subsistence
preference by the Dept. of Interior in so-called "subsistence management zones," the State
of Alaska and the Dept. of Interior urged the House Interior and Insular Affairs Committee
to instead allow the State of Alaska to assume management of the subsistence program
statewide under federal guidelines. *See, generally, H. Rep. 96-97, Part 1* at 539 *et seq.*

The Committee accepted the proposal. *Id.* But accepting state management meant
abandoning its Native preference. As Rep. Udall and other original H.R. 39 co-sponsors
explained in the Committee's report on H.R. 39:

> *In January 1978, the Tundra Times, Alaska's statewide Native
> newspaper, published an interview with Governor Hammond
> conducted in mid-December 1977. Asked for reaction to Title VII
> of Committee Print No. 2, the Governor first, expressed concern
> that the prohibition against racial discrimination in the Alaska
> constitution would prevent the State from being able to submit a
> State program which would satisfy a Federal requirement for a
> specific Native preference for subsistence use.*

*H.Rep. 96-97, Part I* at 542. In response, Udall and the committee relented:

> *In early February 1978, the Subcommittee completed its markup
> of H.R. 39. The subsistence management title (Title VII) was
> amended to satisfy the two major concerns which the Governor
> expressed to the Tundra Times in January. No specific preference
> for Alaska Natives was included.*

*Id.* At 543*; see also* Rep. Udall's comments to House floor on the same subject:

> *Early drafts of the subsistence title by the House Interior
> Committee allocated access to subsistence resources on an ethnic
> basis, an approach similar in concept to that suggested by the*

> Settlement Act Conference Committee. However, that approach was abandoned in the House after Governor Hammond correctly pointed out that under the Alaska Constitution the State cannot participate in a subsistence management system which would require it to allocate access to subsistence resources on the basis of "Nativeness."...

126 *Cong. Rec.* 29278 (Nov. 12, 1980). *See also* 125 *Cong. Rec.* 9904. [14]/

> ### C. Despite broadening the bill in deference to possible State management, protecting Native subsistence rights was still Congress' paramount concern

At the same time, not only Udall, but the various congressional committees that considered H.R. 39, made it clear that the "rural" preference was there only by necessity, and that the principal goal of Title VIII remained protection of Native subsistence traditions.

Udall made the point most directly on the House floor in 1980:

> Although the Federal and State subsistence management system established in the bill is racially neutral, it is important to recognize that the primary beneficiaries of the subsistence title…are the Alaska Native people. **Although there are many non-Natives living a subsistence way of life in rural Alaska which may be an Important national value, the subsistence title would not be included in the bill if non-Native subsistence activities were the primary focus of concern. Rather, the subsistence title and the other subsistence provisions are included in recognition of the ongoing responsibility of the Congress to protect the opportunity for continued subsistence uses in Alaska by the Alaska Native people, a responsibility consistent with our well recognized constitutional authority to manage Indian affairs.**

---

[14] / Ultimately, the Alaska Supreme Court would rule that the state could not even favor "rural" residents, and Congress' effort to facilitate a state-managed subsistence program came to naught. *McDowell v. State*, 785 P.2d 1 (Alaska 1989).

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.*,
Sealaska Corporation Brief of *Amicus Curiae*                                    Page | 17

126 *Cong. Rec.* 29278 (*emphasis added*). Similarly, in 1979, in presenting the bill on the

House floor, Udall said:

> [I]t is important to reiterate that while title VII [ultimately, Title VIII] of the Udall-Anderson substitute is applicable to all rural Alaska residents who are dependent upon subsistence resources, Native and non-Native alike**, it is a statute primarily for the benefit of Alaska Native residents who are dependent upon subsistence uses**…

125 *Cong. Rec.* 9904 (*emphasis added*). [15/]

---

[15] / In *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223 (9th Cir. 1999), a panel of this circuit held that 16 U.S.C. § 3120, which governs federal land management in Alaska, was not "Indian legislation" and therefore not entitled to the rule of statutory construction requiring that any statutory ambiguity be resolved in favor of Indians. In the process, it dismissed Rep. Udall's floor statements.

The panel's holding does not bear on the relevance of this Section's discussion, for each of the following reasons:

*First,* the court was only dealing with a portion of Title VIII of ANILCA (§3120) that was "directed in large part toward land conservation rather than subsistence." 170 F.3d at 1226. That statute is not at issue here.

*Second,* the panel's ruling was predicated on the fact that the purpose of Title VIII is to protect subsistence harvest by all rural residents—Native and non-Native. There was no need for the panel to have even strayed into the world of statutory construction canons at all on that count, since Title VIII is unambiguous in that respect—the Title makes it quite clear that its purpose is to protect all "rural residents'" subsistence use. 16 USC §§3112(1), 3114. In this case, conversely, we are focusing on the factors that primarily motivated Congress' to deal with issue of subsistence ***at all***—a question that the text of Title VIII does not address.

*Third,* the panel's decision was grounded on a Scalian distaste for the use of any legislative history, which the panel labelled a "waste of time." 170 F.3d at 1228. That is not the law in this circuit. When a matter is not unambiguously resolved by the language of the statute, the floor statements of a bill's chief sponsor (here, Rep. Udall) "are an authoritative guide to the statute's construction." *City of Oakland v. Wells Fargo & Co.,* 972 F.3d 1112, 1126-27 (9th Cir. 2020) (citing *Fed. Energy Admin. V. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976)); *in accord N. Haven Bd. Of Education v. Bell,* 456 U.S. 512, 526-27 (1982); *Kalvinskas v. Cal. Inst. of Technology,* 96 F. 3d 1305, 1309 (9th Cir. 1996);

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                    Page | 18

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 23 of 28

Likewise, in commending their various versions of H.R. 39, the congressional committees charged with the bill made it clear that while, yes, Title VIII's statutory preference may be ethnically neutral, the principal motivation of the title was to protect Native subsistence traditions. For example:

In its 1978 report, the House Interior and Insular Affairs Committee stated:

> *This legislation recognizes the long-standing and historic use of the Alaska Native people of large areas of land around their historic villages for hunting, fishing, trapping, berry gathering and other subsistence use purposes…*

*H. Rep. 95-1045*, Part 1 at 187. Indeed, the committee noted, the driving force behind Title VIII was the overwhelming evidence that the committee received in is extensive workshops and hearings on the vital importance of subsistence hunting and fishing to Alaska Natives:

> *Reliable evidence was given to the Committee demonstrating that 50 percent of the food for three-quarters of the Native families in Alaska's small and medium villages is acquired*

---

*United States v. Akers,* 785 F.2d 814, 819 (9ᵗʰ Cir. 1986). In that regard, one district court has cited *Hoonah Indian Association* for only the narrow and inoffensive proposition that "the remarks of individual, **non-sponsor** legislators as to the legislative history are not accorded great weight." *Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 99 F. Supp. 2d 1123, 1139 (E.D. Cal.. 2000) (*emphasis added*). As *note 12, ante*, explains, Rep. Udall can hardly be called a "non-sponsor." Indeed, a different three-judge panel relied on precisely the same Udall floor comments that are quoted herein in describing the evolution of Title VIII. *Kenaitze Indian Tribe v. Alaska*, 860 F.2d at 313 n.1.

Finally, the plaintiff in *Hoonah Indian Association* was arguing for *exclusivity*—it was asking that Native subsistence concerns override other statutory considerations, particularly those in the Tongass Timber Reform Act. Here Sealaska is arguing for *inclusivity*—the right of Indian tribes to participate in their traditional fashion in a community hunt program that is otherwise open to all rural residents.

> through subsistence uses, and 40 percent of such families spend
> an average of 6 to 7 months of the year in subsistence activities...
> as the Federal Field Committee for Development Planning in
> Alaska stated in its report, "Alaska Natives and the Land" (1968):
>> Activities of food gathering (and related subsistence
>> activities) are important to probably more Alaska
>> Natives today than when the U.S. purchased Alaska
>> from Russia. . . While the extent of subsistence varies
>> by region, and among families within communities, it
>> appears that most village Alaskans subsist in some
>> measure by hunting, fishing, and trapping; by
>> gathering berries and greens; and, for some, by using
>> animal skins in garment making; and by gathering
>> driftwood, timber, or willows for fuel.

*Id.* at 181.

In its 96th Congress report, the House Interior and Insular Affairs Committee added:

> The committee recognizes the importance of continued subsistence
> uses to the economy and lifestyle of rural Alaska, and particularly
> to the culture of the Alaska Natives. .... The subsistence management
> and use title is the culmination of Congressional action initiated by
> Congress by the Alaska Native Claims Settlement Act to protect and
> provide for continued subsistence uses by Alaska Natives and other
> rural residents, and is based upon the constitutional authority of
> Congress over Native affairs and its authority under the Property
> Clause and the Commerce Clause.

*H.Rep. 96-97, Part 1* at 278. The House Merchant Marine and Fisheries Committee added

in its report on H.R. 39:

> ...[T]he title confirms traditional management of resident wildlife species
> in the State by the State of Alaska. **It recognizes that while the Federal
> Government has a special responsibility to the Native people of Alaska**,
> the State of Alaska is best equipped to effectively manage the subsistence
> taking of wildlife resources within the State.
>
> ... This Act gives native people the opportunity to decide for themselves
> the rate at which acculturation will take place. **Furnishing protection of**

> **subsistence patterns of existence and subsistence resources will allow**
> **native people, especially the older generation, the opportunity to make**
> **that choice**.

*H. Rep.* 96-97, *Part 2* at 159-60 (1979) (*emphasis added*).

Finally, the Senate Energy and Natural Resources Committee Report on its version

of H.R. 39 stated:

> *The subsistence management provisions of S. 9* [the Senate's
> companion bill] *as introduced reflect a delicate balance between*
> *the traditional responsibility of the State of Alaska for the*
> *regulation of fish and wildlife populations within the State and the*
> *responsibility of the Federal Government for the attainment of*
> *national interest goals, including the protection of the traditional*
> *lifestyle and culture of Alaska Natives.*

*S. Rep. 96-413* at 232 (1979).

Title VIII is the product of Congress' promise to Alaska Natives, originally made

in the course of deliberations over ANCSA, that Native subsistence traditions would be

protected, one way or the other.  There is no small irony in the State's effort to twist that

covenant into a prohibition on Alaska Natives' ability to conduct community hunts in the

same manner that has existed since time immemorial.

## V.  Conclusion

From the outset, the Department of Interior has viewed Section 804 of ANILCA as

allowing the FSB to include Alaska Native tribes among the communities that can

participate in community hunts and that the tribe can choose is hunters and distribute the

meat.  That is certainly a "permissible construction of the statute." *John v. United States,*

720 F.3d 1214, 1228 (9th Cir. 2013).  Had the FSB established a COVID-19 emergency

hunt program solely for Alaska Natives, the State of Alaska would have a case here. But that is not what happened. Here the benefactor of this facially-neutral program happened to be an Indian tribe, which (even if one indulges the State's unproven claim of Native exclusivity) conducted the hunt consistent with its core cultural traditions. Especially in light of the Congressional concerns that gave rise to Title VIII in the first place, that fact begs this question:

So what?

DATED: August 3, 2021

By: */s/ Jonathan Tillinghast*
Jonathan K. Tillinghast
Simpson, Tillinghast, Sheehan & Araujo PC
One Sealaska Plaza, Suite 300
Juneau, Alaska 99801
Telephone: (907) 321-3405
Email: jon@stsl.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2021, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *Jonathan Tillinghast*
Jonathan Tillinghast

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                    Page | 22

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 27 of 28

**Certifications of Counsel**

The undersigned counsel certifies that:

**Word Count**

This document contains **6321** words, excluding items exempted by Local Civil Rule 7.4(a)(4) and complies with the word limits of Local Civil Rule 7.4(a)(1) for pleadings at the dispositive stage.

**Anti-Collusion**

No party counsel authored any portion of this brief, and no person contributed any funds to the preparation of this brief other than Sealaska Corporation itself.

DATED August 3, 2021.

*/s/ Jonathan Tillinghast*
Jonathan K. Tillinghast

Case No. 3:20-cv-00195, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd., et al.,*
Sealaska Corporation Brief of *Amicus Curiae*                                    Page | 23

Case 3:20-cv-00195-SLG   Document 51-2   Filed 08/03/21   Page 28 of 28