Anna C. Crary (Alaska Bar No. 1405020)
Andrew B. Erickson (Alaska Bar No. 1605049)
LANDYE BENNETT BLUMSTEIN LLP
701 West Eighth Avenue, Suite 1100
Anchorage, Alaska 99501
Tel: (907) 276-5152
Fax: (907) 276-8433
Email: annac@lbblawyers.com
Email: andye@lbblawyers.com

*Attorneys for Amicus Curiae First Alaskans Institute*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br>Department of Fish and Game,<br><br>        Plaintiff,<br><br>    v.<br><br>FEDERAL SUBSISTENCE BOARD, et al.,<br><br>        Defendants,<br><br>  and<br><br>ORGANIZED VILLAGE OF KAKE,<br><br>        Intervenor-Defendant. | Case No. 3:20-cv-00195-SLG |

## BRIEF OF AMICUS CURIAE
## FIRST ALASKANS INSTITUTE IN SUPPORT OF FEDERAL DEFENDANTS

# TABLE OF CONTENTS

**Table of Authorities**................................................................................................... 3

**Introduction** ............................................................................................................... 5

**Argument**..................................................................................................................... 6

   I.   State and Federal Case Law Illustrates the History of the Management
Controversy Between User Groups in GMU 13............................................................. 6

   II.  The FSB's Authority to Close Public Lands Because of Competition with
Subsistence Hunting is Vital to the "Continuation of the Opportunity for Subsistence
Uses."............................................................................................................................ 11

**Conclusion** ............................................................................................................... 20

*State of Alaska v. Federal Subsistence Board et al.*     Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute     Page 2 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 2 of 21

# TABLE OF AUTHORITIES

**Cases**

*Ahtna Tene Nene v. State, Dep't of Fish & Game,*
 288 P.3d 452, 455 (Alaska 2012) .............................................................9, 10

*Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game,*
 347 P.3d 97 (Alaska 2015) ............................................................... 10

*Manning v. State, Dep't of Fish & Game,*
 355 P.3d 530 (Alaska 2015) ............................................................... 10

*Manning v. State, Dep't of Fish & Game,*
 S-16461, 2018 WL 3934807 (Alaska, Aug. 15, 2018)................................. 10

*McDowell v. State,*
 785 P.2d 1 (Alaska 1989) ................................................................. 6

*Native Village of Quinhagak v. U.S.,*
 35 F.3d 388, 394 (9th Cir. 1994) ....................................................... 20

*State of Alaska v. Fed. Subsistence Bd.,*
 544 F.3d 1089 (9th Cir. 2008) ........................................................... 9

*State of Alaska, Dep't of Fish & Game v. Manning,*
 161 P.3d 1215 (Alaska 2007) ............................................................. 8

**Statutes**

16 U.S.C. § 3111(1)........................................................................ 20

16 U.S.C. § 3111(3)........................................................................ 11

16 U.S.C. § 3114(a)........................................................................ 13

16 U.S.C. § 3125 .......................................................................... 14

AS 16.05.258 ............................................................................. 5

**Other Authorities**

Ch. 151, SLA 1978........................................................................ 12

*State of Alaska v. Federal Subsistence Board et al.*                     Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                          Page 3 of 21

Ch. 52, SLA 1986 ................................................................................. 12

Federal Subsistence Board Meeting,
   Teleconference Transcript (June 16, 2021) .................................................... 19

H.R. Rep. No. 95-1045, pt. 1, at 182 (1978) ........................................ 13, 15, 20

H.R. Rep. No. 95-1045, pt. 1, at 184 (1978) ........................................ 13

H.R. Rep. No. 95-1045, pt. 1, at 185 (1978) ........................................ 14

H.R. Rep. No. 96-96, pt. 1, at 278 (1979) ........................................ 13, 19

H.R. Rep. No. 96-97, pt. 1, at 231 (1979) ........................................ 14

H.R. Rep. No. 96-97, pt. 2, at 191 (1979) ........................................ 13

Jack B. McGee, Subsistence Hunting and Fishing in Alaska:  Does ANILCA's
   Rural Subsistence Priority Really Conflict with the Alaska Constitution?,
   27 Alaska L. Rev. 221, 228 (2010) .................................................... 12

Miranda Strong, Alaska National Interest Lands Conservation Act
   Compliance & Nonsubsistence Areas:  How Can Alaska Thaw
   Out Rural & Alaska Native Subsistence Rights?,
   30 Alaska L. Rev. 71, 75-77 (2013) .................................................... 12

Robert J. Wolfe, Local Traditions and Subsistence:  A Synopsis from
   Twenty-Five Years of Research by the State of Alaska,
   ADF&G Tech. Paper No. 284 (2004) ........................................................ 15

Sophie Theriault, et al., The Legal Protection of Subsistence:
   A Prerequisite of Food Security for the Inuit of Alaska,
   22 Alaska L. Rev. 35, 65 (2005) ........................................................ 16

Thomas A. Moorehouse & Marybeth Holleman, When Values Conflict:
   Accommodating Alaska Native Subsistence, Occasional Paper No. 22,
   Institute of Social and Economic Research (ISER),
   University of Alaska, Anchorage, at 31-32 (June 1994) .............................. 17

*State of Alaska v. Federal Subsistence Board et al.*   Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute   Page 4 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 4 of 21

# INTRODUCTION

The State of Alaska filed this lawsuit in part to enjoin the Federal Subsistence Board ("FSB") from taking emergency action to close certain public lands in Game Management Unit ("GMU") 13 to non-subsistence caribou and moose hunting.[1] It is widely recognized that GMU 13 has serious management issues. The public lands along the Richardson Highway are easily accessible to hunters who reside in nearby urban cities. The area's popularity has effectively turned GMU 13 into a "combat hunting zone." Over-crowding coupled with a free-for-all mentality among urban hunters who descend onto the rural area each year pose a serious management challenge for both the State and the FSB and threaten the continuation of subsistence uses of caribou and moose by rural residents in GMU 13.

The State takes the position that there are not competing uses in GMU 13, suggesting that there is no difference between a hunter from Anchorage and an Alaska Native subsistence hunter who resides in GMU 13: "[H]ere, we do not have conflicting uses; all are moose and caribou hunters . . .The alleged conflict is competition between hunters, which is not a conflicting use."[2] But the plain language of ANILCA as well as the State's own subsistence law[3] underscore the fundamental difference between subsistence and nonsubsistence uses of natural resources in Alaska. The State's position is contrary to

---

[1]     *See* Docket 1 at 19-20; Docket 3 at 1.

[2]     Docket 49 at 41.

[3]     *See* AS 16.05.258 (distinguishing subsistence uses from "other consumptive uses" and prioritizing subsistence uses above those "other consumptive uses").

*State of Alaska v. Federal Subsistence Board et al.*       Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute       Page 5 of 21

federal and state subsistence policies, is offensive to the traditions and cultures of Alaska Natives and rural Alaskans, and has no basis in the law.

Amicus First Alaskans Institute submits that there are two important points regarding the State's GMU 13 claims that should be brought to this Court's attention. First, the State's arguments are not written on a blank slate in this case; there is a long, contentious history regarding GMU 13 management that is reflected in a series of state and federal cases. Second, the FSB's authority to close public lands to nonsubsistence uses because of competition with subsistence uses is one of the most important policies underlying Title VIII of ANILCA. The State's unsupported attack on that authority must be rejected by this Court.

## ARGUMENT

### I. State and Federal Case Law Illustrates the History of the Management Controversy Between User Groups in GMU 13.

The State's own management failures and the resultant loss of Alaska Native customary and traditional subsistence ways of life have contributed to the present management dilemmas in GMU 13. Early versions of Alaska's subsistence law not only prioritized subsistence over sport and commercial uses, but also provided for a rural subsistence preference.[4] Then in 1989, the Alaska Supreme Court's decision in *McDowell v. State*[5] declared the rural preference unconstitutional, and Alaska announced that "All

---

[4]    *See* Ch. 151, SLA 1978; Ch. 52 SLA 1986.

[5]    785 P.2d 1 (Alaska 1989).

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                Page 6 of 21

Alaskans" may participate in subsistence hunts regardless of whether they lived in urban

or rural areas. Increased competition between urban and rural residents for caribou and

moose in GMU 13, and the resultant conflicts and threats to rural subsistence customary

and traditional uses of wild game caused by that competition, are born out in a series of

State and federal cases.

In 1992, the Kluti Kaah Native Village of Copper Center[6] was granted a preliminary

injunction enjoining the State's consolidation of two separate subsistence and sport hunts

for moose into one 7-day moose hunt for all users.[7] The State's own subsistence expert

cautioned that a shortened and consolidated hunt would not satisfy traditional harvest

practices, and that enhanced competition for moose during the consolidated hunt would

implicate Kluti Kaah residents' chances of success:

> Another issue in the Copper Basin has been the issue of hunter
> numbers and crowding. We do know that large numbers of
> hunters in the field in a short period of time can inhibit hunting
> or inhibit hunting success.[8]

Although the Alaska Supreme Court vacated the injunction, Justice Rabinowitz's dissent

highlighted the competition for moose between sport and subsistence users that was caused

---

[6]     Copper Center is located approximately 19 miles southeast of Glennallen, and is a rural
community located within GMU 13.

[7]     831 P.2d 1270, 1271-72 (Alaska 1992). In past seasons, the Alaska Board of Game had
authorized a short season for sport hunters and a longer hunt for subsistence users, but the Alaska
Department of Law advised the Board that, under *McDowell*, it would not be legal to hold separate
hunts if there were enough moose to support both a sport and a subsistence hunt.

[8]     *Id*. at 1277.

by the consolidated hunt and the irreparable harm that hunt caused to Kluti Kaah customary and traditional practices:

> There is no question that the traditional Ahtna method of hunting this game population encompassed much more protracted opportunities to engage in this activity with the younger generation. To compress the long-standing custom into a sport hunter's seven-day 'vacation' is to legislate a substantial departure from the (b) historical subsistence hunting experience.[9]

In *State of Alaska, Department of Fish & Game v. Manning,* the Alaska Supreme Court went on to invalidate criteria used to prioritize among subsistence uses in circumstances where the lack of a harvestable surplus of game or fish sufficient to meet all subsistence uses made it easier for State subsistence users to qualify for certain subsistence hunts – thus increasing the pressure on subsistence resources in locations like GMU 13 by removing a tool used to manage the competition between State-qualified subsistence users and federally qualified subsistence users.[10]

Notwithstanding the expansion of opportunity for state subsistence uses provided in *Manning,* the State unsuccessfully objected to the FSB's determination that rural residents of Chistochina – a rural community in GMU 12, which is adjacent to GMU 13 and which

---

9     *Id*. at 1275 (Rabinowitz, J. dissenting).

10    *See State of Alaska, Dep't of Fish & Game v. Manning*, 161 P.3d 1215 (Alaska 2007) (finding that qualifying criteria which considered the relative availability of alternative sources of game was not closely related to the State's interest in ensuring that Alaskans who need to engage in subsistence hunting are able to do so and violated Sections 3, 15, and 17 of Article 8 of the Alaska Constitution).

*State of Alaska v. Federal Subsistence Board et al.*      Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute      Page 8 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 8 of 21

also hunted in GMU 13 – had customary and traditional uses of moose in that unit.[11] The State contended that the customary and traditional use determination restricted nonsubsistence taking of moose in that unit because it necessitated greater State conservation efforts, and objected that such a determination would limit the ability of non-federally qualified subsistence users to access – i.e., compete against federally qualified subsistence users for – those resources.

After years of escalating conflicts caused by competition for wildlife in GMU 13, the Alaska Board of Game ("BOG") acknowledged that the State's administration of subsistence hunts and issuance of hunting permits for GMU 13 had shifted from the most dependent local residents to less subsistence-dependent urban residents.[12] Identifying two different subsistence use patterns in GMU 13, the BOG then adopted a community subsistence hunt[13] and an individual subsistence hunt in an effort to address the competition that had arisen between non-traditional hunters and traditional, rural, primarily Alaska

---

[11]     *State of Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089 (9th Cir. 2008).

[12]     *Ahtna Tene Nene v. State, Dep't of Fish & Game*, 288 P.3d 452, 455 (Alaska 2012).

[13]     Under the community subsistence harvest, a group of 25 or more individuals can apply for a subsistence permit to harvest caribou and moose in GMUs where the BOG has identified community harvest areas. *See* 5 AAC 92.072.

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                    Page 9 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 9 of 21

Native subsistence hunters in GMU 13. Despite multiple challenges to its constitutionality, the community subsistence hunt endures.[14]

The community subsistence hunt does not come close to rectifying the harms caused by competition for game resources in GMU 13. People from all over the state can qualify to participate in the community subsistence hunt, so it doesn't eliminate the issue of competition – rather, it simply provides another method by which people can hunt. And while the community subsistence hunt enjoys larger bag limits and longer season than other hunts, community subsistence hunters are held to the same harvestable surplus levels as other hunts. For example, if the State has declared that there is a harvestable surplus of 2,400 caribou in GMU 13, that harvestable surplus applies to not only the community subsistence hunt, but also all State individual subsistence hunters, all State draw hunts, and all federal subsistence hunts. In recent years, the State has encroached on the community subsistence hunt by extending the sport hunting season by emergency order to overlap with the subsistence season. The resulting increased competition for caribou in GMU 13, and early closure of the subsistence season because the State's quotas had been reached, has exacerbated the management dilemma in GMU 13.

---

[14]    *See Ahtna Tene Nene*, 288 P.3d at 455; *see also Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game*, 347 P.3d 97 (Alaska 2015) (determining that the community subsistence harvest regulations did not violate the Equal Access Clauses of the Alaska Constitution); *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530 (Alaska 2015); *Manning v. State, Dep't of Fish & Game*, S-16461, 2018 WL 3934807 (Alaska, Aug. 15, 2018).

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute          Page 10 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 10 of 21

When viewed in the proper historical context, the necessity of ANILCA's rural subsistence priority is obvious, as are the implications of competition upon the continuation of subsistence uses of game populations in GMU 13. Congressional intent, ANILCA's purpose, and the facts of this case all support the authority – and the necessity – of the FSB's decision to address the untenable competition for caribou and moose in GMU 13 by restricting nonsubsistence uses on public lands.

## II.  The FSB's Authority to Close Public Lands Because of Competition with Subsistence Hunting is Vital to the "Continuation of the Opportunity for Subsistence Uses."

In 1980, Congress recognized that Alaska's inevitable population growth posed an existential threat to Alaska Natives' traditional and cultural ways of life. The findings in Section 801 of ANILCA make it clear that the "continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources."[15] As this Court correctly observed, although "competition is not one of the enumerated reasons for restriction of nonsubsistence uses under Section 815, if the levels of competition interfere with the continuation of subsistence uses, or give rise to public safety concerns, restrictions may become necessary for those enumerated reasons."[16] By closing public lands solely to prevent competition among user groups, the FSB exercises an important

---

[15]    16 U.S.C. § 3111(3).

[16]    Docket 28 at 20, *State of Alaska, Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-cv-001955-SLG, 2020 WL 5625897 at * 9 (D. Alaska, Sept. 18, 2020) (citing 16 U.S.C. § 3125(3)).

management tool specifically granted by ANILCA to ensure subsistence uses can continue for future generations.

Protecting subsistence uses from competition by non-subsistence uses for the same resources has been the policy of both the State and federal governments for over half a century.[17] In 1978, the Alaska Legislature codified the first "subsistence priority" in state law.[18] The 1978 act distinguished non-subsistence hunting and fishing from "subsistence uses," which the Legislature defined as "customary and traditional uses in Alaska of wild, renewable resources,"[19] and established a preference for subsistence uses, requiring the Alaska Boards of Fisheries and Game to restrict non-subsistence uses when necessary to "assure the continuation of subsistence uses."[20] While a subsequent version of the law granted a subsistence priority to rural residents,[21] that priority was later invalidated by the Alaska Supreme Court.[22]

---

[17]    *See* Miranda Strong, Alaska National Interest Lands Conservation Act Compliance & Nonsubsistence Areas: How Can Alaska Thaw Out Rural & Alaska Native Subsistence Rights?, 30 Alaska L. Rev. 71, 75-77 (2013).

[18]    Ch. 151, SLA 1978.

[19]    *Id*. at § 15.

[20]    *Id*. at §§ 3-5; *see generally* Jack B. McGee, Subsistence Hunting and Fishing in Alaska: Does ANILCA's Rural Subsistence Priority Really Conflict with the Alaska Constitution?, 27 Alaska L. Rev. 221, 228 (2010) (describing "Alaska First Subsistence Priority Law").

[21]    *See* Ch. 52, SLA 1986.

[22]    *See infra* note 5 and accompanying text.

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute               Page 12 of 21

Title VIII of ANILCA "parallels" the State's 1978 act.[23] Like the Alaska Legislature, Congress was concerned that "cultural ties with a subsistence way of life" were being lost and replaced by "dominant non-Native culture."[24] Congress understood that Alaska's population was growing and increasing pressure on rural ways of life:[25]

> The rapid population growth of Alaska's urban centers has been a major factor threatening subsistence uses, along with inadequate State and Federal actions, declines in certain wildlife populations, and increasing accessibility of remote areas. Between 1965 and 1975, Alaska's population increased from 265,000 to 405,000 people and the number of resident hunting and fishing licenses almost doubled—from 93,000 to 170,550 . . . *As a result of such developments, pressure on many traditional subsistence resources has been unacceptably increased as urban hunters have intruded into more remote, subsistence-dependent areas of the State.*[26]

Congress provided a solution to the threat that increasing competition for limited resources posed to subsistence uses by adopting a preference for subsistence uses on public lands in Alaska.[27] The subsistence priority was at the forefront of Congress's and state leaders' minds in the formulation of ANILCA:

---

[23]    H.R. Rep. No. 96-97, pt. 2, at 191 (1979).

[24]    H.R. Rep. No. 95-1045, pt. 1, at 182 (1978).

[25]    H.R. Rep. No. 96-96, pt. 1, at 278 (1979) ("The Committee recognizes that the importance of continued subsistence uses to the economy and lifestyle of rural Alaska, and particularly to the culture of Alaska Natives. Alternative food sources generally are not available in most rural villages to offset a diminution of the traditional subsistence harvest.").

[26]    H.R. Rep. No. 95-1045, pt. 1, at 184 (1978) (emphasis added).

[27]    *See* 16 U.S.C. § 3114(a) ("Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes.").

Central to the Committee's intent is the creation of a system for establishing priorities among consumptive users of the resources supporting a subsistence lifestyle. As Governor Hammond put in his testimony on this legislation[:]

"The allocation of resources to competitive consumers is a difficult problem at best. Thus, I would hope this Congress establishes a priority of subsistence use *where there is a conflict on national interest lands*. I believe this is a legitimate subject for legislation, and hope that this principle, which has been state policy for some time, is enacted into Federal law."[28]

The subsistence priority was designed explicitly to address competition between subsistence and non-subsistence uses in two scenarios: (1) when "resources become limited among competing consumptive users;"[29] or (2) when "the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened" by non-subsistence users, i.e., "to continue subsistence uses."[30]  In either scenario, Section 815 of

---

[28]    H.R. Rep. No. 95-1045, pt. 1, at 185 (1978) (emphasis added).

[29]    H.R. Rep. No. 96-97, pt. 1, at 231 (1979).

[30]    *Id*. at 280 ("[I]f the continued viability of a particular population or the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened by a harvest by all such persons, the State rule-making authority, in conjunction with the recommendations of the regional council representing the affected area, is required by this section to establish regulations which restrict the taking of such population to protect Alaska residents engaged in subsistence uses.").

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 14 of 21

ANILCA creates an obligation to restrict non-subsistence uses to ensure an adequate subsistence opportunity.[31]

Although "competition" is not one of the enumerated justifications for closing public lands,[32] Congress realized that the "continuation of subsistence uses" depends on the existence of an *opportunity* for subsistence,[33] and not solely on wildlife population levels or access to public lands. ADF&G's own subsistence experts have concluded that when there is direct competition for the same natural resources, rural subsistence users are disadvantaged in several ways that may lead to decreased opportunity:

> Urban-based populations potentially place rural populations at a disadvantage in regards to competition for fish and game. Because urban-based hunters/fisher are mobile, more numerous, and politically advantaged (that is, they are capable of achieving majorities on elected bodies and appointed boards by sheer numbers), they hold the potential for overwhelming harvesters from rural communities.[34]

---

[31]    *See* 16 U.S.C. § 3125 ("Nothing in this title shall be construed as . . . (3) authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 816, *to continue subsistence uses of such populations*, or pursuant to other applicable law . . .") (emphasis added).

[32]    *See id.*; Docket 28 at 20.

[33]    *See* H.R. Rep. No. 95-1045, pt. 1, at 182 (1978) ("The Committee believes that the rate at which subsistence uses and 'cultural ties with a subsistence way of life' are replaced with 'aspects of the dominant non-Native culture' properly should be determined, as far as possible, by the subsistence-dependent Native and other peoples themselves, and that protection of their option in this regard is, and rightly should be, an important goal of correct Federal policy.").

[34]    Robert J. Wolfe, Local Traditions and Subsistence: A Synopsis from Twenty-Five Years of Research by the State of Alaska, ADF&G Tech. Paper No. 284 (2004) (available at: https://www.adfg.alaska.gov/download/Technical%20Papers/tp284Twentyfiveyears.pdf).

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                        Page 15 of 21

Congress clearly intended that the federal government would close public lands to nonsubsistence uses if competition for limited resources threatened the continuation of subsistence uses.

It is widely understood that the threats posed to subsistence from unequal competition with non-subsistence users are myriad.[35] Nonsubsistence users have the potential to directly alter subsistence practices, areas, and hunt timing. Subsistence users may choose not to hunt simply because they perceive their traditional hunting areas are over-crowded or that their hunt will be less likely to be successful.[36] In some cases, as in GMU 13, increased use, particularly by non-local hunters may drive game away from traditional areas.[37] "Deflection" of game, geographically and temporally, is especially

---

[35]     *See, e.g.*, Sophie Theriault, et al., The Legal Protection of Subsistence: A Prerequisite of Food Security for the Inuit of Alaska, 22 Alaska L. Rev. 35, 65 (2005) ("Limited resources, allocated among a potentially large group of people, threaten the capacity of local people to obtain sufficient food from their traditional fishing and hunting grounds.").

[36]     *See* 0170_FSB ("[L]ocal harvesters do experience an influx of non-local hunters and many feel displaced by this activity and alter their subsistence activities."); 0184_FSB ("Local users testified that non-local hunters have more financial resources, more equipment and are less dependent on moose and caribou than local residents and that competition with other users makes it difficult for local users to provide for their families . . . Some local hunters stated they no longer hunt in Unit 13 because of safety concerns.").

[37]     *See* 0184_FSB ("Some further explained that competition due to intense hunting pressure includes direct interference with the hunt, deflection of caribou and moose away from locally preferred road corridors . . .").

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute          Page 16 of 21

problematic when nonsubsistence and subsistence users are targeting different species.[38] The State argues that ANILCA does not guarantee subsistence users "a lack of competition;"[39] however, ANILCA does guarantee the "continuation of the opportunity for subsistence uses." Congress intended broad protection necessary to ensure the opportunity to provide economic, traditional, and cultural existence. Thus, when the subsistence opportunity is diminished to the point where the FSB determines that a threat to continued subsistence uses exists, ANILCA empowers, and requires, the FSB to act.

The fact that competition threatens the continuation of subsistence uses in areas like GMU 13 is not novel. In 1994, researchers found that "Anchorage and Fairbanks hunters compete with Native and non-Native residents of small rural communities in the Copper River Basin . . . [R]ural hunters fear they are being squeezed out of the hunts by ever larger numbers of well-equipped urban hunters."[40] Twenty-seven years later, the problem has only become more profound.

---

[38]    *See* 0175_FSB ("[T]he proponent of this request stated that the influx of caribou hunters during moose season takes away moose hunting opportunity for Federally qualified subsistence users. He stated the area is too crowded to safely hunt with people aiming guns at one another and shooting over one another's heads."); *see also* 0191_FSB ("If WSA 20-03 is approved, Federally qualified subsistence users may experience less competition from non-Federally qualified users along some road corridors, resulting in increased opportunity and possibly increased success in harvesting moose during the 2020/21 hunting season.").

[39]    Docket 3-1 at 13.

[40]    Thomas A. Moorehouse & Marybeth Holleman, When Values Conflict: Accommodating Alaska Native Subsistence, Occasional Paper No. 22, Institute of Social and Economic Research (ISER), University of Alaska, Anchorage, at 31-32 (June 1994) (available at: https://pubs.iseralaska.org/media/62a87f5c-9b9f-4c6e-b4b6-d3ec40e09e3d/1994_06-WhenValuesConflict.pdf).

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                        Page 17 of 21

In this case, the record contains abundant evidence that competitive pressures faced by rural subsistence users in GMU 13 from non-subsistence users threaten the continuation of rural subsistence uses of caribou and moose. The FSB considered the Office of Subsistence Management's report that between 2009 and 2013 "almost every Unit 13 community noted concern over non-local hunters."[41] The FSB heard subsistence hunters describe competition from non-subsistence hunters with better, "expensive equipment,"[42] more financial resources,[43] and less dependence on successful hunts to sustain themselves and their families with food.[44] And, the FSB heard subsistence users express concerns including that "overcrowding has changed customary and traditional moose harvest";[45] "ATV use is out of control";[46] and "[rural subsistence users] aren't hunting there because there's so many people."[47] Based on those concerns, the FSB properly exercised its

---

[41]    0046_FSB ("In 2009-2013 household surveys, almost every Unit 13 community noted concern over non-local hunters stating that non-local hunters who have lots of expensive equipment were out-competing local hunters and driving game away. Public testimony in support of WSA19-03 included many concerns over intense hunting pressure, unsafe hunting conditions, overcrowding, deflection of game and increased difficulty for federally qualified users to harvest most moose and caribou in Unit 13").

[42]    0046_FSB.

[43]    0184_FSB.

[44]    0184_FSB.

[45]    0175_FSB.

[46]    0183_FSB.

[47]    0049_FSB.

authority under ANILCA to close parts of GMU 13 for non-subsistence hunting to protect subsistence opportunity.[48]

The FSB's authority to close public lands to non-subsistence uses—even where public safety or conservation concerns are not present—is critical to the continuation of subsistence uses throughout Alaska. As Congress anticipated, inevitable population growth and increased accessibility of remote areas has increasingly led urban hunters to venture into areas that were once left mainly to local subsistence hunters.[49] For example, in June 2021, the FSB heard testimony from subsistence hunters in GMU 23 and 26A near Kotzebue that competition from nonsubsistence uses threatened the continuation of subsistence uses in that area.[50] Thomas Baker, chair of the Northwest Arctic Regional Advisory Council explained that rural subsistence users are forced to travel further and expend more resources to hunt caribou because non-local nonsubsistence hunters are disrupting caribou migration patterns.[51] Competition from nonsubsistence users "prevents [subsistence] hunters from being able to go up where they typically are and they have to

---

[48]    *See* 0212_FSB.

[49]    H.R. Rep. No. 96-96, pt. 1, at 278 (1979) ("However, the continuation of the traditional subsistence uses in rural Alaska is threatened by the rapid population growth in Anchorage, Fairbanks, and other urban centers and the resultant pressure which urban residents engaged in subsistence and sport use have placed upon important fish and wildlife populations in heretofore remote areas of the state.").

[50]    *See* Federal Subsistence Board Meeting, Teleconference Transcript (June 16, 2021) (available at https://www.doi.gov/sites/doi.gov/files/fsb-mtg-16-jun-2021.pdf) (WSA21-01).

[51]    *Id*. at 19 ("Local residents testified that non-locals do not follow the traditional practice of letting the leader caribou pass, which can result in herd diversion and a small number of hunters having a disproportionate impact on subsistence for entire communities.").

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute                              Page 19 of 21

Case 3:20-cv-00195-SLG   Document 57-1   Filed 08/06/21   Page 19 of 21

go farther and farther, spend more money on gas, food, fuel, what have you, just to get a smaller amount of caribou than they typically are able to get."[52]

Even when nonsubsistence competition is remote and poses no immediate public safety or conservation concerns, the FSB has an obligation to close public lands to non-subsistence uses if those uses influence wildlife behavior to the extent that it threatens continued subsistence opportunity. Detrimental effects to traditional subsistence hunting practices lead to increased reluctance to participate,[53] which is precisely the cultural and traditional change that Congress was concerned would be thrust upon rural Alaska in the absence of ANILCA's subsistence priority.[54] The FSB's authority to take action to protect subsistence uses from competition is therefore essential to the policy underlying ANILCA.

## CONCLUSION

ANILCA contains a clear congressional directive to protect the cultural aspects of subsistence living.[55] When the customary and traditional use of caribou and moose by subsistence users in rural Alaska is existentially threatened by unrelenting competition from nonsubsistence urban hunters who do not rely on those resources for sustenance or continuation of culture, ANILCA directs the FSB to close public lands to those nonsubsistence uses in order to protect and continue subsistence uses. That is exactly what

---

[52]    *Id*. at 32.

[53]    *See* 0170_FSB.

[54]    *See* H.R. Rep. No. 95-1045, pt. 1, at 182 (1978).

[55]    *See Native Village of Quinhagak v. U.S.*, 35 F.3d 388, 394 (9th Cir. 1994); *see also* 16 U.S.C. § 3111(1).

*State of Alaska v. Federal Subsistence Board et al.*          Case No. 3:20-cv-00195-SLG
Brief of Amicus Curiae First Alaskans Institute          Page 20 of 21

the FSB did in GMU 13. The FSB's action was lawful, was supported by ample evidence of the harm to rural subsistence uses caused by competition from non-rural hunters, and complied with ANILCA's statutory mandate to prioritize and protect customary and traditional subsistence uses.

Dated: August 6, 2021, at Anchorage, Alaska.

LANDYE BENNETT BLUMSTEIN LLP
Attorneys for Amici First Alaskan Institute

By: */s/ Anna C. Crary*
Anna C. Crary, Alaska Bar No. 1405020
Andrew Erickson, Alaska Bar No. 1605049

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2021, a copy of the foregoing was served by electronic means and all counsel of record by the Court's CM/ECF system.

*/s/ Anna C. Crary*
Anna C. Crary