TREG R. TAYLOR
ATTORNEY GENERAL

Cheryl R. Brooking (Alaska Bar No. 9211069)
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: cheryl.brooking@alaska.gov

*Attorney for State of Alaska*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF FISH AND GAME | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 3:20-cv-00195-SLG |
| FEDERAL SUBSISTENCE BOARD, *et al.,* | ) ) ) | **STATE OF ALASKA'S REPLY BRIEF** |
| Defendants, | ) ) | |
| and | ) ) | |
| ORGANIZED VILLAGE OF KAKE, | ) ) | |
| Intervenor-Defendant. | ) | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I.      INTRODUCTION .............................................................................. 1

II.     ARGUMENT .................................................................................... 2

        A.      ANILCA provides a subsistence priority when it is necessary to restrict
                hunting and fishing, and allows restrictions on hunting and fishing on
                public lands only for specified reasons and in a specified manner .............. 2

        B.      FSB invalidly authorized itself and federal land managers to open hunts, in
                violation of ANILCA, the APA, the Sunshine Act, and FSB's own
                guidelines ................................................................................................. 5

        C.      FSB lacked the authority to delegate administration of the Kake hunt
                outside a federal agency ............................................................................ 8

        D.      The State's claims are not barred from review .......................................... 11

        E.      The FSB is an agency subject to the Sunshine Act and this court is
                authorized to provide injunctive relief and attorney fees for FSB's
                consistent and intentional violations ......................................................... 14

        F.      FSB improperly closed moose and caribou hunting except for federally
                qualified users on federal public lands in Game Management Subunits 13A
                and 13B .................................................................................................. 18

III.    CONCLUSION ................................................................................ 24

# TABLE OF AUTHORITIES

**Alaska Cases**

*Friends of Alaska Wildlife Refuges v. Bernhardt*
    381 F.Supp.3d 1127, 1139 (D. Alaska 2019)....................................... 23

**Federal Cases**

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Board,*
    2020 WL 1429904 ..................................................................... 17

*Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. The Board of Oil
    and Gas Conservation of the State of Montana,*
    792 F.2d 782, 795-796 (9th Cir. 1986) ............................................ 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837, 842-43 (1984)...................................................4, 21

*East Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640, 658 (9th Cir 2021) ...............................................3, 23

*Encino Motorcars, LLC v. Navarro,*
    136 S.Ct 2117 (2016)................................................................ 21

*ETSI Pipeline Project v. Missouri,*
    484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988)..................... 4

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502, 515-16 (2009)....................................................... 23

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120, 125, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)................. 4

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421, 434 n.17 (1987) .................................................... 3

*Kingdomware Technologies, Inc. v. United States,*
    136 S.Ct. 1969, 1976 (2016) ...................................................... 12

*Michigan v. E.P.A.,*
    576 U.S. 743, 754 (2015)............................................................ 4

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, 43 (1983)............................................................. 10

*Organized Village of Kake v. United States Dep't of Agriculture,*
    795 F.3d 956, 966 (9th Cir. 2015) ................................................ 23

Case 3:20-cv-00195-SLG   Document 62   Filed 08/27/21   Page 3 of 32

*Pan Am. World Airways, Inc. v. C.A.B.,*
    684 F.2d 31 (D.C. Cir. 1982) ............................................................. 17

*Ragsdale v. Wolverine World Wide, Inc.,*
    535 U.S. 81, 91 (2002) ....................................................................... 4

*Spencer v. Kemna,*
    53 U.S. 1, 17 (1998) ......................................................................... 13

*Sturgeon v. Frost,*
    139 S.Ct. 1066, 1079-80 (2019) ........................................................ 3

*University of Texas v. Camenisch,*
    451 U.S. 390, 395 (1981) .................................................................. 24

*United States v. Mazurie,*
    419 U.S. 544, 557 (1975) .................................................................. 10

*U.S. Telecom Ass'n v. F.C.C.,*
    359 F.3d 554, 565 (D.C. Ct. App. Cir. 2004) ................................ 8, 9, 10

**Federal Statutes**

5 U.S.C. § 552b ................................................................................ 1, 14

5 U.S.C. § 552b(d)(1) ........................................................................... 17

5 U.S.C. § 552e ................................................................................... 14

5 U.S.C. § 552b(h) ............................................................................... 17

5 U.S.C. § 552b(h)(1) ........................................................................... 17

5 U.S.C. § 553(b)-(d) ........................................................................... 23

5 U.S.C. § 706 ...................................................................................... 2

16 U.S.C. § 1601 .................................................................................. 18

16 U.S.C. § 3101 ............................................................................... 1, 18

16 U.S.C. § 3112 ......................................................................... 2, 3, 18, 20

16 U.S.C. § 3114 ........................................................................... 2, 3, 20

16 U.S.C. § 3125 ........................................................................... 2, 3, 20

16 U.S.C. § 3126 ............................................................................... 2, 3

**Federal Regulations**

50 C.F.R. § 100.10..................................................................................... 15

50 C.F.R. § 100.10(d)(6)............................................................................. 5

50 C.F.R. § 100.19..................................................................................... 5

50 C.F.R. § 100.19(a)................................................................................. 18

50 C.F.R. § 100.19(b)................................................................ 1, 18, 22, 23, 24

50 C.F.R. § 100.19(b)(1)............................................................................ 21

50 C.F.R. § 100.25(a)................................................................................. 8

**Acronyms**

ADF&G: *Alaska Department of Fish & Game*...........................................*passim*

ANILCA: *Alaska National Interest Lands Conservation Act* ...................*passim*

APA: *Administrative Procedure Act* ........................................................*passim*

BLM: *Bureau of Land Management* ......................................................... 26

FAI: *First Alaskans Institute*.............................................................22, 25

FRCP: *Federal Rules of Civil Procedure* ............................................... 18

FSB: *Federal Subsistence Board* ...........................................................*passim*

OVK: *Organized Village of Kake* ...........................................................*passim*

RAC: *Regional Advisory Councils*.......................................................... 16

## I.    INTRODUCTION

The State of Alaska objects to the Federal Subsistence Board's ("FSB") efforts to grant itself authority that Congress did not provide, and efforts to exclude itself from directives required by Congress. FSB is subject to the open meetings requirements of the Sunshine Act, 5 U.S.C. § 552b, but holds meetings and takes actions without providing notice to the public or allowing the public to be present. FSB delegated authority to federal land managers around Alaska to open hunts, and FSB itself opened a hunt (the "Kake hunt"), in violation of the Alaska National Interest Lands Conservation Act, Pub. Law 96-487 as amended, 16 U.S.C. §§ 3101-3233 ("ANILCA") which does not authorize opening hunting or fishing seasons. FSB improperly delegated administration of the Kake hunt outside of a federal agency, and issued a permit that, on its face, improperly limited participation, without statutory authorization.

FSB cannot close or restrict hunting unless necessary for reasons stated by Congress, and any such closure must be limited to the minimum period necessary. FSB improperly closed moose and caribou hunting on federal lands in Game Management Subunits 13A and 13B to non-federally qualified hunters for two years, in violation of ANILCA and FSB's own regulations at 50 C.F.R. § 100.19(b). The Unit 13 closure was not necessary to assure the continued viability of the moose or caribou populations or the continuation of subsistence uses of moose and caribou in the area, as ANILCA requires, and Congress did not authorize a closure to avoid competition. In announcing the closure, FSB improperly notified the public that its closure also applied on State lands, and did not correct that error until well into the hunting season.

1

All of these actions were final agency actions that were arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").

## II.    ARGUMENT

### A.    ANILCA Provides a Subsistence Preference When it is Necessary to Restrict Hunting and Fishing, and Allows Restrictions on Hunting and Fishing on Public Lands Only for Specified Reasons and in a Specified Manner.

The FSB lacks authority to open hunts, ignores the clear language in Section 802 of ANILCA, and instead invites the court to create a scheme, ECF 50 at 34, whereby the FSB would be allowed to expand its authority to include adopting a regulation to allow what Congress specifically considered and rejected. Sections 802, 804, 815, and 816 of ANILCA are consistent in explaining that the subsistence priority exists only when "necessary to restrict taking." 16 U.S.C. §§ 3112, 3114, 3125, 3126. Section 804 explicitly describes how such restrictions are to be implemented. 16 U.S.C. § 3114.

The FSB cites to general language about the importance of subsistence to Alaskans, ECF 50 at 34. The State is in no way suggesting that subsistence is not important to Alaskans, but FSB ignores the specific language that negates the proposed "scheme" asserted by the FSB. As the State explained previously, Congress considered and rejected language that would have allowed seasons to be opened. ECF 49 at 28-29. The language was included in the House version of ANILCA but was intentionally deleted by the Senate and does not appear in the final version that became law. *Id.* This was a conscious decision by Congress, who made it clear that the FSB is not to open hunting or fishing seasons, even in an emergency. It has long been established that

2

Congressional intent can be determined when one house rejects a version adopted by the other house. *INS v. Cardozo-Fonseca,* 480 U.S. 421, 434 N. 17 (1987). Congress' intent in adopting ANILCA was clear; the House language that would have allowed opening federal subsistence seasons was intentionally rejected. The federal subsistence priority exists when it is "necessary to restrict taking." 16 U.S.C. § 3112. Congress made this abundantly clear, in four places: Sections 802, 804, 815, and 816 of ANILCA. U.S.C. §§ 3112, 3114, 3125, 3126. General statements regarding the importance of subsistence do not conflict with the more specific directives regarding when the priority exists and how it is to be implemented.

(As further explained by the State, unlike the FSB, the Alaska Board of Game and the Commissioner of the Alaska Department of Fish and Game each have the statutory authority to open hunts. ECF 49 at 30.)

Intervenor-Defendant OVK asserts that Title VIII of ANILCA "contains no express limitations on the FSB's ability to open subsistence harvests" (ECF 55 at 16) but stops short of suggesting that Congressional silence equates to a grant of authority. The law requires the FSB to act within the bounds of authority *granted* by Congress. *East Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 658 (9th Cir 2021) (finding a Department of Justice and Department of Homeland Security rule in conflict with the Immigration and Naturalization Act and invalid under the APA).

Because Congress was clear, OVK's use of *Chevron* deference does not apply. *Sturgeon v. Frost,* 139 S. Ct. 1066, 1079-1080 (2019) (finding ANILCA language

unambiguous and no deference to a federal agency is appropriate; invalidating National Park Service regulation). "First, always, is the question whether 'Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, (1984). Even if Congress had been unclear,

"*Chevron* allows agencies to choose among competing reasonable interpretations of a statute; it does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not." *Michigan v. E.P.A.,* 576 U.S. 743, 754 (2015) (rejecting EPA's interpretation of the Clean Air Act). Here, FSB's interpretation of its asserted expanded authority under ANILCA is not given deference because Congress was clear in describing the subsistence preference and how it would be implemented. "Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91 (2002) (invalidating Department of Labor regulation as not being authorized by statute); *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 125, 120 S. Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 517, 108 S. Ct. 805, 98 L.Ed.2d 898 (1988)).

4

**B.**  **FSB invalidly authorized itself and federal land managers to open hunts, in violation of ANILCA, the APA, the Sunshine Act, and FSB's own guidelines.**

The FSB relied on 50 C.F.R. §§ 100.10(d)(6) and 100.19 to authorize itself to open seasons and as authority to delegate to agency field managers throughout Alaska the authority to open hunting and fishing seasons. ECF 4-3 at 5-36; ECF 49 at 11-15, 19-24; ECF 50 at 10, 27. Actions by the FSB on April 9, 2020, April, 14, 2020, June 2, 2020, and other unknown dates were done in secret, with no notice or participation by the public. Action taken on June 22, 2020 was open to the public, but no prior notice was published at least a week in advance as required by the Sunshine Act. ECF 49 at 21-22.

The guidelines to be followed by the agency field managers throughout Alaska (ECF 4-3 at 5-36 are the delegations of authority to agency field managers to open hunts), and the FSB, to open emergency hunting and fishing seasons were adopted secretly by the FSB and are set forth in an undated memorandum from Sue Detwiler to Secretary Bernhardt. 0478-FSB. Hunting and fishing would only be opened "in response to any demonstrated COVID-19-related emergency situation relating to food security that rises to the level of constituting a threat to public safety." 0481-FSB. The State previously explained that this could not possibly be the same document approved on April 9, 2020, as asserted by Theodore Matuskowitz in a sworn statement. ECF 49 at 23-24. The court should not blindly accept obviously false statements.[1]

---

[1]  This is but one of many factual inconsistencies in the record. See discrepancies regarding special actions requests, ECF 49 at 13-15 (Twelve requests received by April 9, Koyukuk's request is dated April 10, OVK's request is dated April 13, but eleven requests received by June 25).

Even if Congress had provided the authority in ANILCA to open hunts, and even if the FSB's guidelines had been properly adopted in an open meeting, and even if the guidelines at 0478-FSB was the document approved by the FSB as guidelines for Covid-19 seasons to be opened on an emergency basis – and all of these suppositions are shown to be wrong – FSB's decision to open the Kake hunt did not comply with FSB's own guidelines. No Covid-19-related action by the FSB was to occur "in the absence of a demonstrable and imminent threat to public safety," prior consultation with the State, and prior confirmation of need by Mass Care. 0478-FSB. None of these requirements were met.

Mass Care confirmed there was no food security or supply chain disruption in Kake associated with COVID-19. 0426-FSB; 0432-FSB. On June 25, 2020, Mass Care advised the Koyukuk/Nowitna/Innoko National Wildlife Refuge Manager that there were no substantial food shortages or food supply chain disruptions. ECF 4-3 at 52-53. On June 29, 2020, Mass Care advised the Forest Service that there were no food shortage or food supply chain disruptions in the State of Alaska. ECF 4-3 at 57-59.

With regard to the Kake hunt, there is no evidence in the record of an attempt by anyone at the local Forest Service office or the FSB to contact anyone at ADF&G.

It is also well-established law that FSB lacks the authority to open hunting or fishing seasons (other than to reopen a closed season). Even if the FSB had legal authority, the record does not provide substantial evidence to support FSB's decision to open an emergency hunt. FSB's own guidelines preclude opening a hunt unless a food security disruption caused by COVID is confirmed by Mass Care. 0478-FSB. Mass Care confirmed there were no food disruptions related to COVID-19. 0426-FSB; 0432-FSB.

There was no "demonstrable and imminent threat to public safety." 0478-FSB. The FSB appeared to rely heavily, if not solely, on testimony from Joel Jackson of OVK on June 22, 2020. 01344-FSB through 01346-FSB. The State has previously shown that his statements do not support a COVID-19 food emergency. ECF 49 at 31-32. A preference for taking game out of season and in excess of bag limits does not give rise to a food shortage.

Although ferries were in regular service, the availability of ferry service is not relevant to food deliveries to Kake because Kake receives its food deliveries by barge. Weekly barge service and food deliveries were not disrupted.[2] OVK confirmed food does not arrive via ferries, but arrives in Kake via barge. ECF 55 at 7.

Mr. Jackson spoke of his concern for tribal citizens and anxiety over COVID-19, 1344-45-FSB, and no one is suggesting that this concern or anxiety is improper. But he also testified that there were "no food supply disruptions." *Id.*

Despite a lack of facts to support a finding of food security disruption or an attempt to communicate with ADF&G, more than two months after the April 13 request, on June 22, 2020, the FSB approved an "emergency" 30-day hunt, to be evaluated after 30 days to determine if it would be extended for another 30 days. 01352-FSB. However, the permit issued to OVK was for 60 days, not 30 days. 0136-FSB. The arbitrary and capricious decision to issue the permit was further exacerbated by the unwarranted term of the permitted hunt.

---

[2]     *See,* lynden.com/aml/barge-schedule/html, and discussion of uninterrupted food deliveries to Kake at ECF 40, 6-7.

Extending a 30-day hunt to 60 days (compare 01352-FSB and 0136 FSB), and ignoring the harvest limit without amending 50 C.F.R. § 100.25(a) (01328-FSB; 01325-FSB), and ignoring the guidelines FSB approved for COVID-related emergency hunts that requires an affirmative finding by Mass Care and consultation with ADF&G, are all actions contrary to FSB's own determinations.

### C. FSB lacked the authority to delegate administration of the Kake hunt outside a federal agency.

It bears repeating that the State is objecting to delegation of hunt administration to anyone outside of a federal agency. In this case it just happened to be delegation to a tribe. This litigation is about errors made by the FSB. FSB lacks authority to delegate to anyone outside of a federal agency absent Congressional authority.

"Absent affirmative evidence of . . . contrary congressional intent," a Secretary subdelegating authority to "subordinate federal officer or agencies" is "presumptively permissible." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004). In contrast, "subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* Subdelegation by a federal agency authority to an outside party requires evidence of expressed congressional subdelegation. *Id.*

OVK suggests that there is nothing in "the plain language of the Tribe's request, the permit itself, or the administrative record" to indicate that only tribal members would benefit, and that "all substantive decisions" for the Kake hunt were made by the FSB. ECF 55 at 19. On the contrary, OVK's request was for tribal members only. ECF 4-3 at

37, "to provide for our tribal citizens." The permit limited participation to those selected by the tribe. 0136-FSB. The absence of factual information in the record does not show the court who benefited, but OVK posted on Facebook that only "enrolled tribal members" would receive meat. (See below.) The suggestion by the FSB that there is "no reason to expect that the OVK will select participants in a manner that is inconsistent with the goals of the FSB or ANILCA's mandate" to not discriminate based on ethnicity (EDF 50 at 44) is contradicted by the information published by OVK:



Organized Village of Kake
P.O. Box 316
Kake, Alaska 99830-0316
Telephone 907-785-6471 • Fax 907-785-4902
Website: www.kake-nsn.gov
(Federally Recognized Tribal Government serving the Kake, Alaska area)

OVK provided moose meat to 57 households
as part of the Cares Act Program. One moose
was completely de-boned, so each household
received boneless moose meat.

Please do not call the OVK office to sign up.

We started with the Kake Elders that are
enrolled tribal members. When there is more
moose meat, we will continue to give to as
many enrolled member households as possible.

The permit is limited.

Hunting season is almost here.

In very few words, OVK stressed *twice* that the tribe would only provide meat to enrolled members. And other members of the community should not bother asking. This illustrates the exact concern the *U.S. Telecomm* case sought to avoid and that the FSB asks this court to assume would never happen, but did happen. The State agrees with the FSB and this court that the basis for the prohibition on delegation without express

Congressional permission is "the fear that 'when an agency delegates power to outside parties, lines of accountability may blur' and there is an increased 'risk that these parties will not share the agency's 'national vision and perspective' and this may pursue goals inconsistent with those of the agency and the underlying statutory scheme.'" ECF 50 at 44, quoting this court's decision at ECF 37 and *U.S. Telecom Ass'n,* 359 F.3d at 566.

*Mazurie* and *Assiniboine* do not support a proposition that the general rule requiring expressed congressional subdelegation can be overridden when a federal agency subdelegates authority to a tribe.[3] ECF 50 at 45. This issue was raised by the FSB only after being suggested by the court. ECF 37 at 40-41. The court "cannot 'supply a reasoned basis for the agency's decision that the agency itself has not given.'" *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co,* 463 U.S. 29, 43 (1983).

The D.C. Circuit Court clarified that the courts in *Mazurie* and *Assiniboine* addressed tribal sovereignty, but such discussions were not "necessary to the outcome" because the rule of expressed congressional subdelegation proved dispositive. *U.S. Telecom Ass'n*, 359 F.3d at 565. Therefore, for the analysis here, the general rule espoused in *U.S. Telecom Ass'n v. F.C.C.* – of expressed congressional subdelegation – controls.

Congress, in ANILCA, did not expressly authorize the FSB to subdelegate outside of a federal agency, nor did it authorize in the specific instance of the Kake hunt to OVK,

---

[3]     This Court suggested this proposition in its "Order Denying Motion for Preliminary Injunction Regarding Delegation of Authority to Open Emergency Hunts," ECF 37 at 40-41, despite the fact that FSB did not assert this proposition.

the authority to administer any aspects of a subsistence hunt occurring – not on Indian reservation lands subject to treaty rights – but on federal Forest Service lands.[4]  The fact that OVK is a tribe is irrelevant; any delegation to any entity is prohibited because there is a risk that the entity will operate in a manner to benefit only its members.[5]

Title VIII of ANILCA is for all rural Alaskans.[6]  Title VIII of ANILCA does not include any express language subdelegating subsistence hunting decisions to outside entities, with the sole exception that Congress authorized delegation *to the State in Section 805(d)*. By improperly delegating its authority outside of a federal agency, the FSB relinquished management and oversight and administration of the Kake hunt.

The delegation of authority throughout Alaska to open hunting and fishing seasons, the granting to itself the unauthorized authority to open hunting and fishing seasons, and actions taken outside of open meetings, and issuing the permit for the Kake hunt violated federal statutes.

> **D.    The State's claims are not barred from review.**

The FSB asserts that the State's claims regarding opening Covid-19 hunts throughout Alaska are moot. ECF 50 at 39-41. The potential for 60-day harvests of

---

[4]     "All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land under all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished." Section 4, Alaska Native Claims Settlement Act, Pub. Law 92-203.

[5]     The State seeks FSB compliance with the Sunshine Act, the APA, and ANILCA. The State is not, as asserted by OVK, seeking to undermine ANILCA in any way or to restrict federally qualified subsistence users, but the State does agree with OVK that this litigation is not about tribal sovereignty. ECF 55 at 23-25.

[6]     The State opposes assertions made by Sealaska in its *amicus* brief as irrelevant to this litigation. ECF 53.

game throughout Alaska for a full year infringes on the State's ability to manage wildlife populations. The State would have no estimate of the potentially unlimited additional harvests that could be authorized by the FSB or the local land managers through delegated authority.

The delegations of authority, ECF 4-3 at 5-36, each expired June 1, 2021. (The June 1, 2020 expiration date noted by the FSB is probably a typographical error. ECF 50 at 39.) There is no commitment by the FSB to *not* issue further delegations, nor is there a commitment by the FSB to not, itself, authorize opening further Covid-19-related hunting or fishing seasons. FSB asserts the "pandemic has abated considerably," ECF 50 at 40, contrary to the current pandemic surge throughout Alaska and the fact that hospitals are now overwhelmed. Annie Berman <u>Alaska Reports 647 Cases of COVID-19 and 4 Deaths Wednesday</u>, ADN, Aug. 19, 2021. *See also*, August 20, 2021 letter from the FSB Board Chair explaining that fall 2021 RAC meetings will be telephonic "due to the latest surge in COVID-19 cases across Alaska driven by the highly contagious delta variant and a return to a statewide high alert level."

The State's claims fall squarely within the exception to the mootness doctrine for matters that are capable of repetition, yet evading review. ECF 50 at 40. This exception is recognized by the U.S. Supreme Court as a constitutional right and was applied in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) to allow judicial review of short-term contracts that would expire in less than two years. The exception applies where the duration of the challenged action is too short to be fully

12

litigated before it terminates, and where there is a reasonable expectation that the complaining party will be subject to the same action again. *Id.,* citing *Spencer v. Kemna,* 53 U.S. 1, 17 (1998).

The FSB issued delegations of authority to local land managers all over Alaska to adopt 60-day emergency COVID hunts; the delegations were valid for one full year until June 1, 2021. ECF No. 4-3 at 5-36. Further delegations of authority, and authorizations for emergency hunting and fishing seasons, are capable of repetition throughout Alaska. The FSB stated that the State did not provide "evidence that such emergency hunts will recur in some future extraordinary condition," ECF 50 at 41, but the State is not required to show this. Plus, the FSB controls the contents of the administrative record so the State is limited on what "evidence" can be provided. The FSB has proven that it will ignore that Congress, in ANILCA, intentionally did not authorize opening hunting and fishing seasons, and has proven that FSB will not follow its own guidelines. Considering also the FSB's reluctance to take actions at public meetings under the requirements of the Sunshine Act, FSB's reluctance to provide harvest information to ADF&G, FSB's resistance to providing a complete and accurate administrative record, FSB's refusal to accept statements from Mass Care that there were no food shortages, FSB's action to open the Kake hunt even though there was no demonstrable and imminent threat to public safety in spite of its own guidelines at 0478-FSB, it is certainly possible that FSB could issue more delegations or could open seasons again.

One year delegations of authority and 60-day emergency seasons would consistently evade judicial review. FRCP 12(a) (2) allows federal defendants 60 days to respond to a complaint filed in federal court, and general timelines required in litigation make it next to impossible to challenge FSB's actions in court. It would be next to impossible to avoid significant impacts to the State's ability to effectively manage fish and wildlife populations and harvests throughout Alaska. The State's claims related to opening seasons, complying with the Sunshine Act, and all other claims discussed in the Complaint at ECF 1, are properly before this court.

E. **The FSB is an agency subject to the Sunshine Act and this court is authorized to provide injunctive relief and attorney fees for FSB's consistent and intentional violations.**

The Sunshine Act requires all actions to be taken at public meetings following at least seven days published notice of a meeting. 5 U.S.C. § 552b. The FSB now asserts that it is not subject to the open meeting requirements of the Sunshine Act because it is not an "agency" as defined in 5 U.S.C. 552(e). ECF 50 at 23-29.

The FSB suggests the Secretaries of Interior and Agriculture, each of whom are appointed by the President and confirmed by the Senate and who have joint responsibilities under Title VIII of ANILCA, are not subject to the Sunshine Act because, viewed separately, they are each an individual head of a federal department. ECF 50 at 25-26. But Congress gave them joint responsibilities on public lands in Alaska and they adopt corresponding identical regulations for federal public lands throughout Alaska. Neither Secretary acts independently in this regard. Further, the Secretaries jointly

adopted regulations that delegated their responsibilities to the FSB. The Secretaries

working together, and the FSB, are collegial bodies as described in the Sunshine Act. The

State supports the legislative history cited by the FSB that the "open meeting requirement

*applies to panels of a Commission, or regional boards, consisting of two or more agency*

*heads and authorized to take action on behalf of the agency.*" ECF 50 at 27.

The FSB cannot avoid its obligations by now suggesting that its regulatory

composition does not meet the Sunshine Act statutory requirements. In ANILCA ,

Congress directed the Secretaries of Interior and Agriculture to manage a subsistence

priority when necessary to restrict harvest. By delegating to the FSB, the statutory

obligations of the Secretaries do not go away.

The suggestion that the FSB (created by regulation at 50 CFR § 100.10, many

years after ANILCA was passed in 1980) is not subject to the Sunshine Act because it is

not named on a list created in 1975 is nonsense. ECF 50 at 28. Nothing in the Sunshine

Act restricts agencies created after 1975 from being subject to the law.

The FSB did not publish a meeting notice for actions taken on April 9, 2020, April

14, 2020, nor for the July 22-27 email action taken on WSA 94-15. ECF 44-1 at 3-4. The

administrative record does not include published notices for the June 22, 2020 or July 16,

2020 meetings.

An email on July 22, 2020 from Lisa Maas, informed Ben Mulligan, ADF&G

Deputy Commissioner, and Mark Burch, ADF&G Wildlife Biologist, that the FSB would

be taking action on WSA 19-15 by email poll, without holding a meeting, and email

votes were due July 27. ECF 4-3 at 54. "Given the short/emergency nature of the request

[dated April 10, 2020 and renewed on June 3, 2020], a teleconference was not able to be convened." *Id.* Now FSB is telling the court that no vote took place on July 22. ECF 50 at 30. This statement flatly contradicts the press release issued by the FSB on July 31, 2020 saying a "vote" was taken to defer WSA 19-15. And the excuse that there was not enough time to schedule a properly noticed meeting on a request the FSB had for more than three months is difficult to swallow.

The State appreciates that the FSB began providing notice of closed sessions since this litigation was filed, but the FSB regularly holds closed meetings without a vote to go into a closed session. ECF 49 at 20-23. There are no published notices or transcripts for the June 22, 2020 or July 16, 2020 closed meetings, and no transcripts for April closed meetings.

The FSB suggests that it need not comply with the Sunshine Act because it did not adopt regulations requiring it to do so, even though it adopted rules and procedures for its own operations that require public meetings. ECF 50 at 28-29, and citing to https://www.doi.gov/subsistence/board. However, this link does not lead to the 2018 meeting procedures adopted by the FSB, which require meetings and work sessions to be published in advance and open to the public. No action can be taken outside of a public meeting, including addressing regulation changes as well as delegations of authority. 2018 Federal Subsistence Board Meeting Guidelnes [sic]. These guidelines also refer to closed meetings "for which a public meeting is not required by law." The FSB did not follow the Sunshine Act or its own guidelines.

The State previously explained the importance of the Sunshine Act, the FSB's

continuing noncompliance, and the availability of injunctive relief and attorney fees as remedies for violations. ECF 49 at 20-26.

The State was not tardy in filing its Complaint, ECF 50 at 30, n. 6, but FSB offers no explanation for its failure to serve an answer within the 30 days required by 5 U.S.C. § 552b(h)(1). The State has shown that the Covid-19 hunt guidelines that the FSB asserts were adopted on April 9, first provided to the State in June, could not have been adopted until much later than April 9. ECF 49 at 23-24. The Complaint also addresses FSB's improper actions in June and July. ECF 1.

FSB acknowledges holding meetings without notice or explanation, ECF 50 at 30-31, but can offer no justification for a failure to vote to close a meeting as required by 5 U.S.C. § 552b(d)(1). And no transcripts are provided, so FSB's assertion that no remedy is available is simply wrong. Injunctive relief and an award of attorney fees are available under the Sunshine Act, 5 U.S.C. § 552b(h), particularly these are the preferred remedies for intentional noncompliance. *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Board,* 2020 WL 1429904; *Pan Am. World Airways Inc. v. CAB,* 684 F.2d 31 (D.C. Cir 1982). The FSB tried to distinguish *12 Percent Logistics* but relied on a 2017 decision, ECF 50 at 32-34, prior to the ultimate 2020 decision awarding prospective injunctive relief and attorney fees for intentional violations.

The FSB suggests that prospective injunctive relief is not available to the State because it was not raised in the State's Complaint. ECF 50 at 33. This is simply untrue; the State requested injunctive relief requiring the FSB to comply with open meeting requirements, and the State requested an award of attorney fees, among other things. ECF

1 at 22-23.

In sum, the FSB is subject to the open meeting requirements of the Sunshine Act and regularly disregards its responsibilities. The State is entitled to injunctive relief and attorney fees, having established a pattern of noncompliance. And FSB's continued assertions, that it need not hold public meetings, ECF 50 at 22-34, further illustrate the intentional disregard for the law that is likely to continue, thereby triggering injunctive relief. If there is any scheme in Title VIII of ANILCA, it is that Congress intended the public is to be heavily involved. *See* 16 U.S.C. §§ 3111, 3112, 3115, 3118, 3120.

### F. FSB improperly closed moose and caribou hunting except for federally qualified users[7] on federal public lands in Game Management Subunits 13A and 13B.

In adopting ANILCA, Congress expressly stated its intent to preserve both sport hunting and subsistence hunting on federal public land. 16 U.S.C. §3101. The FSB's adoption of WSA 20-03, a temporary special action[8] request seeking a one-year closure to moose and caribou hunting on federal lands within Unit 13 as an experiment to reduce hunter competition, violated ANILCA and the APA. 0043-FSB. The FSB refers to the Unit 13A and 13B closure for two years as "modest restrictions" (ECF 50 at 47) and "limited closures" (ECF 50 at 50). As the State previously explained, and as shown on

---

[7]     Federally qualified subsistence users are Native and non-Native rural Alaska residents authorized to take fish and wildlife on federal public lands under Federal Subsistence Board regulations adopted under Title VIII of ANILCA. 16 U.S.C. § 1601 *et seq.*

[8]     FAI's amicus brief incorrectly refers to the Unit 13 closure as an "emergency action." ECF 57-1 at 5. FSB regulations distinguish between emergency and temporary special actions. 50 CFR § 100.19(a) and (b).

18

the map provided by the FSB, these areas contain the federal public lands where hunting is allowed, which contain the most accessible public lands, and where half the caribou harvest occurs. ECF 24-1; 0166-FSB; ECF 49 at 49-50.

No new factual information was presented to the FSB when it adopted WSA 20-03 on July 16 in comparison to the same facts in 2019 when FSB rejected the same proposal. Modifications to include only the most important and accessible areas and to extend the requested closure from one year to two years, do not constitute new facts. The closure was not necessary to continue subsistence uses where there are an abundance of moose and caribou and plenty of harvest opportunity. Congress did not authorize "competition" between hunters as a reason to restrict hunting. The FSB did not even consider hunter effort, even though people previously testified they were not hunting. 0045-FSB; 0049-FSB.

The State explained how relevant information was ignored in the information presented by Lisa Maas to the FSB. ECF 49 at 40-41. It appears the FSB disregarded written comments and relied solely on Lisa Maas, who selectively presented only partial information. The FSB previously suggested to this court that its decision was based solely upon verbal comments and discussion at the July 16 meeting (ECF 18 at 11, asserting the entirety of the state's comments were a few short sentences at the meeting). Now the FSB asserts the State's comments were "fully considered" because they are in the record. ECF 50 at 51. The facts illustrate many of FSB's inconsistencies.

In Section 815 of ANILCA, Congress directed that there would be no restriction on non-federally qualified users:

> unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 816 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law....

16 U.S.C. § 3125.

Lacking any support in ANILCA that a complete ban is a necessary restriction, FSB continues to assert that "user conflicts" is a valid basis for banning users and cites to three unrelated cases to support that assertion. ECF 50 at 49. The State previously explained that those cases do not address hunting, and do not support distinguishing between hunters, or banning some hunters completely, or taking action without adequate public notice. ECF 49 at 41-43.

The subsistence priority and restrictions under ANILCA are only appropriate when "necessary" (16 U.S.C. §§ 3112, 3114, 3125) and Congress explicitly directed how such taking would be restricted in Section 804. The FSB did not discuss any of the criteria in Section 804. Congress authorized restrictions in the form of "appropriate limitations" based on the following criteria "(1) customary and direct dependence upon the populations as the mainstay of livelihood; (2) local residency; and (3) the availability of alternative resources." ANILCA § 804. Instead, the FSB simply banned all non-federally qualified users in the most critical federal lands for hunting moose and caribou and doubled the requested period of closure. There is no authority in ANILCA to justify this decision. Furthermore, the FSB ignored its own regulation requiring it to determine that the temporary action "will not interfere with the conservation of healthy fish and wildlife populations, will not be detrimental to the long-term subsistence use of fish or

wildlife resources, and *is not an unnecessary restriction on nonsubsistence users.*" 50

C.F.R. § 100.19(b)(1), emphasis added.

No *Chevron* deference is owed to the FSB because it failed to follow required

procedures in the Sunshine Act, the APA, and Section 804 of ANILCA. *Encino*

*Motorcars, LLC v. Navarro,* 136 S.Ct 2117, 2120 (2016), there is no *Chevron* deference

if an agency did not follow proper procedures.

The closure is not necessary to continue subsistence uses. Federally qualified

hunters have much longer seasons with no competition and are also eligible to hunt under

state regulations. ECF 49 at 37-40; 0201-0206-FSB. They already enjoy a much greater

opportunity to harvest a plentiful resource. The FSB did not consider hunter effort or the

Section 804 criteria in concluding that "competition" affected hunter success. And it is

important to keep in mind that opportunity is provided but there is no promise of success.

The diligence and effort of a hunter are critical factors. FAI acknowledged the decrease

in subsistence participation. ECF 57-1 at 20.

After improperly banning non-federally qualified hunters, the FSB made things

even worse by issuing a notice on July 31 that its closure also effectively closed state

lands, including submerged lands, within federal boundaries. *See* 0212-FSB and 0213-

FSB. The FSB refused to issue a revised press release until September 2, after this

lawsuit was filed, and 22 days after State caribou and twelve days after State moose

seasons opened. ECF 24-2. The revised press release only corrected a portion of the

FSB's error, regarding gravel bars, but did not reflect that all navigable water below the

high water mark is State land.

The State explained that the FSB's closure to such a significant hunting area where a major portion of the harvest occurs is harming the State's ability to manage caribou and moose in Unit 13. ECF 49 at 48-50. It is misleading for the FSB to suggest that the restrictions are limited or modest or that the area is miniscule. That is simply not true. Congress expressly protected the State's authority to manage wildlife, including on federal public lands, in Section 1314(a) of ANILCA. Any closure by the FSB must be "necessary" to be authorized under Section 815 of ANILCA, and the Unit 13 closure was not necessary or justified.

The statements from Chad Padgett, notably the BLM representative on the FSB in making a decision affecting BLM lands, show that the closure was not necessary to continue subsistence or for public safety. The closure may further disrupt hunting in the area. Boundaries are ill-defined and a closure would be difficult for hunters to navigate. Alleged unsafe shooting practices and conflicts on the road (outside of federal boundaries) are best left to law enforcement. And the closure is not necessary for conservation or to maintain healthy populations of moose or caribou because State objectives are being met. (All statements from 0062-FSB.)

The FSB can point to no new material factual information to support its change in position from when it denied the identical proposal in 2019. Changing the area to focus on the most important areas, and doubling the period of closure (in spite of FSB's own regulation limiting any such closure to the minimum period necessary, 50 CFR §100.19(b)) are not new facts. FSB suggests that federally qualified hunter success may be declining, ECF 50 at 53, but this is contradicted by information in the record that

annual harvest rates have remained consistent. 0044-FSB; 0062-FSB. Furthermore, the FSB did not provide adequate public notice to get renewed input, so the public was unable to oppose as it had earlier. 0044-FSB; 0057-FSB; 0215-FSB. Disregarding its previous decision, and making an opposite decision based on the same facts, is a violation of the APA. *Friends of Alaska Wildlife Refuges v. Bernhardt*, 381 F.Supp.3d 1127, 1139 (D. Alaska 2019), citing *Organized Village of Kake v. United States Dept. of Agriculture,* 795 F.3d 956, 966 (9th Cir 2015) and *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-16 (2009).

The closure adopted by the FSB was not an emergency regulation under the APA, but a temporary special action. FSB violated the APA, the Sunshine Act, and 50 C.F.R. § 100.19(b). The FSB did not provide adequate public notice, and further violated the APA when it immediately put the action into effect without the required time periods mandated by the APA. 5 U.S.C. 553(b)-(d). The Ninth Circuit recently explained the importance of the APA's notice and comment procedures and the 30 day period before a rule goes into effect and invalidated a regulation for violating APA procedures. *East Bay Sanctuary Covenant v. Biden,* 993 F. 3d 640, 676-676 (9th Cir. 2021). In that case, as here, the federal government failed to provide proper notice and grace periods, where no exigency existed and where an untold number of people would be harmed by the action.

Caribou hunting success along the Richardson Highway is linked to the migration of caribou across the highway. 0206-FSB. When the game is present, opportunity for hunting success is present for everyone. The closure is not limited to the one year requested, or to only those periods when the caribou migrate across the Richardson

Highway, but extends to June 30, 2022 regardless of hunting seasons or caribou migration. Not wanting to deal with a potential future request is not a valid justification for extending an improper closure. ECF 50 at 54. This is not the minimum period necessary for a temporary special action as required by 50 C.F.R. § 100.19(b).

## III.   CONCLUSION

In attempting to justify its behavior, FSB improperly, and repeatedly, cites to this court's earlier decision on the question of a preliminary injunction. ECF 50 at 30, 31, 32, 33, 35, 37, 38, 39, etc. Again the FSB ignores long-established law confirming that:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and *the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits*. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits. [Internal citations omitted; emphasis added]

*University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Congress did not authorize the FSB to act as it did. Congress did not authorize FSB to take important actions affecting the public in secret or closed meetings, did not authorize the FSB to open seasons, did not authorize FSB to violate its own regulations or adopted procedures, did not authorize hunting or fishing administration to be delegated outside of a federal agency, did not authorize withholding harvest information from ADF&G, did not authorize a closure based on competition between users, did not

24

authorize the FSB to regulate hunting on State lands, and did not authorize a closure

beyond what is necessary. The FSB violated the APA, ANILCA, and the open meeting

requirements of the Sunshine Act. The State – the primary manager of fish and game

throughout Alaska, including providing for a subsistence priority - is entitled to

declaratory relief, injunctive relief, and an award of attorney fees.


       DATED: August 27, 2021.

                       TREG R. TAYLOR
                       ATTORNEY GENERAL


                       By:    /s/ Cheryl Rawls Brooking
                              Cheryl Rawls Brooking
                              Assistant Attorney General
                              Alaska Bar No. 9211069
                              Department of Law
                              1031 West Fourth Avenue, Ste. 200
                              Anchorage, AK  99501
                              Phone: (907) 269-5232
                              Facsimile: (907) 276-3697
                              Email: cheryl.brooking@alaska.gov

                              *Attorney for State of Alaska*

**<u>CERTIFICATE OF COMPLIANCE WITH WORD LIMITS</u>**

I certify that this document contains **<u>6,561</u>** words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 27th day of August, 2021.

/s/ Cheryl Rawls Brooking
Cheryl Rawls Brooking, Sr. AAG

## **CERTIFICATE OF SERVICE**

I hereby certify that on **August 27 2021**, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

/s/ Richard J. Carter
Richard J. Carter, Legal Support Coordinator

27