# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

STATE OF ALASKA, Department of
Fish and Game,

              Plaintiff,

      v.

FEDERAL SUBSISTENCE BOARD,
*et al.*,

              Defendants,

      and

ORGANIZED VILLAGE OF KAKE,

              Intervenor-
              Defendant.

Case No. 3:20-cv-00195-SLG

## DECISION & ORDER

The State of Alaska, Department of Fish and Game ("the State") commenced this action on August 10, 2020 against the Federal Subsistence Board and several federal officials (collectively, "the FSB").[1] The Organized Village of Kake ("OVK") was permitted to intervene on September 14, 2020.[2] The State

---

[1] Docket 1. The other defendants are the Regional Supervisor of the U.S. Forest Service; the U.S. Secretary of Agriculture; the Alaska Regional Director for the Bureau of Indian Affairs; the Alaska Regional Director for the U.S. Fish and Wildlife Service; the State Director for Alaska for the U.S. Bureau of Land Management; the Alaska Regional Supervisor for the National Park Service; the U.S. Secretary for the Interior; and the three public members of the FSB in their official capacities. *See* Docket 1.

[2] Docket 27. The Sealaska Corporation and the First Alaskans Institute filed amicus briefs. *See* Docket 21-2; Docket 23; Docket 51-2; Docket 60; Docket 57-1; Docket 61. Both the OVK and

alleges that the FSB violated the Administrative Procedure Act ("APA"), the Alaska National Interest Lands Conservation Act ("ANILCA"), and the Government in the Sunshine Act ("the Sunshine Act") by (1) delegating authority to local land managers to open emergency hunts in response to COVID-19-related food-security concerns, authorizing an emergency hunt near the OVK, and voting on a request for an emergency hunt from the Koyukuk Tribal Village; and (2) adopting a temporary special action to close moose and caribou hunting on federal public lands in Game Management Units 13A and 13B to non-federally qualified users.[3] The State asks the Court to (1) enjoin the FSB from "interfering with the State's management," opening emergency hunts, and delegating authority outside of federal agencies; and (2) require the FSB to comply with ANILCA and the Sunshine Act.[4] It also requests an award of attorney's fees and declaratory relief finding that the FSB violated the APA, ANILCA, and the Sunshine Act.[5] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[6]

---

the amici devoted much of their briefs to the delegation issue raised by the State, which the Court does not reach due to mootness. *See infra* pp. 23–29.

[3] *See* Docket 1; Docket 49; Docket 62.

[4] Docket 49 at 53–54; Docket 62 at 29–30.

[5] Docket 49 at 53–54; Docket 62 at 29–30.

[6] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 2 of 49

# BACKGROUND

The Court set out the background in more detail in its previous orders at Docket 28[7] and Docket 37.[8]  The relevant laws and facts are summarized here.[9]

## I.    Alaska National Interest Lands Conservation Act ("ANILCA")

In enacting ANILCA, Congress sought to preserve Alaska's "unrivaled scenic and geological values associated with natural landscapes," historic sites, and ecosystems, while also providing the continued opportunity for rural residents to engage in a subsistence way of life.[10]  Title VIII of ANILCA expresses Congress' intent that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands."[11]   Thus, Title VIII gives priority to subsistence uses, providing that

> nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of

---

[7] *Dep't of Fish & Game v. Fed. Subsistence Bd.*, Case No. 3:20-cv-00195-SLG, 2020 WL 5625897 (D. Alaska Sept. 18, 2020).

[8] *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 501 F. Supp. 3d 671 (D. Alaska 2020).

[9] For citations, see *Fed. Subsistence Bd.*, 2020 WL 5625897, and *Fed. Subsistence Bd.*, 501 F. Supp. 3d 671.

[10] 16 U.S.C. § 3101; *see also Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091 (9th Cir. 2008).

[11] 16 U.S.C. § 3112(1).

such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses.[12]

However, section 815 of Title VIII limits this subsistence priority by providing that "restriction[s] on the taking of fish and wildlife for nonsubsistence uses on the public lands" are not authorized "unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 816 [16 U.S.C. § 3126], to continue subsistence uses of such populations, or pursuant to other applicable law."[13]  In turn, section 816 provides that "[n]othing in this title is intended to enlarge or diminish the authority of the Secretary to designate areas where, and establish periods when, no taking of fish and wildlife shall be permitted on the public lands for reasons of public safety, administration, or to assure the continued vitality of a particular fish or wildlife population."[14]

Congress authorized the Secretaries of the Interior and Agriculture to promulgate regulations in furtherance of ANILCA's directives,[15] and the Secretaries created the FSB and charged it with "administering the subsistence taking and uses of fish and wildlife on public lands."[16]  The FSB is composed of:

[a] Chair to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; two public members who possess personal knowledge of and direct experience with

---

[12] *Id.* § 3112(2).

[13] *Id.* § 3125(3).

[14] *Id.* § 3126(b).

[15] *Id.* § 3124; *Fed. Subsistence Bd.*, 544 F.3d at 1092 & n.1.

[16] 50 C.F.R. § 100.10(a).

subsistence uses in rural Alaska to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; Alaska Regional Director, National Park Service; Alaska Regional Forester, U.S. Forest Service; the Alaska State Director, Bureau of Land Management; and the Alaska Regional Director, Bureau of Indian Affairs.[17]

Pursuant to 50 C.F.R. § 100.19, the FSB has the authority to adopt "special actions." The Board relied on this regulation in approving the emergency Kake hunt and the closure of Units 13A and 13B.[18] Section 100.19(a), concerning "emergency special actions," provides that

> [i]n an emergency situation, if necessary to ensure the continued viability of a fish or wildlife population, to continue subsistence uses of fish or wildlife, or for public safety reasons, the Board may immediately open or close public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for take for subsistence uses, or close public lands to take for nonsubsistence uses of fish and wildlife, or restrict the requirements for take for nonsubsistence uses.[19]

Section 100.19(b), concerning "temporary special actions," provides that

> [a]fter adequate notice and public hearing, the Board may temporarily close or open public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for subsistence take, or close public lands for the taking of fish and wildlife for nonsubsistence uses, or restrict take for nonsubsistence uses.[20]

---

[17] *Id.* § 100.10(b)(1).

[18] The State disputes that ANILCA authorizes the federal government to adopt a regulation such as § 100.19 to the extent it would allow the federal government to *open* a season as opposed to closing a season. *See* Docket 49 at 26–31; *infra* pp. 23–24. Because the Court finds that the State's claims surrounding the emergency Kake hunt are moot, it does not reach this issue. *See infra* pp. 23–29.

[19] 50 C.F.R. § 100.19(a).

[20] *Id.* § 100.19(b).

The FSB may not take temporary special actions unless "it determines that the proposed temporary change will not interfere with the conservation of healthy fish and wildlife populations, will not be detrimental to the long-term subsistence use of fish or wildlife resources, and is not an unnecessary restriction on nonsubsistence users."[21] The length of any such action must "be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances," and a temporary opening or closure cannot "extend longer than the end of the current regulatory cycle."[22]

## II.     The Kake Hunt

In April 2020, in response to the COVID-19 pandemic, the FSB voted to "authorize a process for sending letters of delegation to agency field managers to allow them to open . . . hunting and fishing opportunities in response to any demonstrated emergency situation relating to food security that rises to the level of constituting a threat to public safety."[23] On June 2, 2020, the FSB issued such letters to refuge managers and district rangers. The delegation letters provided that local land managers could "issue emergency special actions *related to food security* . . . only *for reasons of public safety*" and required consultation with the Alaska Department of Fish & Game (ADF&G) "to the extent possible" prior to doing

---

[21] *Id.* § 100.19(b)(1).

[22] *Id.* § 100.19(b)(2).

[23] Docket 15-2 at 1–2, ¶ 3 (Maas Decl.); Docket 4-3 at 4.

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 6 of 49

so.[24]  The FSB also required local land managers to consult with the State of Alaska Unified Command Mass Care Group beforehand and instructed them to defer requests for special action to the Board if the Mass Care Group "[did] not confirm the need for [a] special action."[25]  The letters specified that the delegation of authority was effective until June 1, 2021, unless rescinded before that date.[26]

Soon after, Joel Jackson, the President of the OVK, wrote to the Petersburg District Ranger, Ted Sandhofer, to renew a previous request for an emergency hunt for the Kake community, citing food security concerns.  Mr. Sandhofer, in turn, contacted the Mass Care Group, which informed him that they could not confirm any food shortage or supply-chain disruption in Kake.  Accordingly, Mr. Sandhofer deferred the OVK's request to the FSB on June 12, 2020.  He informed the FSB that he had attempted to contact ADF&G but did not receive a response.[27]

The FSB considered the request at a June 22, 2020 meeting at which Mr. Jackson testified regarding the OVK's food security concerns.  The FSB voted to approve a limited season of up to 60 days to be administered by Mr. Sandhofer, who then issued a permit for a "Kake community harvest . . . allowing the

---

[24] *See, e.g.*, Docket 4-3 at 21 (emphases in original).

[25] *See, e.g.*, Docket 4-3 at 21, 24.

[26] *See, e.g.*, Docket 4-3 at 23.

[27] Mr. Sandhofer conveyed this information in a June 12, 2020 email to the FSB.  *See* Docket 4-3 at 38 (Ex. 4).  The State appears to dispute that Mr. Sandhofer reached out to ADF&G, asserting that "[t]here is no evidence in the record of an attempt by anyone at the local Forest Service office to contact anyone at ADF&G."  Docket 49 at 13.

Organized Village of Kake to harvest up to 2 antlered bull moose and 5 male Sitka black-tailed deer per month."[28]   The permit specified that "[p]articipation in the season is limited to Federally qualified subsistence users selected by the Organized Village of Kake,"[29] and Mr. Jackson confirmed that the harvest would be shared with the entire Kake community.  The hunt concluded on July 24, 2020, and the harvest was distributed to 135 households in the village.

The Koyukuk Tribal Village also renewed a previous request for an emergency hunt in early June 2020.  Like Mr. Sandhofer, the refuge manager for the region reached out to Mass Care Group, which responded that it was unaware of any substantial food shortages or supply-chain disruptions.  On July 22, 2020, the Office of Subsistence Management informed the State that the FSB was voting on the request by email with a July 27, 2020 deadline rather than by teleconference due to the emergency nature of the request.  The FSB ultimately did not grant the Koyukuk Tribal Village's special action request.[30]

On August 17, 2020, a week after the State commenced this action and moved for preliminary injunctive relief, the Secretary of the Interior directed the FSB to temporarily suspend any decisions regarding requests for COVID-19

---

[28] Docket 4-3 at 46.

[29] Docket 4-3 at 46.

[30] The State appears to maintain that the FSB voted on the Koyukuk request, *see* Docket 49 at 23, whereas the FSB asserts that the vote, "while planned, never took place," Docket 50 at 30 (citation omitted).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 8 of 49

emergency seasons until disposition of the State's motions. This Court ruled on the State's motions on September 18, 2020 and November 18, 2020, concluding that the State had failed to show a likelihood of success or serious questions on the merits of its claims.[31] The FSB has not granted any additional emergency special action requests to open hunting or fishing after this Court issued its second order in November 2020.[32] The delegation letters lapsed on June 1, 2021, and the FSB has not renewed the delegation of authority.[33]

## III.    Game Management Units 13A and 13B

On July 16, 2020, the FSB held a public Work Session Meeting by teleconference. During the meeting, the FSB considered Wildlife Special Action 20-03 ("WSA 20-03"), a proposal that the Board "close Federal public lands in [Game Management] Unit 13 to the hunting of moose and caribou by non-Federally qualified users for the 2020/21 season."[34] Unit 13 is a popular area for moose and caribou hunting due to its road accessibility; it is divided into five subunits, A through E, of which Units 13A and 13B are the most accessible. In 2019, the FSB had rejected an identical proposal to close all of Unit 13 to non-federally qualified

---

[31] *Fed. Subsistence Bd.*, 2020 WL 5625897, at *13; *Fed. Subsistence Bd.*, 501 F. Supp. 3d at 697–98.

[32] *See* Docket 50 at 40.

[33] *See* Docket 4-3 at 22–23; Docket 50 at 11, 40.

[34] Docket 18-1 at 4.

users for the 2019/2020 season ("the 2019 proposal"), reasoning that the closure was not warranted under section 815 of ANILCA.

At the July 16 meeting, Lisa Maas, the Acting Policy Coordinator/Wildlife Biologist for the Office of Subsistence Management ("OSM"), presented a summary of the OSM staff's analysis of WSA 20-03 to the FSB. First, she explained that WSA 20-03's proponent made the request due to "extreme hunting competition" in Unit 13, that competition's negative effects on harvest success for federally qualified subsistence users, and public safety concerns.[35] Next, Ms. Maas summarized written comments and public testimony from Alaska residents and ADF&G. Supporters of WSA 20-03 cited safety and overcrowding concerns, highlighted ANILCA's rural subsistence priority, and noted that federal public lands comprise only a small portion of Unit 13. Opponents of WSA 20-03 expressed their belief that public lands should remain open to all and noted a lack of conservation need. ADF&G's written comments asserted that "no conservation concerns exist for either moose or caribou in Unit 13" and that a "closure would not likely affect hunting success . . . of Federally-qualified users or address public safety concerns."[36]

Ms. Maas next shared information about the caribou and moose population and discussed trends in harvest success rates. She noted the OSM's conclusion

---

[35] Docket 18-1 at 4.

[36] Docket 18-1 at 5.

that closure to continue subsistence uses of moose was warranted based on low moose harvest success rates for federally qualified users compared to non-federally qualified users. The OSM also concluded that closure for public safety reasons may be warranted because of the "intense hunting pressure, overcrowding, disruption of hunts, and unsafe shooting practices . . . repeatedly stated by all user groups."[37] Ms. Maas explained that the OSM supported WSA 20-03 with two modifications: (1) closing federal public lands to non-subsistence users only in Units 13A and 13B; and (2) extending the closure through the 2022 regulatory cycle to "reduce the administrative burden associated with processing special action requests" because "no change in the situation" was expected in the near future.[38] After addressing questions from Board members, Ms. Maas also reported that the InterAgency Staff Committee ("ISC") recommended adopting WSA 20-03 with the OSM's proposed modifications on the basis of public safety and subsistence concerns.

Following Ms. Maas's testimony, comments were solicited from the Regional Advisory Council Chairs and the Native Liaison for the OSM, but none were offered. Members of the public were again allowed to weigh in, and two testified—both in support of WSA 20-03. Finally, Ben Mulligan of ADF&G offered testimony on behalf of the State, reiterating the State's position that federal data did not

---

[37] Docket 18-1 at 8–9.

[38] Docket 18-1 at 9.

support the OSM's subsistence concerns and that WSA 20-03 would not improve public safety.

After the testimony concluded, the FSB deliberated and voted on WSA 20-03 with the OSM's proposed modifications. All but one FSB member voted in favor of the modified proposal, citing subsistence and public safety concerns. Chad Padgett of the Bureau of Land Management voted against the proposal based on his belief that the closure was unnecessary for conservation, continuation of subsistence uses, or public safety.

On July 31, 2020, the FSB issued a press release explaining the closure and answering "common questions and concerns."[39] The release included a map of the closure area and noted that non-federally qualified users could still "take moose and caribou between the edge of the river and the ordinary high water mark along navigable waters" but cautioned that both hunter and game "must be *above* the actual water line . . . for the harvest to be legal."[40] Shortly after, Mr. Mulligan contacted the FSB via email and raised concerns that the release improperly closed certain state lands because it implied that non-federally qualified users could not take moose or caribou standing in navigable waters.[41] Subsequently, on September 2, 2020, the FSB issued a revised press release, clarifying that non-

---

[39] Docket 18-2 at 1.

[40] Docket 18-2 at 2 (emphasis in original).

[41] *See* Docket 3-3 at 17–18.

federally qualified users could take moose and caribou on gravel bars along navigable waters below the high water mark so long as the moose and caribou were not swimming.

## LEGAL STANDARD

The State seeks invalidation of the FSB's actions surrounding the Kake hunt and the closure of Units 13A and 13B pursuant to § 706 of the Administrative Procedure Act.[42]   Section 706 provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[43]

The Ninth Circuit has detailed the circumstances under which an agency action is arbitrary and capricious:

> [An] agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[44]

By contrast, an agency action is proper if "the agency considered the relevant factors and articulated a rational connection between the facts found and the

---

[42] Docket 49 at 9; Docket 62 at 7.

[43] 5 U.S.C. § 706(2).

[44] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011)).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 13 of 49

choices made."[45]  When determining whether an action is arbitrary and capricious, "a court is not to substitute its judgment for that of the agency,"[46] particularly where "the challenged decision implicates substantial agency expertise."[47]

When an agency action is based on factual conclusions drawn from the administrative record, the reviewing court must determine whether those conclusions are supported by "substantial evidence."[48]  "'Substantial evidence' is 'more than a mere scintilla but less than a preponderance.'"[49]  This standard is "extremely deferential," requiring the reviewing court to "uphold the [agency's] findings unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result."[50]

Agency action is "not in accordance with the law" when it "conflict[s] with the language of the statute."[51]  This entails "a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[52]

---

[45] *Id.* (quoting *Greater Yellowstone Coal.*, 665 F.3d at 1023).

[46] *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[47] *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

[48] *Ctr. for Biological Diversity*, 900 F.3d at 1068; *see also Dickinson v. Zurko*, 527 U.S. 150, 163–64 (1999).

[49] *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[50] *Monjaraz-Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003) (quoting *Singh-Kaur v. I.N.S.*, 183 F.3d 1147, 1149–50 (9th Cir. 1999)).

[51] *Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 537 F.3d 1006, 1014 (9th Cir. 2008) (quoting *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)).

[52] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs.*, 537 F.3d at

# DISCUSSION

## I. The Sunshine Act

The State contends that the "FSB consistently and intentionally violates the open meetings requirement of the Sunshine [Act]" and asks this Court for injunctive relief and an award of attorney's fees.[53]   Specifically, the State maintains that (1) the "FSB did not publish a meeting notice for actions taken on April 9, 2020, April 14, 2020, nor for the July 22–27 email action taken on WSA 94-15; (2) "[t]he administrative record does not include published notice for the June 22, 2020 or July 16, 2020 meetings"; and (3) "[t]he FSB regularly holds closed meetings without a vote to go into a closed session," including the closed executive sessions held before public meetings on April 20, 2020 and July 16, 2020.[54]   The State asserts that the FSB is a "federal agency" within the meaning of the Act and is thus "bound to comply" with its open-meeting provisions.[55]

In response, the FSB disputes that the Sunshine Act applies, asserting that the FSB is not an "agency" within the meaning of the Act's open-meeting provisions.[56]   In the alternative, the FSB asserts that even if the Act applies, the

---

1014).

[53] Docket 49 at 20, 24–26.

[54] Docket 49 at 16.

[55] Docket 49 at 24.

[56] Docket 50 at 23–29.

FSB has complied with it and that even if the FSB violated the Act, the only remedy available under the Act is the release of transcripts.[57]

The open-meetings section of the Sunshine Act, 5 U.S.C. § 552b, provides that "every portion of every meeting of an agency shall be open to public observation," subject to ten specified exceptions.[58] At least one week before a meeting, the agency must publicly announce "the time, place, and subject matter of the meeting, whether it is to be open or closed to the public, and the name and phone number of the official designated by the agency to respond to requests for information about the meeting."[59] When an agency is statutorily permitted to close a meeting or a portion thereof, that action may only be taken if "a majority of the entire membership of the agency" votes to do so.[60]

The Sunshine Act also contains specialized definitions of the terms "agency," "meeting," and "member" for purposes of § 552b:

(1) the term "agency" means any agency, as defined in section 552(e) of this title, headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency;

(2) the term "meeting" means the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint

---

[57] Docket 50 at 23, 29–34.

[58] 5 U.S.C. § 552b(b); *see also id.* § 552b(c) (listing circumstances in which a meeting or portion thereof may be closed).

[59] *Id.* § 552b(e)(1).

[60] *Id.* § 552b(d)(1).

conduct or disposition of official agency business, but does not include deliberations required or permitted by subsection (d) or (e); and

(3) the term "member" means an individual who belongs to a collegial body heading an agency.[61]

The FSB contends that it does not constitute a "collegial body" within the meaning of these provisions because "none of [its] members, much less a majority, were appointed by the President with the advice and consent of the Senate."[62] And it maintains that the FSB is not a "subdivision thereof" because it interprets the term to refer only to "sub-groups" of a collegial body.[63] The State, by contrast, asserts that the FSB falls under the Act's definition of "agency" because "Congress gave [the Secretaries of Interior and Agriculture] joint responsibilities on public lands in Alaska," and "the Secretaries jointly adopted regulations that delegated their responsibilities to the FSB."[64] Therefore, the State contends, "[t]he Secretaries working together, and the FSB, are collegial bodies as described in the Sunshine Act."[65]

The Court finds that § 552b's definition of "agency," when read together with nearby provisions, does not include the FSB.[66] To begin with, the FSB is clearly

---

[61] *Id.* § 552b(a).

[62] Docket 50 at 23–24.

[63] Docket 50 at 24–25 (quoting *Hunt v. Nuclear Regul. Comm'n*, 611 F.2d 332, 335–36 (10th Cir. 1979)).

[64] Docket 62 at 19–20.

[65] Docket 62 at 20.

[66] The Court acknowledges that its November 18, 2020 order concluded that the FSB is likely

not a "collegial body" as defined by § 552b because none of its members are appointed by the President with the advice and consent of the Senate.[67] Thus, the question is whether the FSB is covered by the Sunshine Act as a "subdivision."[68] Section 552b(a)(1) is ambiguous on this point; it is unclear from the section's wording whether "subdivision thereof" refers to a portion of the entire entity headed by a collegial body or only to a portion of the collegial body itself. However, the definitions that follow § 552b(a)(1) make clear that "subdivision thereof" refers solely to the collegial body.[69] Section 552b(a)(2) defines "meeting" narrowly to cover only "deliberations of at least the number of individual agency members required to take action on behalf of the agency." And § 552b(a)(3), in turn, defines "member" to mean "an individual who belongs to a collegial body heading an agency." There cannot be a "meeting" under the Act without the participation of agency heads who were appointed by the President with the advice and consent of the Senate. Accordingly, it would be illogical to read "subdivision thereof" to

---

subject to the Open Meetings Act. *See Fed. Subsistence Bd.*, 501 F. Supp. 3d at 688. However, upon further consideration and with the benefit of the parties' more thorough briefing on the issue, including their discussion of *Hunt v. Nuclear Regulatory Commission*, 468 F. Supp. 817, 820 (N.D. Okla. 1979), *aff'd*, 611 F.2d 332, the Court has now determined that the Sunshine Act does not apply to the FSB.

[67] *See* 50 C.F.R. § 100.10(b)(1) (describing the composition and appointment process of the FSB); Docket 50 at 24 n.4 (same).

[68] *See* 5 U.S.C. § 552b(a)(1).

[69] *See* Richard K. Berg, Stephen H. Klitzman & Gary J. Edles, A.B.A. Section of Admin. L. & Regul. Prac., *An Interpretive Guide to the Government in the Sunshine Act* 6 (2d ed. 1978) ("It should be noted that 'subdivision thereof' refers back to 'collegial body,' not to 'agency.' Subdivisions made up entirely of employees other than members of the collegial body are not covered by the Act, even though they may be authorized to act on behalf of the agency.").

encompass boards like the FSB that could not actually hold "meetings" as defined by the Act.[70]

The Northern District of Oklahoma and the Tenth Circuit reached this same conclusion when considering whether hearings conducted by the Nuclear Regulatory Commission's Atomic Safety and Licensing Board ("ASLB") were covered under the Sunshine Act.[71] Similarly to the FSB, the ASLB exercises power pursuant to a delegation of authority by the commissioners of the Nuclear Regulatory Commission.[72] The commissioners are appointed by the President with the advice and consent of the Senate, but the ASLB does not itself include any commissioners.[73] Given the ASLB's structure, the Northern District of Oklahoma concluded that the Sunshine Act did not apply to the ASLB's hearings because "a board or panel without 'members' is not a 'subdivision' of an agency under the Sunshine Act."[74] The district court explained that "[i]f such boards or panels were meant to be covered, the 'meeting' requirement would have to be

---

[70] The State's contention that the Secretaries of the Interior and Agriculture constitute a "collegial body" when performing joint responsibilities is inapposite. *See* Docket 62 at 19–20. The Court need not determine whether that proposition is true; even if it is, the FSB itself would not constitute an "agency" or "subdivision thereof" because the Secretaries do not sit on the FSB or participate in its decision-making.

[71] *See Hunt*, 468 F. Supp. at 820.

[72] *Id.*

[73] *See Hunt*, 611 F.2d at 334–35.

[74] *See Hunt*, 468 F. Supp. at 820–21.

ignored" because "meetings are deliberations of members."[75]  On appeal, the

Tenth Circuit, too, concluded that "the mandate for open hearings does not apply

to an adjudicatory hearing before [the ASLB]" because "subdivision" refers only to

when "a collegial body . . . has divided itself into sub-groups to conduct the

business of the agency."[76]

The legislative history of the Sunshine Act, as noted by both courts in *Hunt*,[77]

also supports this reading of the Act.  The Senate Report on the Act contains

numerous statements about the open-meetings section that reflect the Senate's

intent that § 552b apply only to decision-making bodies that include members of a

collegial body.  The report's "Summary of the Legislation" section describes section

201 of the Senate bill—which became 5 U.S.C. § 552b—as designed to ensure

that meetings between agency heads are open to the public:

> Section 201 applies to the Federal Election Commission and
> the 46 other Federal agencies headed by two or more Commissioners
> or similar officers appointed by the President with the advice and
> consent of the Senate.  The bill requires meetings between heads of
> such agencies to be open to the public. . . .
> Section 201(a) establishes the basic principle that all meetings
> between the *heads of these collegial agencies* must be open to the
> public.  The term "meeting" is defined to include agency deliberations
> where at least a quorum of the agency's members meet to conduct or
> dispose of official agency business.  Chance encounters which do not
> involve substantive discussions, and social events at which business
> is not discussed, would not be covered by the section.  *Nor does the
> bill cover discussions between less than quorum of the Commission,*

---

[75] *Id.* at 820.

[76] *Hunt*, 611 F.2d at 335–36.

[77] *See Hunt*, 468 F. Supp. at 820–21; *Hunt*, 611 F.2d at 336–37.

*or discussions between a Commissioner and any number of staff employees.*[78]

In its "Background and Purpose of the Legislation" section, the report states that the open-meetings section is intended to "increase the public's confidence in government by permitting the public to observe firsthand the way agency heads carry out their duties."[79]  And in a section discussing the open-meetings provisions in more detail, the report explicitly contrasts meetings involving agency heads with those involving only staff members, explaining why the former are subject to public scrutiny but the latter are not: "The agency heads are high public officials, having been selected and confirmed through a process very different from that used for staff members.  Their deliberative process can be appropriately exposed to public scrutiny in order to give citizens an awareness of the process and rationale of decisionmaking."[80]   The same section of the report also clarifies the term "subdivision thereof," suggesting that such an entity must involve at least two agency heads:

> Section 201(a) provides that all meetings of the individual Commissioners, board members, or the like, except those discussions exempted by subsection (b), must be open to the public.  Included within this requirement are meetings of agency subdivisions authorized to take action on behalf of the agency.  The open meeting requirement applies to panels of a Commission, or regional boards, *consisting of two or more agency heads* and authorized to take action on behalf of the agency.  To be a subdivision of an agency covered

---

[78] S. Rep. No. 94-354, at 2–3 (1975) (emphases added).

[79] *Id.* at 4–5.

[80] *Id.* at 17.

by this subsection, the panel need not have authority to take agency action which is final in nature. Panels or boards *composed of two or more agency members* and authorized to submit recommendations, preliminary decisions, or the like to the full commission, or to conduct hearings on behalf of the agency, are required by the subsection to open their meetings to the public.[81]

The corresponding House Report, while less explicit on this point, also supports a reading of the Act that would exclude the FSB from the Act's open-meeting requirements. In its discussion of section 3 of the House bill—now 5 U.S.C. § 552b—the report notes that "panels or boards authorized to submit recommendations, preliminary decisions, or the like to the *full* commission, or to conduct hearings on behalf of the agency are required to comply with the provisions of section 552b."[82] The report's use of the phrase "full commission" suggests that the House intended that covered "panels or boards" would include at least some members of the agency's collegial body. Similarly, the report notes that the term "agency" includes "any subdivision thereof authorized to act on behalf of the agency (without regard to the number of members composing or included in the subdivision)"—again suggesting that a "subdivision thereof" includes at least *some* members of the collegial body heading an agency.[83]

---

[81] *Id.* (emphases added).

[82] H.R. Rep. No. 940-880, pt. 1, at 7 (1976) (emphasis added).

[83] *Id.* at 7.

Both reports also emphasize that the open-meeting provisions apply only to agencies "headed by a collegial body composed of two or more members."[84] The Senate Report explains the reasoning behind that decision: "Multiheaded agencies operate on the principle of give-and-take discussion between agency heads. . . . The single-headed agency operates differently. Only the single head is ultimately responsible for agency actions, while the staff functions as extensions of the head."[85] This distinction would not be warranted if employees other than the agency heads were subject to the open-meeting provisions; a meeting between several employees of a single-headed agency would involve the same "give-and-take discussion" as a meeting between several employees of a multiheaded agency. In sum, both the Senate and House reports indicate that the Sunshine Act's open-meeting provisions do not apply to the FSB.

Because the Sunshine Act does not apply to the FSB, the Court does not reach the parties' arguments regarding whether the FSB's actions would constitute a violation of the Sunshine Act and what the proper remedies for alleged violations of the Act are.

## II.     The Kake Hunt

The State asserts that the FSB's actions regarding the Kake hunt violated the APA for several reasons. First and foremost, it maintains that "the FSB's

---

[84] *Id.* at 7; *see also* S. Rep. No. 94-354, at 16–17.

[85] S. Rep. No. 94-354, at 16–17.

regulation at 50 C.F.R. § 100.19 is invalid to the extent the regulation authorizes opening a hunting or fishing season" because both the text and legislative history of ANILCA indicate that Congress did not intend to grant such authority to federal agencies.[86] The State also contends that (1) the FSB's decision was not supported by substantial evidence; (2) the FSB violated ANILCA by delegating the administration of the hunt to an entity outside a federal agency, issuing a permit that improperly limited participation in the hunt, and initially refusing to share certain information about the hunt with ADF&G; and (3) the FSB violated its "rules and procedures for its own operations that require public meetings."[87]

In response, the FSB asserts that (1) its actions were lawful under the APA, ANILCA, and its own regulations; and (2) the State's claims regarding the Kake hunt are moot, noting that "the Kake hunt occurred over a year ago and it was the only such hunt approved under the FSB's COVID-19 delegation process that expired on June 1, [2021]."[88] The Court will address the second contention as a threshold matter as the Court lacks jurisdiction to consider the merits of the State's claims if they are moot and do not fall under an exception to the mootness doctrine.[89]

---

[86] Docket 49 at 26–31; Docket 62 at 10–11.

[87] Docket 49 at 8, 14, 19, 31–39; Docket 62 at 11–16, 21, 29.

[88] Docket 50 at 28–29, 34–47.

[89] *See Vegas Diamond Props., LLC v. FDIC*, 669 F.3d 933, 936 (9th Cir. 2012) ("[A]s a prerequisite to our exercise of jurisdiction, we must satisfy ourselves that a case is not moot.");

"The mootness doctrine 'requires that an actual, ongoing controversy exist at all stages of federal court proceedings.'"[90] A claim generally must be dismissed as moot if "events subsequent to the filing of the case resolve the parties' dispute."[91] However, there exists an exception to the mootness doctrine for "a controversy that is 'capable of repetition, yet evading review.'"[92] That exception applies where "(1) the duration of the challenged action is too short to allow full litigation before it ceases or expires, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the challenged action again."[93] "Unlike the initial mootness question, where the *defendants* have the burden, '[u]nder the "capable of repetition" prong of the exception to the mootness doctrine, the *plaintiffs* have the burden of showing that there is a reasonable expectation that they will once

---

see also *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1208 (9th Cir. 2021) ("The case or controversy requirement of Article III . . . deprives federal courts of the jurisdiction to hear moot cases." (quoting *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir. 1984))).

[90] *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)); *see also Arizonans for Off. English v. Arizona*, 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975))).

[91] *Leigh*, 677 F.3d at 896 (quoting *Pitts*, 653 F.3d at 1086); *see also Native Vill. of Nuiqsut*, 9 F.4th at 1210 ("[O]ur duty to examine mootness is an ongoing obligation.")).

[92] *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

[93] *Native Vill. of Nuiqsut*, 9 F.4th at 1209 (quoting *Wildwest Inst. v. Kurth*, 855 F.3d 995, 1002–03 (9th Cir. 2017)); *see also Kingdomware Techs.*, 136 S. Ct. at 1976.

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 25 of 49

again be subject to the challenged activity . . . .'"[94]  Courts apply the capable of repetition, yet evading review exception "only in exceptional situations."[95]

In its previous order at Docket 37, this Court found that the State's claims regarding the Kake hunt were not moot as of November 2020—in part due to the "capable of repetition, yet evading review" exception.[96]  The Court explained then:

> The State's motion seeks to enjoin more than the Kake hunt: it asks the Court to enjoin Defendants from delegating regulatory authority to in-season managers, from opening any future hunt for COVID-19-related reasons, from refusing to share harvest information, and from delegating administrative authority outside of federal agencies.  Thus, to the extent the State's motion applies to future hunts, which could well occur during the pendency of this litigation, the completion of the Kake hunt does not render the State's request for preliminary injunction moot.
>
> As to the State's challenges to the emergency Kake hunt itself, the Court obviously cannot grant the State the relief that it seeks. However, as the parties noted, there exists an exception to the mootness doctrine for a controversy that is "capable of repetition, yet evading review." . . .
>
> The Court concludes that the exception to the mootness doctrine applies to the emergency Kake hunt.  These emergency hunts are necessarily limited to 60 days or less, which is too short a period of time to complete judicial review.  Moreover, it is reasonably likely that Defendants may authorize other emergency hunts and that those hunts may be delegated to members of the community to oversee.  The FSB's delegation of authority to local land managers does not expire until June 2021, and the COVID-19 pandemic is ongoing.[97]

---

[94] *Native Vill. of Nuiqsut*, 9 F.4th at 1209 (citation omitted) (alteration in original) (quoting *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985)).

[95] *Spencer*, 523 U.S. at 17 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)).

[96] *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 501 F. Supp. 3d 671, 684–86 (D. Alaska 2020).

[97] *Fed. Subsistence Bd.*, 501 F. Supp. 3d at 685–86.

The FSB acknowledges the Court's prior decision but contends that "today's changed circumstances require a different result," noting that "[t]he delegation process has expired and the COVID-19 pandemic has abated considerably."[98] It asserts that the "capable of repetition, but evading review" exception does not apply because the FSB "[has] not authorized similar hunts, [has] not issued renewed delegations, and there is no basis in the present record for finding that the Kake hunt creates a template or is any way predictive of the FSB's response to a different request."[99] Rather, the FSB maintains, "[t]he Kake hunt was a discrete response on a particularized record to address one remote community's needs during a global pandemic."[100]

The State appears to concede that—given the expiration of the delegation process—its claims are moot unless a mootness exception applies. It contends that the "capable of repetition, but evades review" exception is applicable here because it is "certainly possible" that the FSB could authorize similar hunts or issue further delegations in the future, and those incidents would be sufficiently brief to evade review.[101] Regarding the likelihood of future actions, the State asserts that "there is no commitment by the FSB to *not* issue further delegations, nor is there a

---

[98] Docket 50 at 40.  When the FSB filed its brief in July 2021, the COVID-19 pandemic *had* abated considerably, but Alaska experienced another surge in fall 2021.  *See infra* notes 103–04.

[99] Docket 50 at 40–41.

[100] Docket 50 at 40.

[101] Docket 62 at 18.

commitment by the FSB to not, itself, authorize opening further Covid-19-related hunting or fishing seasons."[102] And it disputes the FSB's claim that the pandemic has "abated considerably,"[103] pointing to "the current pandemic surge throughout Alaska and the fact that hospitals are now overwhelmed," which was certainly the case when its reply brief was filed on August 27, 2021.[104]

The Court is unpersuaded that the instant motion presents an "exceptional situation" justifying the application of the "capable of repetition, yet evading review" exception. The sixty-day length of the Kake hunt certainly satisfies the limited durational requirement of the exception,[105] and the one-year length of the delegation likely does as well.[106] But the exception also requires the plaintiff to demonstrate "a reasonable likelihood" that they will be subject to the same action again.[107] This Court's previous conclusion that the Kake hunt was subject to the exception was premised on the FSB's then-ongoing delegation to local land managers,[108] but that delegation has since expired. And the State has failed to

---

[102] Docket 62 at 17.

[103] Docket 50 at 40.

[104] Docket 62 at 17.

[105] *See* Docket 62 at 19 (explaining that the deadline for serving an answer in federal court and the "general timelines required in litigation" would "make it next to impossible" to challenge 60-day emergency seasons (citing Fed. R. Civ. P. 12(a)(2))).

[106] *See, e.g.*, *Kingdomware Techs.*, 136 S. Ct. at 1976 (allowing judicial review of expired short-term contracts that were performed in less than two years).

[107] *See id.*; *see also Lyons*, 461 U.S. at 109.

[108] *See Fed. Subsistence Bd.*, 501 F. Supp. 3d at 686 (concluding "it is reasonably likely that

---

demonstrate that another such delegation is reasonably likely. The parties appear to agree that the FSB had never delegated the authority to open emergency seasons before the 2020 delegation,[109] and the FSB has not renewed the delegation or indicated any intention of doing so. Moreover, even when the 2020 delegation was active, the FSB only approved one emergency season: the Kake hunt. And while the State is correct that COVID-19 rates increased considerably this fall in Alaska, there is no indication in the record that food security concerns in rural communities are ongoing. Given all this, there is not a reasonable likelihood that the FSB will issue a similar delegation to local land managers or approve similar hunts in the future—thus, the State's claims do not satisfy the "capable of repetition, yet evading review" exception to the mootness doctrine. Because the State's claims regarding the Kake hunt must be dismissed as moot, the Court does not reach the merits of those claims.[110]

## III. Closure of Units 13A and 13B

The State alleges that the FSB's decision to close Units 13A and 13B to non-federally qualified users was arbitrary and capricious. The State bases this

---

Defendants may authorize other emergency hunts" because "[t]he FSB's delegation of authority to local land managers does not expire until June 2021"); *id.* (distinguishing *Fund for Animals v. Mainella*, 335 F. Supp. 2d 19 (D.D.C. 2004), on the basis that "the FSB's continued delegation of authority to local land managers allows them to open emergency 60-day hunts").

[109] *See* Docket 49; Docket 50; Docket 62.

[110] *See Native Vill. of Nuiqsut*, 9 F.4th at 1216 ("With the case being moot, our court and the district court are without jurisdiction to decide this case. . . . [B]ecause we do not have jurisdiction, we cannot consider the merits of Plaintiffs' claims.").

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 29 of 49

contention on the following grounds:  First, the FSB violated ANILCA by imposing restrictions on an improper basis.  Second, the record lacked substantial evidence to support the FSB's closure decision.  Third, the FSB closed state lands over which it has no authority in violation of ANILCA.  Fourth, the FSB's actions interfered with the State's authority to manage wildlife in violation of ANILCA.  Fifth, the FSB failed to provide a reasoned explanation for its change in position given that it rejected a similar proposal in 2019.  Sixth, the FSB violated its own regulations by closing the units for longer than necessary.  Seventh, the FSB violated "rules and procedures for its own operations that require public meetings." And eighth, the FSB violated APA § 553 in imposing the closure because it "failed to provide proper notice and grace periods, where no exigency existed."[111]  The Court does not address the State's final two grounds because they were not raised in the State's Complaint or Opening Brief but rather raised for the first time in the State's Reply.[112]  The Court will address each of the State's remaining contentions in turn.

*First*, the State asserts that "[n]othing in ANILCA or caselaw allows a closure to avoid competition from other hunters."[113]   It points to section 815 of ANILCA,

---

[111] Docket 49 at 40–53; Docket 62 at 6–9, 23–29.

[112] *See Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived." (citing *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)); Docket 1 at 2, ¶ 2; Docket 49; *see also Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

[113] Docket 49 at 41.  The State asserted earlier in this litigation that "public safety" was also an

which allows the federal government to adopt restrictions on non-subsistence uses if "necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 3126 of this title [section 816], to continue subsistence uses of such populations, or pursuant to other applicable law."[114] In response, the FSB contends that the State's reading of ANILCA "defies common sense and basic concepts of causality" because ANILCA's subsistence priority plainly allows the federal government to manage "user conflict."[115] It notes that Title VIII "explicitly directs the FSB to prioritize subsistence uses over non-subsistence uses," directing the FSB to "discriminat[e] between different types of hunters, i.e., subsistence and non-subsistence hunters."[116]

The Court finds that the FSB instituted the closure on permissible bases under section 815. Although "competition" is not an enumerated reason for the restriction of non-subsistence uses under section 815, the Board clearly viewed competition between users as linked to both subsistence and public safety concerns—the overarching reasons for its decision to adopt WSA 20-03. When testifying before the FSB, Ms. Maas explicitly drew this connection, explaining the OSM's conclusion that "[a] closure may reduce competition from non-Federally-

_____

improper basis for closure, *see* Docket 3-1 at 11, but it appears to have abandoned that contention.

[114] 16 U.S.C. § 3125(3).

[115] Docket 50 at 48.

[116] Docket 50 at 49.

qualified users, increasing hunting opportunity and harvest success of Federally-qualified subsistence users."[117]  Further, much of the testimony presented to the FSB linked public safety concerns to overcrowding.  Given the clear connection between competition and two of the permissible bases for restrictions under section 815, it was not improper for the FSB to mention "competition" when discussing its subsistence and public safety rationales for adopting WSA 20-03 as modified.

**Second**, the State contends that "[t]he record lacks substantial evidence to support a conclusion that any closure, much less an extended closure, was necessary to continue subsistence."[118]  It asserts that "the FSB disregarded written comments and relied solely on Lisa Maas, who selectively presented only partial information."[119]  The State primarily disputes that federally qualified users are negatively impacted by competition from state hunters, noting that "[t]he record shows that federally qualified users had longer seasons for both moose and caribou, with the areas already to themselves without competition from hunters who may only hunt under State regulations."[120]  It asserts that the FSB "ignored" information presented to it on this point, highlighting a memorandum submitted to

---

[117] Docket 18-1 at 8; *see also* Docket 18-1 at 8–9 (testimony of Ms. Maas) (discussing safety concerns resulting from "intense hunting pressure" and "overcrowding").

[118] Docket 49 at 44.

[119] Docket 62 at 24.

[120] Docket 49 at 43–44.

the Board by Mr. Mulligan that concluded that "[f]ederal hunt data does not support the interpretation that the number of state hunters in the field negatively impacts either moose or caribou hunt success on federal permits in Unit 13."[121]  The State also asserts that the FSB's suggestion that "federally qualified hunter success may be declining . . . is contradicted by information in the record that annual harvest rates have remained consistent."[122]  Further, the State appears to suggest that there are other explanations for lower rates of success for federally qualified subsistence uses, asserting that "[t]he FSB did not even consider hunter effort, even though people previously testified they were not hunting."[123]

The State also disputes the FSB's conclusion that public safety concerns warranted the closure.  It quotes the Mulligan memorandum, which concluded that "no hunting-related accidents have been reported in Unit 13 to substantiate a public safety concern related to excessive hunting pressure."[124]  The memorandum conceded that "questionable hunting practices do create a public safety concern when caribou are migrating across the Richardson Highway" because of "traffic jams caused by hunters walking on and/or parking on the

---

[121] Docket 49 at 46; *see also* Docket 32-3 at 204 (Mulligan memorandum).

[122] Docket 62 at 27–28 (citing Docket 32-3 at 44 (testimony of Ms. Maas) (summarizing ADF&G written comments); Docket 32-3 at 62 (statement of Mr. Padgett)).

[123] Docket 62 at 24; *see also* Docket 62 at 26 ("[I]t is important to keep in mind that opportunity is provided but there is no promise of success.  The diligence and effort of a hunter are critical factors.").

[124] Docket 49 at 47 (quoting Docket 32-3 at 205 (Mulligan memorandum)).

pavement of the Richardson Highway in narrow and dangerous sections of the road."[125] However, the memorandum maintained that this situation would occur regardless of whether state hunters were restricted from hunting caribou.[126]

The FSB responds that the State is merely "second-guessing the FSB's exercise of discretion, which is not a sufficient basis for overturning an agency decision under the APA."[127] It maintains that it did not "fail[] to consider [the State's] preferred facts" but rather "assigned them a different weight and drew different conclusions."[128] It points out that the State "list[s] a number of facts and issues that the FSB allegedly 'ignored,' but confusingly references pages in the transcript of the July 16, 2020, meeting where the FSB literally discussed those same facts and issues."[129] As one example, the FSB notes that federally qualified hunters' additional harvest opportunities "[were] addressed in the OSM Staff Analysis, and were thereby considered by the FSB."[130]

Moreover, the FSB disputes the State's contention that federally qualified users have access to meaningfully greater harvest opportunities. It asserts that

---

[125] Docket 32-3 at 205.

[126] Docket 32-3 at 205.

[127] Docket 50 at 51.

[128] Docket 50 at 51.

[129] Docket 50 at 51 (noting that Mr. Mulligan's memorandum was provided to the FSB and was "fully considered when making [the] decision—hence its inclusion in the administrative record").

[130] Docket 50 at 19.

"[a]ny discussion about additional opportunities for federal subsistence users in the form of a longer hunting season fails to recognize that, in recent years, ADFG has issued emergency orders extending its season beyond the approved end date of the [sic] September 21, which has negated the rural priority on public lands and undermined the FSB [sic] efforts to meet its mandate under Title VIII."[131]  And it notes that "[w]hile the season for moose opens one month earlier for Federally-qualified subsistence users, 'most moose are harvested in mid-September due to cooler weather and increased bull susceptibility to harvest' limiting any Federal subsistence priority afforded by the longer season."[132]

Further, the FSB contends there was ample evidence in the record showing that "closure is warranted for continuations of subsistence uses."[133]  It asserts that "[f]ederal subsistence harvest success rates have been lower than for State hunters, a fact noted by the FSB in reaching its decision."[134]  In particular, it highlights subsistence hunters' lower success rate for moose harvesting, noting that the fact that "those most dependent on the resource are suffering such

---

[131] Docket 50 at 19–20; *see also* Docket 50 at 51 ("A fact that Plaintiff actively ignores in its briefs, however, is that in recent years, the State has issued emergency orders extending the caribou season to end on the same day as the Federal season . . . ."); Docket 18-1 at 6 ("One testifier pointed out that ADF&G has extended the State's fall caribou season in recent years precluding a rural priority from a longer fall season.").

[132] Docket 50 at 20 (quoting Docket 32-3 at 191).

[133] Docket 50 at 52.

[134] Docket 50 at 20 (citing Docket 32–3 at 47, 65).

dismissal success rates in itself argues for action to be taken to continue subsistence uses."[135]

The record demonstrates that the FSB relied on public safety concerns as one basis for adopting WSA 20-03 as modified.[136] The FSB's decision was based in part on testimony by the proponent, who stated that "the area is too crowded to safely hunt as people aim guns at one another and shoot over people's heads,"[137] and testimony by multiple members of the public who "echoed these safety and overcrowding concerns."[138] The OSM and the ISC cited public safety concerns when recommending that the FSB adopt the modified proposal.[139] The FSB also adopted the closure as "necessary . . . to continue subsistence uses."[140] That determination was based on testimony by the proponent that a closure was

---

[135] Docket 50 at 52.

[136] *See* Docket 18-1 at 26–27.

[137] Docket 18-1 at 6 (testimony of Ms. Maas) (summarizing proponent's rationales).

[138] Docket 18-1 at 6 (testimony of Ms. Maas) (summarizing testimony from public hearing on WSA 20-03); *see also* Docket 18-1 at 21 (public comment) ("My concern is dealing simply with the public safety issues. . . . I have had numerous very dangerous situations with road hunting in the area and just the amount of traffic on the highway does present a significant public hazard to me, personally. And I think this would be a good step in the right direction.").

[139] Docket 18-1 at 8–9 (testimony of Ms. Maas) ("Closure for reasons of public safety may be warranted. Safety concerns resulting from intense hunting pressure, overcrowding, disruption of hunts, and unsafe shooting practices have been repeatedly stated by all user groups."); Docket 18-1 at 17 ("The InterAgency Staff Committee concurs with the OSM Staff analysis that the request . . . is justifiable to improve safety and reduce user conflicts . . . . [S]pacial and temporal concentration of hunters along the highway on Federal lands has the potential to lead to serious safety issues and has already led some subsistence users to avoid the area thus reducing opportunity.").

[140] 16 U.S.C. § 3125(3); Docket 18-1 at 26.

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 36 of 49

"necessary due to extreme hunting competition . . . which precludes a rural subsistence priority and results in low harvest success by Federally-qualified subsistence users,"[141] testimony by members of the public,[142] and household surveys in which "almost every Unit 13 community noted concern over non-local hunters[,] stating that non-local hunters who have lots of expensive equipment were out competing local hunters and driving game away."[143]  The FSB also relied on the OSM's recommendation, which highlighted lower moose harvest success rates for federally qualified users compared to non-federally qualified users,[144] and the ISC's recommendation, which agreed that a closure was justifiable to continue subsistence uses of moose and caribou in Units 13A and 13B.[145]  The State contends that the FSB "relied solely on Lisa Maas" in making its decision, but the record demonstrates that the FSB heard from multiple members of the public and other stakeholders.  Further, it was reasonable for the FSB to heavily weigh Ms.

---

[141] Docket 18-1 at 4 (testimony of Ms. Maas) (summarizing the proponent's rationales).

[142] Docket 18-1 at 6 (testimony of Ms. Maas) ("Several supporters of the request referenced Title VIII of ANILCA calling for a rural subsistence priority.  One testifier pointed out that ADF&G has extended the State's fall caribou season in recent years precluding a rural priority from a longer fall season.").

[143] Docket 18-1 at 7 (testimony of Ms. Maas).

[144] Docket 18-1 at 7–8; *see also* Docket 18-1 at 8 ("[A]s most caribou harvest occurs under State regulations and caribou in Unit 13 experience extremely heavy hunting pressure, a closure may reduce competition and limit disruption to caribou movements which may increase hunting opportunity and harvest success by Federally-qualified subsistence users.").

[145] Docket 18-1 at 17.

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 37 of 49

Maas's testimony given that she not offering her personal opinion, but rather summarizing testimony and data from multiple other sources.

The record also reflects that the FSB considered alternatives to WSA 20-03 as modified. Mr. Peltola raised the possibility of limiting federal permits instead of imposing the closure.[146] The OSM responded that permits issued under federal regulations had increased only slightly in the past several years, so it was unlikely that the suggested alternative would meaningfully reduce competition for subsistence users.[147] FSB member Greg Siekaniec suggested a shorter temporary closure from September 21 to 30 to "provide that additional opportunity" for federally qualified users during the caribou season,[148] which the OSM opined "would probably help the issue but . . . wouldn't be a complete solution addressing the local subsistence users [sic] concern for the immense competition and safety . . . [and] would not really address the moose hunt at all."[149] Both Mr. Peltola and Mr. Siekaniec ultimately voted in favor of the modified proposal.[150] While some members of the public and Mr. Padgett contended that public safety issues

---

[146] Docket 18-1 at 9–10.

[147] Docket 18-1 at 11.

[148] Docket 18-1 at 12.

[149] Docket 18-1 at 12.

[150] Docket 18-1 at 25–26.

were better addressed by increased law enforcement,[151] other FSB members rejected that alternative as "outside of the Board's purview."[152]

Further, the FSB did not "ignore" opposing viewpoints as the State contends. At the July 16 meeting, the Board heard testimony in opposition to WSA 20-03 from members of the public and a representative of ADF&G, Mr. Mulligan.[153] At the same meeting, Ms. Maas also summarized written comments in opposition from Resident Hunters of Alaska, opposing testimony given by members of the public during a previous public hearing on the matter, and written comments from ADF&G.[154] The OSM's Staff Analysis also addressed these comments and included Mr. Mulligan's memorandum in full in an appendix.[155]

Based on the foregoing, the Court finds that there was substantial evidence in the record to support the FSB's decision to adopt WSA 20-03 as modified. Under the highly deferential "substantial evidence" standard, an agency's findings are proper "unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result."[156] Here, the FSB considered the relevant factors,

---

[151] Docket 18-1 at 7, 23.

[152] Docket 18-1 at 26 (statement of Mr. Striker); *see also* Docket 18-1 at 9 (testimony of Ms. Maas) ("While these concerns may be better addressed through increased law enforcement or restrictions along road sides, these options have not been implemented and are outside of the Board's authority.").

[153] *See* Docket 18-1 at 5, 21–22.

[154] Docket 18-1 at 5–7.

[155] *See* Docket 32-3 at 174, 184–85, 201–06.

[156] *Monjaraz-Munoz*, 327 F.3d at 895 (quoting *Singh-Kaur*, 183 F.3d at 1149–50).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 39 of 49

the record contained ample evidence to support the Board's decision, and the Board articulated a rational connection between that evidence and its decision.

**Third**, the State contends that the FSB improperly closed State lands. It asserts that the FSB's initial announcement of the closure "improperly informed the public that the federal closure also closed state lands, including submerged lands, within federal boundaries."[157] The FSB responds that it issued a revised press release on September 2, 2020, "clarifying that non-Federally qualified users can take moose and caribou on gravel bars along navigable waters below the ordinary high water mark even when the adjacent uplands are Federal public lands because those gravel bars are state-owned submerged lands."[158] But the State notes that the press release was issued after State caribou and moose seasons had begun and contends that it only partially corrected the FSB's error because it "did not reflect that all navigable water below the high water mark is State land."[159]

The original press release did not in itself close any state lands; but it did state that non-federally qualified hunters could "take moose and caribou between the edge of the river and the ordinary high water mark along navigable waters on BLM lands."[160] The release stated that hunting was permissible on "the strip of

---

[157] Docket 49 at 48.

[158] Docket 50 at 52.

[159] Docket 62 at 26.

[160] Docket 32-3 at 213.

land—often a gravel or mud bar—between the edge of the river and the 'ordinary high water mark,'"[161] which may have implied to some readers that gravel bars *within* the river were off limits; however, the release did not explicitly state that such gravel bars were closed to non-federally qualified users. The release also cautioned that "both the hunter AND the caribou must be *above* the actual water line . . . for the harvest to be legal."[162] Based on the briefing for the instant motion, both the State and the FSB now appear to agree that the State has authority over lands below the high water mark of inland navigable waters.[163] Thus, to the extent that moose and caribou standing on the riverbed partially submerged in water are considered "below the water line," the State is correct that the original press release misstated the bounds of federal and state lands.

The revised press release, while not a model of clarity, resolved the gravel-bar ambiguity and corrected the original press release's error regarding submerged lands. First, the revised release simply stated that "non-Federally qualified users [can] take moose and caribou on gravel bars along navigable waters below the 'ordinary high water mark.'"[164] Second, the FSB removed the

---

[161] Docket 32-3 at 213.

[162] Docket 32-3 at 213.

[163] *See* Docket 49 at 48; Docket 50 at 52; Docket 62 at 26; *see also United States v. Alaska*, 521 U.S. 1, 6 (1997); Alaska Statehood Act, Pub. L. No. 85-508, § 6(m), 72 Stat. 339, 343 (1958) (codified as amended at 43 U.S.C. § 1301 note (Application to State of Alaska)); *Lessee of Pollard v. Hagan*, 44 U.S. (3 How.) 212, 228–29 (1845).

[164] Docket 24-2 at 2.

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 41 of 49

language requiring game to be above the actual water line, thus no longer advising hunters not to take moose or caribou standing on the riverbed. The revised release also noted that "the taking of swimming moose and caribou is prohibited under Federal and State law in all portions of Unit 13,"[165] implying that taking game that is not swimming but rather standing in the water is permissible. Given the above, the Court finds that the revised press release does not inform the public that a non-federally qualified hunter is prohibited from taking a moose or caribou standing in navigable waters.

*Fourth*, the State maintains that the FSB's approval of WSA 20-03 violated ANILCA because it impeded the State's ability to manage wildlife as required by the Alaska Constitution. The State notes that ANILCA "expressly protect[s] the State's authority to manage wildlife, including on federal public lands," by requiring that closures by the federal government be "necessary" under section 815.[166] This contention is not separable from the State's first two claims, rejected above, that the FSB closed Units 13A and 13B on an improper basis and that the record lacked substantial evidence to support a closure to continue subsistence uses. By granting to federal agencies the authority to impose closures under certain circumstances, ANILCA necessarily tolerates some level of federal interference with state authority if an action is otherwise permissible under section 815. Thus,

---

[165] Docket 24-2 at 2 (citing 50 C.F.R. § 100.26(b)(15); Alaska Admin. Code tit. 5, § 92.085(7)).

[166] Docket 49 at 48–50.

because the FSB's decision rested on proper grounds and was supported by substantial evidence, it did not upset the balance that ANILCA strikes between state and federal authority.

**Fifth**, the State asserts that the FSB violated the APA because "[t]here was no new factual information before the FSB in 2020 to support an arbitrary change in position after denying an identical proposal in 2019."[167]  The Supreme Court addressed what the APA requires when an agency changes its policy in *FCC v. Fox Television Stations, Inc.*[168]  Per *Fox*, "a policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'"[169]

The State describes the 2019 proposal as "identical" and asserts that the policy change was not based on "new facts" because "selecting the areas where accessible federal public lands are located and extending the closure to two years[]

---

[167] Docket 49 at 50; *see also* Docket 49 at 50 ("It is a violation of the APA for an agency to not provide a reasoned explanation for disregarding its previous factual findings." (citing *Friends of Alaska Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1139 (D. Alaska 2019))).

[168] 556 U.S. 502 (2009).

[169] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox*, 556 U.S. at 515–16 (emphasis omitted)).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 43 of 49

do not constitute 'new information' brought before the FSB."[170]  The FSB responds that the policy change was justified both because the 2019 proposal and WSA 20-03 as adopted differed in scope and because the FSB considered new information in adopting WSA 20-03.[171]  First, it notes that "[t]he 2019 proposal would have closed the entirety of Unit 13," whereas "the 2020 decision was much more limited," and it maintains that "[this] limitation factored heavily into the FSB's analysis and reasoning."[172]  Second, the FSB asserts that it considered new information regarding the success rates of federally qualified subsistence users: that federally qualified users had an 11% success rate in the moose harvest compared to a 17% success rate for non-federally qualified users.[173]

The Court finds that the FSB's decision to adopt WSA 20-03 after rejecting the 2019 proposal complies with *Fox*'s requirements for policy changes and thus was not arbitrary and capricious.  First, the record demonstrates that the FSB displayed "awareness that it [was] changing position" during the 2020 deliberations.[174]  Mr. Siekaniec, for example, raised concerns over the similarity of the 2020 and 2019 proposals, which Ms. Maas addressed by explaining the difference in scope between the 2019 proposal and the OSM's proposed

---

[170] Docket 50 at 51.

[171] *See* Docket 50 at 52–53.

[172] Docket 50 at 53.

[173] Docket 50 at 53; *see also* Docket 18-1 at 7–8.

[174] *Fox*, 556 U.S. at 515 (emphasis omitted).

Case No. 3:20-cv-00195-SLG, *State of Alaska v. Federal Subsistence Board, et al.*
Decision & Order
Page 44 of 49

modification in 2020.[175]  The OSM and other FSB members referenced the 2019

proposal at other points throughout the work session as well.[176]  Second, the FSB

asserts that the new policy is "permissible under the statute" as discussed

above.[177]  Third, the FSB's decision to adopt WSA 20-03 evidences its belief that

the new policy is better.[178]

Whether the FSB must satisfy the fourth *Fox* requirement of a "reasoned

explanation" for its policy change depends on whether it relied on factual findings

that contradict those underlying its decision on the 2019 proposal.[179]  In rejecting

the 2019 proposal, the Board reasoned that the closure was not warranted for

continuation of subsistence uses because "[f]ederally-qualified subsistence users

[sic] annual harvest rates have remained fairly consistent in comparison to the

annual harvest rates by non-Federally-qualified users."[180]  And it found that "the

closure would not have alleviated public safety concerns as non-Federally-

qualified users would still have been able to cross Federal public lands to access

---

[175] Docket 18-1 at 13.

[176] *See, e.g.*, Docket 18-1 at 5 (Ms. Maas discussing the 2019 proposal); Docket 18-1 at 10 (FSB member Peltola noting that "the Board addressed a similar proposal 19-03 which was rejected by the Board").

[177] *See supra* pp. 31–32.

[178] *See Fox*, 556 U.S. at 515 ("It suffices that . . . the agency *believes* it to be better, which the conscious change of course adequately indicates."); *Organized Vill. of Kake*, 795 F.3d at 967 ("[W]e assume the Department 'believes' the new policy is better because it decided to adopt it." (quoting *Fox*, 556 U.S. at 515 (emphasis omitted))).

[179] *See Organized Vill. of Kake*, 795 F.3d at 966 (quoting *Fox*, 556 U.S. at 516).

[180] Docket 18-1 at 5 (testimony of Ms. Maas).

State and private lands."[181]  In 2020, by contrast, it adopted WSA 20-03 as modified because it determined that the closure was necessary to address public safety concerns and to continue subsistence uses.[182]  Because these findings are contradictory, the Board must provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[183]

The FSB has fulfilled its duty to provide such a reasoned explanation.  First, the record demonstrates that the OSM's proposed modification to WSA 20-03, reducing its scope to only Units 13A and 13B, caused the FSB to weigh the available information differently than it had in 2019—concluding that a partial closure of Unit 13 was warranted even if a full closure was not.  Indeed, one FSB member stated that he would have voted against WSA 20-03 in its unmodified form.[184]  Second, the FSB also considered newly available moose harvest success rates for federally qualified users, which showed that subsistence users were experiencing low success on both an absolute and relative scale.[185]  The Board highlighted this new information in concluding that a closure was warranted for

---

[181] Docket 18-1 at 5 (testimony of Ms. Maas).

[182] *See* Docket 18-1 at 26.

[183] *Fox*, 556 U.S. at 516.

[184] *See* Docket 18-1 at 24 (statement of Mr. Striker); *see also* Docket 18-1 at 26 (statement of Mr. Striker) ("[W]e believe that this action is . . . targeted to problem areas.").

[185] *See* Docket 18-1 at 7–8 (testimony of Ms. Maas).

continuation of subsistence uses.[186]  Particularly given that "[m]ost moose harvest on Federal lands occurs in Unit 13B,"[187] the FSB's reliance on the proposed reduced scope of the closure and the new data about moose harvest success is sufficient to constitute a reasoned explanation for departing from the factual findings underlying the Board's decision on the 2019 proposal.

*Sixth*, the State contends that the FSB violated its own regulation—50 C.F.R. § 100.19(b)—by instituting a two-year closure instead of a shorter one.[188] Section 100.19(b)(2) governs the duration of temporary special actions: "The length of any temporary action will be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances. In any event, a temporary opening or closure will not extend longer than the end of the current regulatory cycle."[189]  The State focuses on the "minimum time period . . . necessary" language, asserting that the two-year duration of the closure was not necessary but rather was selected solely to "avoid an administrative burden."[190]  The FSB responds that the two-year closure, extending to the end of

---

[186] *See* Docket 18-1 at 26 (statement of Mr. Striker) ("I think there's a little bit of new information in the success rates that we have most recently and it's troubling to us that the Federally-qualified subsistence user success rate is significantly lower than non-Federally-qualified users. That doesn't seem to be the direction we're supposed to head in.").

[187] Docket 18-1 at 8 (testimony of Ms. Maas).

[188] Docket 49 at 8.

[189] 50 C.F.R. § 100.19(b)(2).

[190] Docket 49 at 52.

the regulatory cycle, "would justifiably reduce administrative burdens" due to the longstanding nature of the issues in Unit 13 and the fact that "'no change in the situation'" was expected in the next year.[191]

The Court finds that the two-year closure did not violate § 100.19(b)(2)'s requirement that closures be only for the minimum time necessary. The OSM's suggestion that extending the closure could reduce "administrative burden" was explicitly premised on its belief that the ongoing nature of the issues in Unit 13 would inevitably result in the need to process an identical request in a year's time.[192] Given the OSM's recommendation and the information in the record,[193] it was reasonable for the FSB to conclude that two years was the "minimum time period . . . necessary under the circumstances." Thus, the FSB's adoption of the OSM's recommendation did not run afoul of § 100.19(b)(2).

## CONCLUSION

For the foregoing reasons, Plaintiff's request for declaratory and permanent injunctive relief is DENIED. The Court lacks jurisdiction over the issues associated with the Kake hunt because that portion of the State's claims are moot, and the

---

[191] Docket 50 at 53–54 (quoting Docket 32-3 at 48).

[192] *See* Docket 18-1 at 9 (testimony of Ms. Maas) ("This has been an issue for decades, [and] no change in the situation [is] expected between this year and the next.").

[193] *See, e.g.*, Docket 18-1 at 7 (testimony of Ms. Maas) ("Conflicts between local and non-local hunters has [sic] been a longstanding issue in Unit 13."); Docket 18-1 at 9 (testimony of Ms. Maas) ("[S]afety concerns have been an issue for decades . . . ."); Docket 18-1 at 26 (statement of Mr. Striker) ("[W]e've had serious safety concerns that have remained unaddressed for decades potentially.").

FSB's decision to close Units 13A and 13B to non-subsistence users was not arbitrary or capricious.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 3rd day of December, 2021, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE